# United States District Court
# District of Massachusetts

| | |
|---|---|
| ROBERT J. HARRINGTON, et al., | Civil Action No. 04–12558–NMG |
| *Plaintiffs,* | |
| *v.* | |
| DELTA AIR LINES, INC., et al., | |
| *Defendants.* | |

## PLAINTIFFS' COMBINED OPPOSITION TO THE MOTIONS TO DISMISS OF THE DOMESTIC DEFENDANTS, ALASKA AIRLINES, THE AIR TRANSPORT ASSOCIATION OF AMERICA, INC., AND DEUTSCHE LUFTHANSA A.G.

---

## I. INTRODUCTION

The plaintiffs submit this combined opposition to the Motions to Dismiss filed by (1) defendants Delta Air Lines, American Airlines, Continental Airlines, Northwest Airlines, Southwest Airlines, Alaska Airlines, and the Air Transport Association of America ("ATA") (collectively, the "Domestic Defendants"), (2) Alaska Airlines, (3) ATA, and (4) Deutsche Lufthansa, S.A. ("Lufthansa"). As many of the arguments made are identical, similar, or overlapping, a combined opposition is the most efficient way to address these various motions.

## II. INTENDED AMENDMENT OF COMPLAINT

Plaintiffs filed their Complaint in State court in Massachusetts, stating claims primarily under Massachusetts law. The defendants removed the case to Federal court. Many of the defendants (as listed in the introduction) filed motions to dismiss, on various grounds, including lack of jurisdiction and failure to state a claim.

The plaintiffs intend to file an Amended Complaint within the next 1–2 weeks. Among

other things, technical insufficiencies will be remedied in the Amended Complaint. (The insufficiencies to be addressed include some pointed out by the defendants in their motions.)

## III. ARGUMENT

### A.    Standard of review.

The burden on a motion to dismiss is not on the plaintiffs to demonstrate conclusively that their claims are true, but merely that they are colorable. Rather, the burden is on the defendants to prove that the plaintiffs cannot, under any set of facts consistent with the Complaint, prevail on any cognizable claim. The defendants have not met that burden.

In considering "a motion to dismiss, [the Court] consider[s] only those facts and allegations set forth in the complaint and must view them in a light most favorable to the plaintiff. A complaint should be dismissed only if plaintiff is not entitled to relief under any set of facts he could prove." *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir. 1976) (citing J. Moore and J. Lucas, 2A Moore's Fed. Practice § 12.08 at 2271, 2274). Thus, the Court must accept the factual averments of the complaint as true, and draw all reasonable inferences in favor of the plaintiffs. *Coyne v. City of Somerville*, 972 F.2d 440, 442–443 (1st Cir. 1990).

"It is a well-settled principle of law that a complaint should not be dismissed merely because a plaintiff's allegations do not support the particular theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." *Bowers v. Hardwick*, 478 U.S. 186, 201, 106 S.Ct. 2841, 2849 (1986) (Blackmun, J., dissenting) (citations and internal quotation marks omitted). "Instead of asking whether the complaint points to the appropriate statute, a court should ask whether relief is possible under any set of facts that could be established consistent with the allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (Easterbrook, J.) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102 (1957)). Under the liberal

reading required by Rule 12, "the complaint need not identify a legal theory, and specifying an incorrect theory is not fatal." *Id.*, 953 F.2d at 1078. Moreover, "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir. 1985) (citing 2A Moore's Federal Practice ¶ 12.08 at 2274, 2285 (1984)).

In sum, dismissal is improper "unless it appears beyond doubt that the plaintiff can prove ***no set of facts*** in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. at 102 (footnote omitted); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987). The defendants simply have not met their burden of showing that the plaintiffs cannot make a claim under any set of facts consistent with the allegations of the Complaint.[1]

**B.     Challenges to personal jurisdiction under Rule 12(b)(2) (Alaska Airlines and ATA).**

**1.     Standard of review for personal jurisdiction.**

Plaintiffs have the burden of demonstrating that this Court has personal jurisdiction over the defendants. *Lizotte v. Canadian John Manville Co.*, 387 F.2d 607, 608 (1st Cir. 1967). Generally, the amenability of a foreign corporation to suit in a Federal court in a diversity action is determined in accordance with the law of the State where the court sits.[2] *Walsh v. National Seating Co., Inc.*, 411 F.Supp. 564, 568 (D.Mass. 1976) (citing *Pulson v. American Rolling Mill Co.*, 170 F.2d 193 (1st Cir. 1948)).

---

[1] To the extent that the defendants' Motions to Dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) (and this opposition to those motions) require the Court to consider matters beyond the scope of the Complaint, the motions should be treated as Rule 56 motions for summary judgment. Rule 12(b); *Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234 (1972); *Sloan Const. Co. v. American Renovation and Const. Co.*, 313 F.Supp.2d 24, 30 (D.P.R. 2004). The Court should permit a reasonable period and opportunity for discovery appropriate to a summary judgment motion. Alternatively, the Court should deny the motions and permit discovery as otherwise provided under the Federal Rules of Civil Procedure.

[2] Although the plaintiffs have established diversity in this case (as discussed *infra* at pg. 12 *et seq.*), they do not rely on diversity as their sole basis for Federal court jurisdiction.

Jurisdiction over the person may be either specific or general. General jurisdiction is acquired where there are "continuous and systematic" contacts with the forum State. *LTX Corp. v. Daewoo Corp.,* 979 F.Supp. 51, 58 (D.Mass 1997). To obtain specific jurisdiction under the Massachusetts long-arm statute, Mass.Gen.L. ch. 223A, § 3, the cause of action must "arise from" the conduct upon which long-arm jurisdiction is sought. *See Carlson Corp. v. University of Vermont,* 380 Mass. 102, 106, 402 N.E.2d 483, 486 (1988); *Heins v. Wilhelm Loh Wetzlar Optical Machinery GMBH & Co. KG,* 26 Mass. App. Ct. 14, 22, 522 N.E.2d 989, 994 (1988). The Court may exercise specific jurisdiction over a defendant in a suit arising out of or related to the defendant's contact with the forum. *Id.* But a foreign corporation will not be subject to personal jurisdiction until it has purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240 (1958).

### 2.    General personal jurisdiction over Alaska Airlines.

Alaska Airlines argues that this Court has no jurisdiction over it because neither the airline nor the plaintiff bringing a claim against it (plaintiff Buck) is a resident of Massachusetts and there is no allegation that it does business in Massachusetts. Alaska Airlines analyzes the jurisdictional situation in terms of the specific jurisdiction requirements of the Massachusetts long-arm statute, Mass.Gen.L. ch. 223A, § 3, skirting the question of whether it actually does business here, despite the lack of a specific allegation to that effect in the Complaint.[3] While the plaintiffs believe they could demonstrate specific jurisdiction over Alaska Airlines, they nevertheless argue a general jurisdiction analysis, based on the laws relating to foreign

---

[3] The omission of a paragraph naming Alaska Airlines and identifying it as doing business in Massachusetts was an oversight and will be corrected in the Amended Complaint.

corporations in Massachusetts. Mass. Gen. L. ch. 181 (foreign corporations); *see also* Mass.Gen. L. ch. 223, § 38 (service of process on foreign corporations).

In Massachusetts, a foreign corporation, *see* Mass.Gen.L. ch. 181, § 1, is required to file a certificate with the State secretary. *Id.* at § 4. Moreover, "[f]oreign corporations shall be liable to be sued … in the same manner and to the same extent as individuals who are residents of other states." *Id.* at § 15. "In an action against a foreign corporation … which … is engaged in or soliciting business in the commonwealth, permanently or temporarily, service may be made in accordance with the preceding section relative to service on domestic corporations in general, instead of upon the state secretary." *Id.* at § 38.

Alaska Airlines has been registered as a foreign corporation eligible to do business in Massachusetts since January 25, 2002, and has designated an agent for service of process in the Commonwealth.[4] It operates at least 68 flights out of Boston, most of which are available on any given day.[5] And it operates at least one Internet Web site (http://www.AlaskaAir.com) on which Massachusetts residents (or residents of any other State) may purchase tickets for travel on any of those flights (or the hundreds of others available across the country). *Cf. Venture Tape Corp. v. McGills Glass Warehouse*, 292 F.Supp.2d 230, 233 (D.Mass. 2003) (California company engaged in business by maintaining interactive Internet Web site available to residents of Massachusetts).

In these circumstances, Alaska Airlines is "engaged in a regular, continuous and systematic course of business activity," *Waltham Precision Instrument Co. v. McDonnell Air Corp.*, 310

---

[4] *See* Exhibit A, Mass. Foreign Corp. Registration Record Summary for Alaska Airlines, Inc. (available via online search at <http://corp.sec.state.ma.us/corp/corpsearch/corpsearchinput.asp>).
[5] *See* Exhibit B, Alaska Airlines System Timetable (Feb. 15, 2005 to Apr. 8, 2005) pp. 2–3 (excerpts) (available online at <http://www.alaskatimetable.com/AS.pdf>.)

F.2d 20, 24 (1st Cir. 1962), that constitutes "a sustaining endeavor with a significant degree of permanency and continuity." *Id.* "[T]he activities carried on … were neither irregular nor casual," but were "systematic and continuous [and have doubtless] … resulted in a large volume of interstate business, in the course of which appellant received the benefits and protection of the laws of the state, including the right to resort to the courts for the enforcement of its rights." *International Shoe Co. v. State of Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160 (1945).

"[W]here the corporation's activities more closely approximated the regular conduct of a domestic corporation," *Caso v. Lafayette Radio Electronics Corp.*, 370 F.2d 707, 711 (1st Cir. 1966), or "where the activities of the corporation had a sufficiently substantial impact on the Commonwealth, the connection between the cause of action and the activities need not be present." *Walsh v. Nat'l Seating Co.*, 411 F.Supp. at 575 (D.Mass. 1976). The airline's strong business presence in the Commonwealth demonstrates that it engages in business to a significant extent in Massachusetts. That business is certain to have a substantial effect on commerce here. Since Alaska Airlines' "activities within the forum do approximate those of a domestic corporation, and do substantially affect the commerce of the Commonwealth, the fact that the instant case did not arise from [Alaska]'s activities within this state cannot defeat jurisdiction." *Id.*

In sum, when, as here, a foreign defendant's contacts with a forum are substantial, a suit may be maintained though it concern a matter having no connection with the forum. *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448, 72 S.Ct. 413, 420 (1952); *Volkswagen Interamericana S.A. v. Rohlsen*, 360 F.2d 437, 440 (1st Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 230 (1966). Therefore, this Court has general personal jurisdiction over Alaska Airlines.

**3.     Jurisdiction over Air Transport Association of America (ATA).**

Any demonstration of personal jurisdiction requires a fact-based analysis. In this case, the

facts upon which such an analysis could be made with respect to defendant ATA are in large part within the control of the defendant. The plaintiffs' burden of demonstrating the Court's personal jurisdiction over the defendant ATA cannot be met without appropriate discovery. Thus, in order to be able to demonstrate whether specific or general jurisdiction is appropriate over ATA, the plaintiffs will require some reasonable opportunity for discovery.

### (a)    Factors for analysis of personal jurisdiction.

An illustrative case, specifically with respect to trade associations, is *City of Boston v. Smith & Wesson Corp.*, No. 99–02590, 2000 WL 34018326, *1 (Mass. Super. Nov. 21, 2000) (attached as Exhibit C), which sets out a number of factual factors that may affect the analysis on which personal jurisdiction depends. In that case, the City of Boston essentially claimed that the trade association defendants were "part of the propaganda machine of the firearms industry" to effectuate the industry's goals. *Id.* at *11.

In its *Memorandum and Order on the Defendant Trade Associations' Motion to Dismiss for Lack of Personal Jurisdiction*, the Massachusetts Superior Court, Suffolk County, held that a group of gun industry trade associations were subject to specific jurisdiction in Massachusetts courts because: "Each trade association, among many other contacts, maintained an Internet Web site, travelled to this forum to conduct business, participated in this forum's government, and sent numerous publications to this forum." *Id.* at *9. Moreover, "the Defendant Trade Associations undertook purposeful activity in the forum—through mailings, paper and electronic publications, advertising, membership sales, solicitations, lobbying, and holding events in the forum—such that the Trade Associations are not unsuspecting defendants who would be surprised by being hailed into court here." *Id.* at *16.

### (b)    Application of factors to ATA.

Plaintiffs allege that ATA played a significant role in its—and its member airlines'—

policies with respect to the (non)refund of fees and charges complained of. *See* Complaint ¶ 33. However, without some discovery of information available only from ATA, the information currently available to the plaintiffs is insufficient to positively demonstrate personal jurisdiction.

According to its *2002 Annual Report*, "The Air Transport Association of America (ATA) is the nation's oldest and largest airline trade association. U.S. members account for 95 percent of the passenger and cargo traffic carried by U.S. scheduled airlines."[6] ATA operates at least one Internet Web site (<http://www.airlines.org/>). That Web site provides the following general information about ATA:

> ATA serves its member airlines and their customers by assisting the airline industry in … advocating fair airline taxation and regulation worldwide to foster an economically healthy and competitive industry; and by developing and coordinating industry actions that are … economically reasonable….

> The fundamental purpose of the association is to foster a business environment that will permit U.S. airlines to flourish. By working with members in the technical, legal and political arenas, ATA supports measures that enhance … industry well-being….

> ATA is recognized by Congress, state legislatures, the Department of Transportation, the Federal Aviation Administration, the Department of Homeland Security, the Transportation Security Administration, the press and the public for its … representation of the industry….

> [T]he Air Transport Association continues to represent the industry on major aviation issues before Congress, federal agencies, state legislatures and other governmental bodies. ATA … serves as a focal point for industry efforts to standardize practices and enhance the efficiency of the air transport system.[7]

In addition, through the Web site, residents of Massachusetts may purchase publications (or obtain certain titles for free),[8] including one entitled, *Massachusetts Report: The Economic Benefits of Aviation to the U.S. Economy and the Potential Impact of Service Disruptions*. (Excerpts attached as Exhibit F.)

---

[6] Exhibit D, ATA, *2002 Annual Report* pg. 4 (excerpts) (available online at <http://www.airlines.org/>).
[7] Exhibit E, ATA, *About Us: What is the ATA?* (available online at <http://www.airlines.org/about/d.aspx?nid=978>).
[8] *See* <http://airlinesorg.siteprotect.net/store/>.

ATA is an association that represents and promotes the interests of its member airlines.[9] Whether ATA is liable under any theory asserted in the Complaint is a matter, in large part, of its relationship with those member airlines. ATA is comprised of its members, and it represents the interests of those members. By its nature, an "association" is made up of the entities associated— in this case, the airlines. It is simply not possible, without some amount of discovery, to determine ATA's relationship with its members. It would be unreasonable to dismiss the plaintiffs claims, out of hand, without some meaningful opportunity for discovery of the nature and extent of that relationship (among other things).

Since information sufficient to confirm ATA's relationship with its "members" (airlines) (e.g., its own charter or corporate papers) is beyond the immediate knowledge of the plaintiffs without *some* discovery, and is indeed within the control of ATA, the association should not be permitted to withhold the information necessary to determine jurisdiction while claiming that there is no such jurisdiction.

Other information about ATA's contacts with Massachusetts would include the extent of each of the following:

(1) Use of ATA's Internet Web site by Massachusetts residents, including paper and electronic publications available to Massachusetts residents through the site.

(2) Travel to Massachusetts to conduct business.

(3) Participation in Massachusetts government, as through lobbying or lawsuits with respect to State laws or regulations.

(4) Publications sent or mailings made to Massachusetts.

(5) Advertising reaching Massachusetts.

---

[9] *See* Exhibit D, *supra* footnote 6, at pg. 27 (member airlines listed, including several of the airline defendants).

(6) Revenue derived directly or indirectly from association members with strong business connections with Massachusetts.

(7) Solicitations of Massachusetts residents or businesses.

(8) Holding or attending association-related events in Massachusetts.

(9) Contracts for goods or services produced or provided in Massachusetts or by Massachusetts residents or businesses.

After appropriate discovery, the plaintiffs could then cure any "[d]effective allegations of jurisdiction" by amendment under 28 U.S.C. § 1653.

**C.    Challenge to subject matter jurisdiction under Rule 12(b)(1) (Lufthansa).**

Lufthansa argues that the plaintiffs lack subject matter jurisdiction over it because no specific allegations against Lufthansa appear in the Complaint. Lufthansa is correct in its assertion that there are no specific allegations against it in the Complaint. (Omission of a paragraph alleging similar claims as made against the other defendants was, plaintiffs acknowledge, a significant oversight, which will be corrected in the Amended Complaint.)

For purposes of analysis, let us assume that the Complaint contained allegations similar to those made against the other airline defendants for (1) improperly (and unlawfully) failing to refund, to passengers who did not use their nonrefundable tickets, money ostensibly collected as federally authorized or mandated fees on air travel, and (2) failing to remit such funds to the levying authorities. *See* Complaint ¶¶ 1, 36, 40, and 44.

Based on the allegations made against the other airlines named in the complaint, Lufthansa has sufficient notice of the nature of the claims made against it. Defective allegations of jurisdiction may be amended. 28 U.S.C. § 1653. The lack of any specific allegations related to Lufthansa was an oversight to be corrected in the Amended Complaint. Therefore, to the extent that the other airlines (and particularly the international airlines) are under the subject matter

jurisdiction of this Court, so is Lufthansa (or it will be after amendment of the Complaint).

**D.    Jurisdiction in the Federal courts.**

Jurisdiction in the Federal courts is proper under 28 U.S.C. § 1331 (Federal question), § 1332 (diversity of citizenship and amount in controversy), § 1340 (cases involving customs duties), and § 1367 (supplemental jurisdiction).

**1.    Jurisdiction under 28 U.S.C. § 1331 (Federal question).**

Federal question jurisdiction is appropriate in this case under 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The plaintiffs' claims arise under the laws of the United States, since the Passenger Facility Charges ("PFCs") and other charges or fees they seek to recover are authorized or imposed under Federal law. *See* Complaint ¶¶ 1, 36, 40, and 44. These charges and fees are discussed below.

**(a)    Federal law authorizes Passenger Facility Charges (PFCs).**

Plaintiffs seek recovery of PFCs paid to the airline industry but neither due nor paid to the levying authority. *See id.* ¶¶ 1(a), 36(a), 40(a), and 44(a). The Passenger Facility Charge Program authorizes the collection of PFC fees up to $4.50 for every enplaned passenger at commercial airports controlled by public agencies. The fees are then used by the airports to fund projects approved by the Federal Aviation Administration ("F.A.A.") that enhance safety, security, or capacity, reduce noise, or increase air carrier competition. The Aviation Safety and Capacity Expansion Act of 1990,[10] reenacted as positive law at 49 U.S.C. § 40117, created the PFC program. Under the PFC statute, the F.A.A. may authorize a public agency to impose a PFC of $1, $2, $3, $4, or $4.50 for each enplaned passenger at those commercial service airports that

---

[10] Pub. L. 101–508, title IX, subtitle B (§ 9101 *et seq.*), 104 Stat. 1388–353 (1990).

the public agency controls. The public agency can then use this PFC revenue to finance F.A.A.-approved eligible airport-related projects. The F.A.A.'s regulations that govern the PFC program are located in 14 C.F.R. part 158 and became effective in 1991. To impose a PFC, use PFC revenue, or amend an approved PFC, a public agency operating an airport must apply for F.A.A. approval by following the application process set forth in 14 C.F.R. part 158.

> **(b)    Federal law imposes other (nontax) passenger user fees.**

Plaintiffs seek recovery of passenger user fees paid to the airline industry but neither due nor paid to the levying authority. *See* Complaint ¶¶ 1(c), 36(c), 40(c), and 44(c).[11] Certain fees are imposed on most passengers arriving in the United States on international flights. These include a U.S. Customs fee, an immigration fee, and an agricultural inspection fee.[12] These are not taxes, such as the excise tax imposed on air transportation of persons under § 4261 of the Internal Revenue Code of 1986 (26 U.S.C. § 4261). Rather, these are separately imposed fees or charges for services related to the safe and lawful arrival and entry of air passengers (U.S. citizens and noncitizens alike) into the United States. In addition, beginning in February 2002, a U.S. security service fee (also called the "September 11th Security Fee") is imposed on most passengers boarding a domestic or international flight originating at an airport in the United States.[13]

> **2.    Jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship and amount in controversy).**

The plaintiffs also have established Federal court diversity jurisdiction based on the

---

[11] These are described in the Complaint as "foreign landing tax[es] or ***user fees***."

[12] *See gen'lly*, 19 C.F.R. part 24 (especially § 24.22(g)(1)) (U.S. Customs user fee), 8 C.F.R. part 286 (immigration user fee), and 7 C.F.R. § 354(f) (agricultural inspection user fee).

[13] *See gen'lly*, 49 C.F.R. part 1510 (U.S. security service fee). To the extent that U.S. security "service fees" are not clearly encompassed within the Complaint's references to "user fees" (*see* ¶¶ 1(c), 36(c), 40(b), and 44(c)), the claim will be stated more clearly in the plaintiffs' Amended Complaint.

citizenship of the parties and the amount in controversy. Section 1332(a) of title 28, United States Code, provides that "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 … and is between … citizens of different States and in which citizens or subjects of a foreign state are additional parties."

### (a) Citizenship of the parties.

The plaintiffs are citizens of Massachusetts, California, and South Carolina.[14] The Domestic Defendants are citizens of Alaska, Delaware, Georgia, Illinois, Texas, Washington State, and the District of Columbia.[15] The foreign defendants are citizens of Germany, Great Britain, Greece, Italy, and the People's Republic of China.[16] Since none of the plaintiffs is a citizen of the same State as any of the Domestic Defendants, there is complete diversity here. Jurisdiction is therefore proper under 28 U.S.C. § 1332(a)(3).

(Any arguments made by Alaska Airlines that defending itself in a Massachusetts court would constitute a burden on the airline are specious, as Alaska Airlines operates an air transport business in the Commonwealth, and has made foreign corporation filings with the Secretary of the Commonwealth which include naming an agent for service of process. *See* footnote 4 above.)

---

[14] Plaintiffs Byron, Harrington, Ivanovitz, Kalaitzidis, Karagiorgos, Marshall-Smith, Micciche, Pawson, Tsouvrakas, and Zalwango are residents of Massachusetts. Complaint ¶¶ 2–4, 10–16. Plaintiffs Blau, Buck, Drasnin, and Golumbuk are residents of California. *Id.* at ¶¶ 5–6, 8–9. Plaintiff Mills is a resident of South Carolina. *Id.* at ¶ 7 (mistakenly identifying the State of residence as simply "Carolina").

[15] Defendant Alaska Airlines is a citizen of Alaska and Washington State. *See* footnote 4. American Airlines is a citizen of Delaware and Texas. Complaint ¶ 18. Continental Airlines is a citizen of Texas. *Id.* at ¶ 20. Delta Air Lines is a citizen of Delaware and Georgia. *Id.* at ¶ 17. Northwest Airlines is a citizen of Minnesota. *Id.* at ¶ 21. Southwest Airlines is a citizen of Texas. *Id.* at ¶ 31. United Air Lines is a citizen of Delaware and Illinois. *Id.* at ¶ 22. Air Transport Association of America is a citizen of the District of Columbia. *Id.* at ¶ 33.

[16] Defendant Alitalia is a citizen of Italy. Complaint ¶ 30. British Airways is a citizen of Great Britain. *Id.* at ¶ 28. China Eastern Airlines and China Southern Airlines are citizens of the People's Republic of China. *Id.* at ¶ 24–25. Lufthansa is a citizen of Germany. *Id.* at ¶ 26. Olympic Airways is a citizen of Greece. *Id.* at ¶ 32.

**(b)  Amount in controversy.**

Although it is impossible to say with complete certainty, the value of the claims asserted on behalf of the plaintiff class are substantial and will almost certainly exceed $75,000. For example, according to the F.A.A.'s Office of Airport Planning and Programming, there were 11,087,799 enplanements (passenger boardings) at Boston's Logan International Airport in collection year (CY) 2003.[17] That means that the airline industry collected $33,263,397 in PFCs in that collection year at Logan alone.[18] Of that amount, the industry legitimately kept $2,661,071.76 for itself (at a rate of $0.08 per PFC remitted[19]), as well as any interest accrued between collection from passengers and payment to the Government, as 'collection compensation.' 14 C.F.R. § 158.53. Nationally, over $2 billion in PFCs were collected by the airline industry in collection year 2003, resulting in approximately $160 million of such 'compensation' to the airline industry.[20]

According to an industry consultant, $50 million is too low an estimate for the amount of fees kept by airlines after forfeit of passenger air tickets.[21] While these statistics do not themselves establish the value of the claims asserted on behalf of the plaintiff class,[22] the figures

---

[17] *See* Exhibit G, F.A.A., "CY 2003 Commercial Service Airports" pg. 1 (excerpt) (available online at <http://www.faa.gov/arp/planning/stats/2003/CY03CommSvAprts.pdf>).

[18] *See* Exhibit H, F.A.A., "PFC Approved Locations" (as of Jan. 31, 2005) pg. 7 (excerpt) (available online at <http://www.faa.gov/arp/financial/pfc/reports/Airports105.pdf>), indicating approval of a $3.00 PFC for Boston's Logan International Airport.

[19] As of May 1, 2004, the current rate is $0.11 per PFC "collected." 14 C.F.R. § 158.53(a). *See* footnote 37 for discussion of "collected" vs. "remitted."

[20] *See* Exhibit I, F.A.A., "PFC Reports: Key Passenger Facility Charge Statistics" (as of Aug. 31, 2003) (available online at <http://www.faa.gov/arp/financial/pfc/reports/stats.cfm>).

[21] *See* Exhibit J, J.M. Lawrence, "$50M Plane Ticket to Ride: Lawsuit Exposes Airline Windfall," *Boston Herald* (Nov. 28, 2004) (available online (site registration, fee) at <http://news.bostonherald.com/localRegional/view.bg?articleid=56150>).

[22] With respect to the F.A.A. statistics, this is especially true, since the claims are for amounts collected from passengers that (1) were not due from them (since they never 'enplaned,' or boarded), (2) were not repaid to them by the airlines, and (3) were not remitted by the airlines to the public agency levying the PFC, and were so probably not included in the figures compiled by the F.A.A.

provide an idea of the magnitude of the fees collected by the airline industry and thus the potential value of the claims here, which will almost certainly exceed the required $75,000.

### 3.    Jurisdiction under 28 U.S.C. § 1340 (cases involving customs duties).

Jurisdiction is also proper under 28 U.S.C. § 1340, which provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for … revenue from imports or tonnage except matters within the jurisdiction of the Court of International Trade." The U.S. Customs fee imposed under 19 C.F.R. § 24.22(g),[23] and sought by the plaintiffs to be refunded, is treated for jurisdictional purposes as a Customs duty.[24] Thus, the U.S. Customs fees fall within the meaning of 28 U.S.C. § 1340 and this Court properly has original jurisdiction of the plaintiffs' claims with respect to those duties or fees.

### 4.    Jurisdiction of State law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

Having established Federal court jurisdiction under one or more of the theories discussed above, any related State law claims are permitted under 28 U.S.C. § 1367, which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action … that they form part of the same case or controversy."

### E.    No Federal preemption under 49 U.S.C. § 41713(b)(1).

The Domestic Defendants and Lufthansa argue that 49 U.S.C. § 41713(b)(1)[25] preempts the

---

[23] The authority (or "Act of Congress" in the terms of 28 U.S.C. § 1340) for issuance of the regulations contained in 19 C.F.R. part 24 comes from 5 U.S.C. § 301; 19 U.S.C. §§ 58a–58c, 66, 1202 (General Note 23, Harmonized Tariff Schedule of the United States), 1505, 1520, 1624; 26 U.S.C. §§ 4461, 4462; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. § 1 *et seq.*).

[24] "For purposes of determining the jurisdiction of any court or agency of the United States, any fee provided for under this section shall be treated as if such fee is a Customs duty." 19 C.F.R. § 24.22(j)(2).

[25] In 1994, the Congress enacted the laws then classified to title 49, United States Code, as positive law, without change to the substance of the laws incorporated into that title. *See* § 1(a) of Pub. L. 103–272, 108 Stat. 745 (1994).
(FOOTNOTE CONT'D)

plaintiffs' claims. However, those claims are not preempted because (1) the plaintiffs seek to enforce the federally mandated terms of their air travel contracts with the defendants in the only available forum, namely a State court contract action, (2) such an action in State court is entirely consistent with the statutory preemption and savings clauses of title 49, United States Code, and (3) under the Supreme Court's decision in *American Airlines v. Wolens*, 513 U.S. 219, 115 S.Ct. 817 (1995), the plaintiffs' claims for breach of contract (and good faith and fair dealing) are specifically permitted, as they do not arise from any "State-imposed obligations" (which would almost certainly have been a fatal flaw under that decision or that of *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031 (1992)), but rather from obligations **already** imposed by the Federal Government under Federal law.

### 1. Plaintiffs' claims are remedial only and do not seek to impose State obligations on the prices, routes, or services of air carriers.

Section 41713(b)(1) of title 49, United States Code, preempts "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation." Interpreting this provision, the Supreme Court, in *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, held that claims against airlines alleging no breach of 'State-imposed obligations' (including those alleging breach of 'self-imposed undertakings') are not preempted by 49 U.S.C. § 41713(b)(1).

The plaintiffs allege that the airline industry collected certain Government-imposed fees from passengers then (1) failed to refund those fees when passengers did not use (or forfeited) their air tickets, and (2) failed to pay that money to the fee-levying authorities.

---

Section 105 of the Airline Deregulation Act of 1978, Pub. L. 95–504, 92 Stat. 1705, 1707 (1978), which had previously been codified at 49 U.S.C. App. § 1305(a)(1), was reenacted as 49 U.S.C. § 41713(b)(1).

The Federal Government mandates certain terms of air carrier contracts, but those contracts are only enforceable under State contract law. What the plaintiffs are requesting is simply that their contracts with the defendants be enforced. The terms of those contracts are set, in part, by Federal regulation. The only remedy available, however, is a State law contract action. The fact that the Federal Government sets one or more terms is irrelevant to the question of whether the claim is permitted in State court, since the State has not imposed any additional or incompatible terms, obligations, or requirements.

The Federal preemption under 49 U.S.C. § 41713(b)(1) is intended to permit the airlines to set their own rates, routes, and services, in accordance with Federal law, and free of prescriptive obligations or burdens the States might variously seek to impose. *See Wolens, supra* pg. 16. Here, resort to State law merely provides a mechanism to seek redress for wrongs committed in violation of Federal requirements, but that redress does not—and in fact cannot—affect the rates, routes, or services, since the redress occurs only ***after*** the rates, routes, and services have been determined by the air industry (free of State-imposed obligations). And if, as the plaintiffs allege, the Domestic Defendants are unlawfully keeping money that should either be paid to a governmental agency or to the plaintiffs, in violation of Federal requirements, the airlines can scarcely argue that enforcement of Federal law has an unwarranted affect on their ability to set their own rates, routes, or services, free from State-imposed obligations.

Resort to State law is for the purposes of remedy only, and it has no prescriptive effects with respect to prices (or rates), routes, or services, as those are set by the airline industry—free from interference from the States, just as the Congress intended—(1) ***before*** a passenger purchases a ticket, (2) ***before*** the passenger forfeits or fails to use a nonrefundable ticket, and (3) ***before*** the airline fails to refund any unowed governmental charges or fees. In these

circumstances, there can be ***no causal relationship*** between the *post hoc* remedy sought by the plaintiffs and the earlier exercise of the airline industry's right to set its own rates, routes, and services without the meddling of the States. There simply is no interference.

> **(a)    Airlines set the prices or rates for their tickets, the Government sets the rates for its fees.**

Airline ticket prices (or rates) are composed two separate components: (1) the ***fare prices*** (or rates) set by the airlines, which comprise the base cost of a ticket, and (2) the ***taxes, fees, and charges*** imposed by the Government or other fee-levying authorities. While airlines are free to set their ***fare prices***, they cannot modify the taxes, fees, and charges imposed (and which the airlines typically collect on behalf of) the levying authorities. Rather than seeking the return of excise taxes imposed by the Federal Government under 26 U.S.C. § 4261 (*see infra*, pg. 29 *et seq.*), the plaintiffs seek return of charges and user fees which are only due if a passenger actually ***uses*** the services the fees are designed to pay for. User fees the plaintiffs seek return of include the following:

> (1) Passenger Facility Charges (PFCs) imposed under 14 C.F.R. part 158.

> (2) U.S. Customs user fees imposed under 19 C.F.R. § 24.22(g).

> (3) Immigration user fees imposed under 8 C.F.R. part 286.

> (4) Agricultural inspection user fees imposed under 7 C.F.R. § 354(f).

> (5) U.S. security service fees imposed under 49 C.F.R. part 1510 (also called the "September 11th Security Fee").

The plaintiffs' claims involve allegations that the airline industry collected these charges and fees from air passengers and failed (1) to refund those charges to passengers who did not use nonrefundable tickets, and (2) to remit the collected funds on those unused tickets to the levying authority. *See* Complaint ¶¶ 1, 33, 36, 40, and 44.

**(b)** **Federal law and regulation imposes certain requirements on air carriers and their contracts with passengers.**

Plaintiffs' claims are not State-imposed prescriptions or obligations burdening the airlines' ability to determine prices or services. Rather, they are related to the violation of Federal statutes and regulations. The effect of the defendants' undeterred unlawful conduct is the unjust enrichment of the airline industry at the expense of certain passengers and, possibly, the governmental agencies levying the user fees the defendants failed to return to the plaintiffs or submit to the agencies. Some of the Federal requirements relevant to the plaintiffs' claims are as follows:

**Federal requirements for contracts of carriage.** "To the extent the Secretary of Transportation prescribes by regulation, an air carrier may incorporate by reference in a ticket or written instrument any term of the contract for providing interstate air transportation." 49 U.S.C. § 41707; *see also* 14 C.F.R. part 253 (notice of terms of contract of carriage). Under this authority, the Federal Government imposes some requirements and some limitations on air carriers' ability to contract with passengers. *See* 14 C.F.R. part 253. In doing so, the Government seeks to set "uniform disclosure requirements, which preempt any State requirements on the same subject, for terms incorporated by reference into contracts of carriage" for air travel. *Id.* at § 253.1. A ticket or contract for air transportation may incorporate contract terms by reference, without setting out the entire terms on the face of the contract itself, if notice complying with 14 C.F.R. part 253 is given to the passenger along with the ticket or contract. *Id.* at § 253.4(a).

The consequences of improper notice are that, "*[i]n addition to other remedies at law*, an air carrier may not claim the benefit as against the passenger of, and *the passenger shall not be bound by, any contract term* incorporated by reference if notice of the term has not been provided to that passenger in accordance with this part." *Id.* (emphasis added). Moreover, certain

terms are not permitted to be incorporated only by reference. "A passenger shall not be bound by any *terms restricting refunds of the ticket price, imposing monetary penalties on passengers, or permitting the carrier to raise the price*, unless the passenger receives conspicuous written notice of the salient features of those terms on or with the ticket." *Id.* at § 253.7 (emphasis added).

Of course, it is impossible to evaluate the contracts at issue in this case without permitting at least some discovery. Only then can the Court determine (1) what, if any, terms were incorporated by reference, (2) whether other terms were given the required conspicuous notice, and (3) based on the contracts themselves, whether there was a breach of the contracts or these requirements.

**Federal requirements related to collection, handling, and remittance of passenger charges and user fees.** Air carriers have a number of duties with respect to the collection, handling, and remittance of passenger charges and user fees. Air carriers are required to collect the charges and user fees,[26] which often must be held in "trust," by the collecting air carrier.[27] Of course, the collector must also periodically remit the fees to the appropriate fee-levying

---

[26] 14 C.F.R. §§ 158.45, 158.47 (PFCs); 7 C.F.R. § 354.3(f)(4)(i) & (f)(1) table note 1 (agricultural inspection user fees); 8 C.F.R. § 286.4 (immigration user fees); 19 C.F.R. § 24.22(g)(4) (U.S. Customs user fees); 49 C.F.R. § 1510.9 (U.S. security service fees).

[27] 14 C.F.R. § 158.49(c) (PFC revenues held after collection "*constitute a trust fund … for the beneficial interest of the public agency imposing the PFC*," in which the air carrier "holds neither legal nor equitable interest in the PFC revenues except for any handling fee or retention of interest collected on unremitted proceeds as authorized in §158.53.").

7 C.F.R. § 354.3(f)(4)(C) ("AQI [agricultural quarantine and inspection] user fees collected from international passengers … shall be *held in trust for the United States [and]* … shall be accounted for separately and … *regarded as trust funds* … for the beneficial interest of the United States. All such user fees held by any person shall be property in which the person holds only a possessory interest and not an equitable interest.").

49 C.F.R. § 1510.11(b) (After collection, security service fees are "*held in trust by … [the] carrier for the beneficial interest of the United States* in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940. The … carrier holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to § 1510.13(b).").

authorities,[28] maintain accounting systems and methods and submit to external audits,[29] and submit regular reports or statements about their fee-collecting and remitting activities.[30]

**Passenger refunds of fees.** Some of the user fees specifically contemplate that 'unearned' fees will be refunded to passengers. For example, "Refunds by a remitter of [agricultural inspection] user fees ***collected in conjunction with unused tickets*** or travel documents shall be netted against the next subsequent remittance."[31]

The regulations governing the U.S. security service fee appear to affirmatively ***require*** air carriers to refund the fee if a passenger's number of enplanements decreases. (In the case of an unused ticket, the number of enplanements decreases to zero.) "The security service fee must be based on the air travel itinerary at the time the air transportation is sold. ***Any changes by the passenger to the itinerary that alter the number of enplanements are subject to*** additional collection or ***refund of the security service fee*** by the direct air carrier or foreign air carrier as appropriate." 49 C.F.R. § 1510.9(b) (emphasis added).

In addition, the regulations make references to refunds in the context of the accounting and reporting requirements, apparently contemplating that carriers will refund unearned fees. For example, with respect to U.S. security services fees, air carriers must "establish and maintain an

---

[28] 14 C.F.R. § 158.51 (PFCs); 7 C.F.R. § 354.3(f)(5) (agricultural inspection user fees); 8 C.F.R. § 286.5 (immigration user fees); 49 C.F.R. § 1510.11 (U.S. security service fees).

[29] 14 C.F.R. §§ 158.69, 158.71 (PFCs); 7 C.F.R. § 354.3(f)(7) (agricultural inspection user fees); 8 C.F.R. §§ 286.5, 286.6 (immigration fees); 19 C.F.R. § 24.22(g)(7) (U.S. Customs user fees); 49 C.F.R. §§ 1510.11(c); 1510.15, 1510.19 (U.S. security service fees).

[30] 14 C.F.R. § 158.65 (PFCs); 8 C.F.R. §§ 286.2(c), 286.5(c) & (e) (immigration user fees); 19 C.F.R. § 24.22(g)(5) (U.S. Customs user fees); 49 C.F.R. § 1510.17 (U.S. security service fees).

[31] 7 C.F.R. § 354.3(f)(5)(ii); *cf.* 8 C.F.R. § 286.5(b)(2) ("Refunds by a remitter of [immigration user] fees ***collected in conjunction with unused tickets*** or documents for transportation shall be netted against the next subsequent remittance.").

accounting system to account for the security service fees imposed, collected, **_refunded_** and remitted."[32]

In another example, "[u]nless otherwise agreed by the collecting carrier and public agency, reports shall state … the total PFC revenue collected, **_the total amount of PFC revenue refunded to passengers_**, and the amount of collected revenue withheld by the collecting carrier for reimbursement of expenses in accordance with §158.53 of this part."[33]

**Fairness and reasonableness of carrier's fee-handling procedures.** An interesting feature of the PFC and U.S. security service fee regulations is the requirement that, in accounting and auditing the charges or fees collected, held, refunded, and remitted, the air carrier must obtain the opinion of an outside accountant with respect to how fair and reasonable the carrier's fee-handling procedures are. "The accountant shall express an opinion on the **_fairness and reasonableness of the carrier's procedures for collecting, holding, and dispersing PFC revenue_**."[34]

**User fees due when 'service' is 'used'.** The nature of user fees is to become due (that is, the fee is required to be paid to the fee-levying authority) only if or when the passenger actually 'uses' the 'service.' PFCs and U.S. security services fees (September 11th Security Fees) are due upon passenger "enplanement," agricultural inspection user fees are due "upon arrival" of the passenger from abroad, immigration user fees are due for passengers "arriving" from abroad, and U.S. Customs user fees are paid for "services provided in connection with arrival of each

---

[32] 49 C.F.R. § 1510.15(a) (emphasis added); *cf.* 14 C.F.R. § 158.69(a) ("Collecting carriers shall establish and maintain … an accounting record of PFC revenue collected, remitted, **_refunded_** and compensation retained under §158.53(a)." (emphasis added)).

[33] 14 C.F.R. § 158.65(a) (emphasis added); *cf.* 49 C.F.R. § 1510.17(b)(4) (quarterly reports must show "[t]he total amount of September 11th Security Fees **_refunded_** … by the … air carrier" (emphasis added)).

[34] 14 C.F.R. § 158.69(b)(1) (emphasis added); *cf.* 49 C.F.R. § 1510.15(c) ("The accountant must express an opinion on the **_fairness and reasonableness_** of the direct air carrier's and foreign air carrier's procedures for collecting, holding, and remitting the fees." (emphasis added)).

passenger" from outside the Customs territory of the United States.[35] What constitutes 'use' varies slightly from fee to fee, but all amount to the same thing: ***If a passenger doesn't use the fee, the fee does not have to be paid to the fee-levying authority.*** Consequently, in the context of the refund and trust regulatory language discussed above, if the fee never becomes due to the levying authority, it should be returned to the person who paid the fee. This is especially true where the collecting carrier 'holds neither legal nor equitable interest' in the fees. *See* footnote 27.

**Incentives for fee collection .** Some of the charges or user fees allow for 'collection compensation,' in the form of retention of (1) a portion of the fee, and (2) the interest accrued on unremitted funds. Carriers may retain the interest on fees collected until the time of remittance to the fee-levying authorities with respect to PFCs, agricultural user fees, and U.S. security service fees.[36] In addition, carriers are "entitled to … "[r]etain $0.11 of each PFC collected."[37]

**2.** ***American Airlines, Inc. v. Wolens* specifically permits breach of contract claims that are not based on State-imposed obligations.**

"We do not read the ADA's [Airline Deregulation Act of 1978[38]] preemption clause, however, to shelter airlines from ***suits alleging no violation of state-imposed obligations***."

---

[35] 14 C.F.R. § 158.5 (PFCs); 49 C.F.R. § 1510.9(a) (U.S. security service fees); 7 C.F.R. § 354.3(f)(1) (agricultural inspection user fees); 8 C.F.R. § 286.2(a) (immigration user fees); 19 C.F.R. § 24.22(g)(1)(i)–(ii) (U.S. Customs user fees).

[36] 14 C.F.R. § 158.53(b) (PFCs); 7 C.F.R. § 354.3(f)(4)(C) (agricultural user fees); 49 C.F.R. §§ 1510.11(b), 1510.13(b) (U.S. security service fees).

[37] 14 C.F.R. § 158.53(a) (as amended, effective May 1, 2004); this amount was previously "$0.12 of each PFC *remitted* on or before June 28, 1994. Thereafter,… $0.08 of each PFC *remitted*." (Emphasis added.) One might reasonably think that the $0.11 per PFC is not (or should not be) retained when the PFC is refunded, as it has not been 'collected' for purposes of ultimate 'remittance' to the levying authority. *But see discussion* "Compensation Based on Remitted PFCs vs. Collected PFCs," *in* Revisions to PFC Rule for Compensation to Air Carriers (Final Rule), 69 Fed. Reg. 12,940, 12,941 (Mar. 18, 2004). It is unclear what practical effect the change from the "remitted" to the "collected" language will have for consumers seeking refunds.

[38] Pub. L. 95–504, 92 Stat. 1705 (1978).

*Wolens*, 513 U.S. at 228, 115 S.Ct. at 824 (emphasis added).[39] *See also Morales, supra* pg. 16 (preempting State guidelines that set "binding requirements as to how airline tickets may be marketed," *id.*, 504 U.S. at 388, 112 S.Ct. at 2039, and "imposed [obligations that] would have a significant impact upon ... the fares [airlines] charge." *Id.* 513 U.S. at 390, 112 S.Ct. at 2040.)

The plaintiffs' breach of contract and related claims are not preempted by 49 U.S.C. § 41713(b)(1), since the terms of the contract were not imposed by State law (statutory, regulatory, or common law). "A remedy confined to a contract's terms simply holds parties to their agreements." *Wolens*, 513 U.S. at 229, 115 S.Ct. at 824. Here, the violations alleged are violations only of Federal law, with the State merely providing a passive means by which to seek relief.

The plaintiffs therefore seek the remedy in the only forum available to them—a State court contract action. The State provides the forum for the remedy against the airline industry, but does not in any way regulate the airline industry. This is completely in keeping with the Federal preemption clause, 49 U.S.C. § 41713(b)(1), and the savings clause, 49 U.S.C. § 40120(c), as well as the Supreme Court's decisions in *Wolens, supra* pg. 16, and *Morales, supra* pg. 16.

In other words, Federal law permits the plaintiffs to bring claims in State court under State contract law for breach of contract (and good faith and fair dealing) against the Domestic Defendants, so long as ***no part of the contract is imposed on the parties by State law***. If the Court were to hold otherwise, consumers would have no recourse either in State courts or under Federal law to seek redress for an air carrier's breach of contract, even if the terms alleged to

---

[39] The defendants urge the Court to give great import to the last half of this sentence (quoted here), which they argue ***only*** permits contract actions "seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Wolens*, 513 U.S. at 228, 115 S.Ct. at 824. They fail to recognize that it is the first half of the sentence (quoted in the text) that states the ***general rule***, of which contract claims involving only violations of 'self-imposed undertakings' constitute just one particular example.

have been breached are ***specifically mandated*** under Federal law. It is the State prescription, seeking to control the conduct of the airline industry, that is preempted. Here, there is simply "no enlargement or enhancement based on state laws or policies external to the agreement," *id.*, 513 U.S. at 232–233, 115 S.Ct. at 826, other than policies mandated by Federal law—and those should provide no sound basis for preemption of remedial State enforcement of contracts governed by that law.

> **(a)  Consumers cannot seek to enforce private contract rights through the Department of Transportation (DOT).**

A contract claim under State law is the only remedy available to the plaintiffs. Although 49 U.S.C. § 41712 gives the Secretary of Transportation the power to investigate and enjoin unfair or deceptive practices, it does not authorize the Secretary to vindicate private rights, nor does it entitle individual consumers to initiate proceedings.[40]

"When Congress dismantled [the airline regulation] regime,… the lawmakers indicated no intention to establish, simultaneously, a new administrative process for DOT adjudication of private contract disputes." *Wolens*, 513 U.S. at 232, 115 S.Ct. at 825. Thus, administrative redress is not available.

> **(b)  Using rule argued by the defendants would render meaningless almost all airline contracts and certain provisions of Federal law.**

"The ADA's preemption clause, [49 U.S.C. § 41713(b)(1)[41]], read together with the FAA's

---

[40] *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978 (1976) (Secretary may not vindicate private rights; individual consumers not entitled to initiate proceedings); *Aloha Airlines, Inc. v. C.A.B.*, 598 F.2d 250, 194 U.S.App.D.C. 331 (D.C.Cir. 1979) (Secretary may not act to vindicate private rights); *Polansky v. Trans World Airlines, Inc.*, 523 F.2d 332 (3d Cir. 1975) (private remedy may not be implied).

[41] The preemption clause was formerly part of the Airline Deregulation Act of 1978 (ADA), *supra* footnote 38, and was previously classified to 49 U.S.C.App. § 1305(a)(1). *See* footnote 25.

saving clause, [49 U.S.C. § 40120(c),[42]] stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from ***affording relief*** to a party who claims and proves that an airline dishonored a term the airline itself stipulated," *Wolens*, 513 U.S. at 232–233, 115 S.Ct. at 826 (emphasis added), ***or one mandated by Federal law***.

"Market efficiency requires effective means to enforce private agreements." *Id.*, 513 U.S. at 230, 115 S.Ct. at 825. Surely the Congress cannot have intended to keep the savings clause in 49 U.S.C. § 40120(c), permitting State law claims for breach of contract where the air carrier "voluntarily assents" to undertake one or more unspecified duties under the contract, while at the same time denying State courts the ability to hear claims based on violations of terms considered by the Congress to be sufficiently important to be specified or limited by Federal law, but (inexplicably) not sufficiently important to permit enforcement in any court. Such a result would be incongruous. The Congress surely would not have foreclosed the State courts from hearing such cases, as that would effectively make contracts meaningless and roll back, rather than advance, the market efficiency that the Airline Deregulation Act of 1978 (ADA) was designed to promote. *Wolens*, 513 U.S. at 230, 115 S.Ct. at 825 ("The ADA, as [the Supreme Court] recognized in *Morales,* 504 U.S. at 378, 112 S.Ct. at 2034, was designed to promote 'maximum reliance on competitive market forces.' [49 U.S.C. § 40101(a)(4)].").

If a contract has terms dictated by the Federal Government, but the Federal Government does not provide any way to enforce that contract, then (1) the Federal contract requirements are pointless, (2) the savings clause in 49 U.S.C. § 40120(c) becomes meaningless, and (3) far from achieving its purpose, the preemption clause in 49 U.S.C. § 41713(b)(1) ends up defeating the

---

[42] The savings clause was formerly part of the Federal Aviation Act of 1958 (FAA), Pub. L. 85–726, 72 Stat. 731 (1958). That Act is now incorporated into positive law, as set out in title 49, United States Code. *See* footnote 25.

very "presuppos[ition of] the vitality of contracts governing air carrier transportation" that the *Wolens* court found compelling. *Wolens*, 513 U.S. at 230, 115 S.Ct. at 825.

### 3. Logic of *Wolens* case extends to State court actions for violation of federally mandated contract terms.

A rule permitting enforcement of airline-passenger contracts in State court, where the terms being enforced are imposed under Federal law, is entirely consistent with the Supreme Court's decisions in the *Wolens* and *Morales* cases. *Wolens, supra* pg. 16; *Morales, supra* pg. 16. On the other hand, the rule the Domestic Defendants urge would be incongruous—permitting breach of contract suits in cases where the airline 'voluntarily' entered into some contract term or other, while denying a suit where the alleged breach is of Federal statutorily ***mandated*** terms.

Indeed, the reasoning used in *Wolens* dictates that State contract actions are logically as valid for claims based on violation of federally mandated contract terms as they are for claims based on violation of terms 'voluntarily undertaken' by the airlines themselves. In ***both*** cases, the States have not imposed any additional burdens or requirements on the airline industry, and as such, neither of these contract claims is preempted. And the defendants have not cited any authority in this Circuit to the contrary.

### 4. Discovery required to determine nature, terms, and compliance with respect to the contracts between the plaintiffs and the airlines.

The defendants beg the question of whether the contracts between the plaintiffs and the airlines required repayment by the airline of fees paid by the passenger to the airline but not by the airline to the levying authority. Indeed, how can the Court possibly rule on a contract when the contract is not yet part of the record? At this early stage of litigation, the Court cannot hold that the contract terms provide no basis for the plaintiffs' claims, where the contract has yet to be produced in discovery or examined by the parties or the Court.

The Federal requirements discussed above again demonstrate the need for discovery and

the prematurity of the defendants' motions to dismiss, since the plaintiffs and the Court lack essential information and discovery to aid in determining the extent of the plaintiffs' claims, such as the following:

(1) What are each defendant's accounting procedures with respect to PFCs and user fees and are those procedures sufficient to meet the Federal requirements?

(2) What are each defendant's reporting statistics with respect to the collection, refund, and remittance of PFCs and other user fees?

(3) What are the opinions of each defendant's outside accountants about the fairness and reasonableness of the defendant's policies and procedures?

(4) What is each defendant's policy with respect to refund of passenger user fees not due to the fee-levying authority when the passenger fails to use (or otherwise forfeits) a nonrefundable air ticket?

These questions, among many others, demonstrate that material questions of fact exist—not just questions of law—and justice requires at least *some* reasonable opportunity to conduct discovery to determine facts relevant to the plaintiffs' claims that are within the control of the defendants. Plaintiffs have set forth a reasonable basis and an outline of what they hope to prove. Under the lenient standard required for motions to dismiss, that is enough to avoid premature dismissal and permit discovery to commence.

**F.     Section 4261 of the Internal Revenue Code of 1986 has no effect on nontax claims.**

The Domestic Defendants and Lufthansa argue that § 7422 of the Internal Revenue Code of 1986 (26 U.S.C. § 7422) bars the plaintiffs' claims. The plaintiffs acknowledge that 26 U.S.C. § 7422 bars them from seeking a refund of any "tax" (or "excise tax") paid. But to the extent that the plaintiffs' claims are *not* based on a claim for a refund of a "tax," § 7422 has no effect.

Section 4261 of the Internal Revenue Code of 1986 (26 U.S.C. § 4261) imposes several

excise taxes on the "amount paid" for the transportation of persons by air. *See also* § 4263(d). Although these taxes are refundable to the extent a ticket is refundable (and to the extent the ticket is unused), *see* § 4263(b), taxes on unused nonrefundable tickets are due under § 4261 even if the transportation is not used (since the nonrefundable amount is "paid" either way). Therefore, the plaintiffs make no claim to the return of excise taxes paid on unused nonrefundable tickets—nor could they successfully make such a claim in this Court.

### 1.    Claims for so-called "Zip tax" relinquished.

The plaintiffs acknowledge a mistaken belief that the so-called "Zip tax" referred to in the Complaint, *see* ¶¶ 1(b), 36(b), 40(b), and 44(b), was not an excise tax. However, their current understanding is that this is actually the U.S. flight segment tax imposed by 26 U.S.C. § 4261(b). The term "Zip" tax was in reference to the code ("ZP") used by the airline industry to identify the charges on travel documents. However, all other excise taxes under § 4261 are identified by the code "US."[43] The term "Zip tax" itself seems to have resulted in the confusion in the statement of the plaintiffs' claim.[44] For these reasons, any claim relating to "Zip" taxes will not be pursued by the plaintiffs and the Amended Complaint will omit any such claim.

### 2.    Claims for other fees (vs. taxes) *not* barred by 26 U.S.C. § 7422.

*If* the plaintiffs held *refundable* tickets that were not refunded, or refundable tickets on which a partial refund was due (after partial use of the ticket), any claims for refund of the "Zip" tax would be barred by 26 U.S.C. § 7422. However, the remainder of the fees described in the Complaint are not taxes payable to the U.S. Treasury (through the Internal Revenue Service) but

---

[43] These taxes include the U.S. ticket tax, the U.S. international arrival and departure taxes, and the Alaska/Hawaii ticket tax and international travel facilities taxes.

[44] *See* Exhibit K, Letter dated Oct. 31, 2002, from Richard Kocak (Internal Revenue Service) to Evans J. Carter (plaintiffs' counsel) ("Regarding the PFC and the Zip tax, the IRS has no regulatory authority over these charges and no authority over airlines concerning their collection or disposition").

are user fees (or charges) imposed under various provisions of Federal law, mostly for actual services provided in connection with air transportation, as discussed in detail above (see pg. 11 *et seq.*). As such, § 7422 has no effect on the plaintiffs' remaining claims.

**G.     The plaintiffs have stated claims for relief.**

This Court or the State courts of Massachusetts may grant plaintiffs relief for their declaratory judgment, breach of contract, good faith and fair dealing, unjust enrichment, civil conspiracy, and fiduciary duty claims. To the extent these claims or allegations are inadequately pleaded or present technical insufficiencies, the plaintiffs intend to seek to file an Amended Complaint, as discussed above. These claims, just as much as plaintiffs' contract claim, seek only remedies. They do not impose any additional burdens or requirements on the airline industry, and as such are not expressly preempted.

Defendants cannot meet their burden to demonstrate that plaintiff's claims are clearly barred as a matter of law. Rather, they urge this Court to ignore the purposes of notice pleading and to require that the plaintiffs set out their entire case in detail before these defendants have even answered the Complaint and before any discovery of any kind has been conducted. Plaintiffs, by contrast, ask that this Court act in accordance with the letter and the spirit of the Federal Rules by applying "the more deferential Rule 12(b)(6) standard of review," *Coyne v. City of Somerville*, 972 F.2d at 445, and giving the Complaint "the indulgent reading it deserves." *Id.* at 443.

The Domestic Defendants' arguments, at pp. 19–20 of their Memorandum in Support of their Motion to Dismiss, serve as an illustrative, though by no means exclusive, example of defendants' wrong-headedness. There, the Domestic Defendants contend that plaintiffs' claims for breach of contract and breach of the duty of good faith and fair dealing fail to state a claim, in addition to being preempted under *Wolens*, because the Complaint does not specifically allege

the detailed provisions of the contracts the plaintiffs allege the defendants breached with respect to refunds of unearned fees on nonrefundable tickets.

This argument puts the cart before the horse. Notice pleading does not require detailed allegations. Especially at this early stage in the case, it is simply unreasonable to expect plaintiffs to know every term of their contracts with the airlines. This is particularly true in the case of air travel contracts, which very often incorporate contract terms by reference.[45] Further, whether or not defendants gave plaintiffs adequate notice of the terms of the contracts is one of the issues the plaintiffs ask the Court to address. If, as the plaintiffs contend, the defendants failed to give sufficient notice of the incorporation of contract terms as required by 14 C.F.R. § 253.5 (general notice of incorporated terms) or § 253.7 (direct notice for certain terms, including terms "restricting refunds" and "imposing monetary penalties"), they would be in violation of those federally imposed contract requirements. Here, the effect of retaining fees to which the airline industry was not entitled was to impose a 'monetary penalty,' in the amount of the unrefunded charges and fees that were not due the Government when the plaintiffs' nonrefundable tickets went unused or were forfeited. Even though a ticket might have stated that it was "nonrefundable" or had a $75 or $100 (or higher) "change fee," which amounts to a 'penalty,' the plaintiffs were not informed of the **additional** penalty that would be imposed on them if they failed to use their nonrefundable tickets. The detailed discussion above, at pg. 15 *et seq.*, demonstrates that the breach of contract claim is fact-intensive and requires discovery before it is appropriate for the Court to consider dismissal.

Plaintiffs' civil conspiracy claims likewise rest to a great extent on the facts that will be

---

[45] *See* 49 U.S.C. § 41707; 14 C.F.R. part 253 (notice of terms of contract of carriage); discussion above at pg. 19 *et seq.*

uncovered during the discovery process. This is particularly true with respect to defendant ATA, which describes itself, at least in part, as "serv[ng] its member airlines … by developing and coordinating industry actions…." and "serv[ing] as a focal point for industry efforts to standardize practices … of the air transport system."[46]

These statements may describe the innocent role of an industry association, or they may describe a more sinister purpose with respect to ATA's role in guiding or setting industry policy, especially if the "industry actions" it coordinates or the "standardize[d] practices" it seeks to establish turn out to be unlawful, as alleged in the Complaint. In addition, the nature and relationships between ATA and its member airlines are unknown, as is the amount of control ATA asserts over industry policy and the role of individual member airlines in determining that policy.

Finally, passengers *must* pay user fees, and ostensibly they make payment of those fees to the airline industry to hold in trust pending payment to the agencies levying the fees. *See supra* pg. 19 *et seq.* and footnote 27 (setting out several requirements that fee collectors hold the collected funds in trust). These user fees are paid *in addition to the airfare* charged by the airlines and are separately enumerated on receipts passengers receive. Yet airline industry policy appears to be uniform in the failure or refusal to refund those fees to passengers who have purchased and not used (or have forfeited) nonrefundable tickets. The plaintiffs assert that this practice is unlawful, and facts tending to show that the airline industry has acted in concert to prevent such passengers from receiving refunds support the plaintiffs' civil conspiracy and breach of fiduciary duty claims.

In short, the plaintiffs have met their initial pleading burden by setting out their claims, and

---

[46] *See* Exhibit E, *supra* footnote 7.

the supporting facts, to the best of their knowledge, information, and belief. Further, the plaintiffs intend to file an Amended Complaint to correct any technical insufficiencies in the present Complaint. These actions are sufficient to provide the defendants with notice of the claims against them. Before the plaintiffs must respond to the more searching inquiry the defendants seek, they are entitled to the opportunity to uncover additional facts to support their claims through the discovery process.

## IV. CONCLUSION

The plaintiffs respectfully request that the Court deny the various defendants' Motions to Dismiss. Alternatively, the plaintiffs request that the Court—

(1) treat the Motions to Dismiss under Rule 12(b)(6) for failure to state a claim as motions for summary judgment under Rule 56, and

(2) deny those motions until the plaintiffs have had reasonable opportunity to "present … facts essential to justify the [plaintiff]'s opposition," Rule 56(f), based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits," Rule 56(c), and "order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had." Rule 56(f).

Respectfully submitted,
*Counsel for the Plaintiffs:*


/s/ Evans J. Carter

EVANS J. CARTER, Esq.
    (Bd. of Bar Overseers No. 076560)
Hargraves, Karb, Wilcox & Galvani, LLP
550 Cochituate Road
P.O. Box 966
Framingham, MA 01701–0966
(508) 620–0140 phone
(508) 875–7728 facsimile

Dated: March 3, 2005

# V. LIST OF EXHIBITS

**Exhibit A.**  Mass. Foreign Corp. Registration Record Summary for Alaska Airlines, Inc. Online (search): <http://corp.sec.state.ma.us/corp/corpsearch/corpsearchinput.asp>.

**Exhibit B.**  Alaska Airlines System Timetable (Feb. 15, 2005 to Apr. 8, 2005) (excerpts). Online: <http://www.alaskatimetable.com/AS.pdf>.

**Exhibit C.**  *City of Boston v. Smith & Wesson Corp.*, No. 99–02590, 2000 WL 34018326, *1 (Mass. Super. Nov. 21, 2000).

**Exhibit D.**  Air Transport Association of America, Inc., *2002 Annual Report* (excerpts). Online: <http://www.airlines.org/>.

**Exhibit E.**  Air Transport Association of America, Inc., *About Us: What is the ATA?* Online: <http://www.airlines.org/about/d.aspx?nid=978>.

**Exhibit F.**  *Massachusetts Report: The Economic Benefits of Aviation to the U.S. Economy and the Potential Impact of Service Disruptions* (excerpts). Online: <http://airlinesorg.siteprotect.net/store/>.

**Exhibit G.**  Federal Aviation Administration, "CY 2003 Commercial Service Airports" (excerpt). Online: <http://www.faa.gov/arp/planning/stats/2003/CY03CommSvAprts.pdf>).

**Exhibit H.**  Federal Aviation Administration, "PFC Approved Locations" (as of Jan. 31, 2005) (excerpt). Online: <http://www.faa.gov/arp/financial/pfc/reports/Airports105.pdf>.

**Exhibit I.**  Federal Aviation Administration, "PFC Reports: Key Passenger Facility Charge Statistics" (as of Aug. 31, 2003). Online: <http://www.faa.gov/arp/financial/pfc/reports/stats.cfm>.

**Exhibit J.**  J.M. Lawrence, "$50M Plane Ticket to Ride: Lawsuit Exposes Airline Windfall," *Boston Herald* (Nov. 28, 2004). Online (requires registration, fee): <http://news.bostonherald.com/localRegional/view.bg?articleid=56150>.

**Exhibit K.**  Letter dated Oct. 31, 2002, from Richard Kocak (Internal Revenue Service) to Evans J. Carter (plaintiffs' counsel).



# The Commonwealth of Massachusetts
# William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

## *ALASKA AIRLINES, INC.* Summary Screen

Help with this form

**The exact name of the Foreign Corporation:** ALASKA AIRLINES, INC.

**Entity Type:** Foreign Corporation

**Identification Number:** 920009235

**Date of Registration in Massachusetts:** 01/25/2002

**The is organized under the laws of:** State: AK    Country: USA    **on:** 12/09/1937

**Current Fiscal Month / Day:** 12 / 31

**The location of its principal office:**
No. and Street: 19300 INTERNATIONAL BLVD., SO.
City or Town: SEATTLE    State: WA    Zip: 98188    Country: USA

**The location of its Massachusetts office, if any:**
No. and Street:
City or Town:    State:    Zip:    Country:

**The name and address of the Registered Agent:**
Name: CORPORATION SERVICE COMPANY
No. and Street: 84 STATE STREET
City or Town: BOSTON    State: MA    Zip: 02109    Country: USA

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration<br>of Term |
|---|---|---|---|
| PRESIDENT | WILLIAM S. AYER | 19300 INTERNATIONAL BLVD.,SO.<br>SEATTLE, WA 98188 USA | |
| TREASURER | AMBER POST | 19300 INTERNATIONAL BLVD., SO.<br>SEATTLE, WA 98188 USA | |

| SECRETARY | KEITH LOVELESS | 19300 INTERNATIONAL BLVD., SO. SEATTLE, WA 98188 USA | |
| DIRECTOR | WILLIAM S. AYER | 19300 INTERNATIONAL BLVD.,SO. SEATTLE, WA 98188 USA | |
| DIRECTOR | RONALD F. COSGRAVE | 19300 INTERNATIONAL BLVD.,SO. SEATTLE, WA 98188 USA | |
| DIRECTOR | WILLIAM S. AYER | 19300 INTERNATIONAL BLVD.,SO. SEATTLE, WA 98188 USA | |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments *Num of Shares*     *Total Par Value* | Total Issued and Outstanding *Num of Shares* |
|---|---|---|---|
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | |

__ Consent    __ Manufacturer    __ Confidential Data    __ Does Not Require Annual Report

__ Partnership    __ Resident Agent    __ For Profit    __ Merger Allowed

**Select a type of filing from below to view this business entity filings:**

**Comments**

© 2001 - 2005 Commonwealth of Massachusetts
All Rights Reserved

Help



# S Y S T E M   T I M E T A B L E

**F E B   1 9 ,   2 0 0 5   -   A P R   8 ,   2 0 0 5**

# Alaska Airlines

Visit us on the Internet at
## www.alaskaair.com

TOLL-FREE RESERVATIONS
within the U.S. and Canada
### 800-ALASKAAIR
(800-252-7522)

En Espanol
### 800-858-5525

from Mexico
### 001-800-252-7522

When calling from
all other countries:
### 800-252-75200

TDD for the Hearing Impaired
### 800-682-2221

## Alaska Airlines Air Cargo
### 800-225-2752

## Alaska Airlines Vacations
### 800-468-2248

## Group Sales
### 800-445-4435

# Horizon Air

Visit us on the Internet at
## www.horizonair.com

TOLL-FREE RESERVATIONS
within the U.S. and Canada
### 800-547-9308

En Espanol
### 800-858-5525

from Mexico
### 001-800-252-7522

TDD for the Hearing Impaired
### 800-843-1338

## Horizon Air Holidays
### 1-888-766-9754

## Group Sales
### 800-547-9308

## Alaska Airlines Mileage Plan
### 800-654-5669

# NEW CHECK-IN POLICY FOR TIMELY DEPARTURES

**10 minutes** prior to departure **be in your seat.**    **3 minutes** prior to departure **doors close.**    **0 minutes** for a timely departure **we take off.**

## How to Read This Timetable

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|-------|--------|--------|------|------|-------|------|

### From: ANCHORAGE                    (ANC)

**To: Homer (HOM)**                          1190 miles

| 4:20a | 5:10a | ★ 4870 | SWM | Daily | 0 | |

**Meal Service**
M designates Meal Service - Code followed by a "/" indicates
First Class only service.
B = Breakfast    L = Lunch    D = Dinner    S = Snack

**Days of Operation**
1 = Monday   2 = Tuesday   3 = Wednesday   4 = Thursday
5 = Friday   6 = Saturday   7 = Sunday   X = Except

## How to Build Flight Connections

1. Select a flight from your origin airport to a connecting airport. Note the arrival time.
2. To determine how much time is needed to transfer between flights, add the connecting flight's arrival time to the minimum connecting time. This is your adjusted arrival time.
3. Select a flight from your connecting airport to your final destination, which leaves after your adjusted arrival time.

For additional flight connections, visit alaskaair.com

**Alaska Airlines/Horizon Air Min. Connecting Times**

| | Domestic to Domestic | Domestic to Int'1 | Int'1 to Domestic | Int'1 to Int'1 |
|---|---|---|---|---|
| Anchorage | :25 | :40 | 1 :30 | - |
| Boise | :20 | - | - | - |
| Fairbanks | :20 | - | - | - |
| Juneau | :20 | - | - | - |
| Los Angeles | :20 | :30 | 1:15 | 1:30 |
| Phoenix | :20 | :30 | 1:20 | - |
| Portland | :30 | :40 | :40 | - |
| San Diego | :20 | :30 | 1:20 | 1:30 |
| San Francisco | :25 | :45 | 1:20 | :45 |
| Seattle | :40 | :40 | 1:00 | 1:20 |
| Spokane | :25 | - | - | - |



# Codeshare Partners and Regional Affiliates

| Flight Numbers | Operated By |
| --- | --- |
| 1-999 | Alaska Airlines |
| 1000-1999 | American Airlines |
| 2000-2999 | Horizon Air |
| 3000-3199 | Continental Airlines |
| 3200-3299 | Peninsula Airways |
| 3380-3449 | Big Sky Airlines |
| 3450-3499 | Helijet Airways |
| 4350-4799 | American Eagle |
| 4800-4999 | Era Aviation |
| 5000-5999 | Northwest Airlines |
| 6750-6999 | Hawaiian Airlines |

All other flight number ranges are operated by Alaska Airlines

# Other Airline Partners

Cathay Pacific Airways
Lan Chile
KLM Royal Dutch Airlines
Qantas Airways

# Equipment Types

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 100 | Fokker F-100 | 73M | Boeing 737-200C | D9S | Boeing DC-9-30/40/50 |
| 319 | Airbus A319 | 752 | Boeing 757-200 | DH4 | Bombardier Q400 |
| 320 | Airbus A320 | 753 | Boeing 757-300 | DH8 | Bombardier Q200 / Dash 8 |
| 330 | Airbus A330 | 757 | Boeing 757 | DHT | DeHavilland Turboprop |
| 717 | Boeing 717 | 762 | Boeing 767-200 | ER3 | Embraer 135 Regional Jet |
| 733 | Boeing 737-300 | 763 | Boeing 767-300 | ER4 | Embraer 145 Regional Jet |
| 734 | Boeing 737-400 | 764 | Boeing 767-400 | ERD | Embraer Regional Jet |
| 735 | Boeing 737-500 | 777 | Boeing 777 | M80 | Boeing MD-80 |
| 738 | Boeing 737-800 | CRJ | Bombardier CRJ-700 | S76 | Sikorsky S-76 |
| 739 | Boeing 737-900 | CVR | Convair Turboprop | SF3 | Saab SF-340 |
| 73G | Boeing 737-700 | D10 | Boeing DC-10 | SWM | Fairchild Metro |

Data shown in this publication is for information only. Alaska Airlines, Inc. will not be responsible for damages resulting from the failure of flights to depart or arrive at the times stated in this publication, or for failure to make connections with planes, errors, or any omissions of data. Schedules are subject to change without notice. Schedules shown are based on expected flying times as presented to the publisher. Departures and arrivals cannot be guaranteed since weather and other factors may affect operating conditions. Timetable production software copyright 2005 by GoldenWare Travel Technologies, LLC. Neither Alaska Airlines, Inc. or GoldenWare Travel Technologies, LLC assume liability for damages, consequential or otherwise, for use of this data, even if notified in advance of such alleged potential damage.

Check In from Your Home or Office with

# *24-Hour Web Check-In*

## at alaskaair.com

Earn 1,000 Mileage Plan Bonus Miles the first time you use 24-Hour Web Check-In!   View Details.

## *alaskaair.com*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Earn Free Travel Faster!

**Want a free ticket?** Purchase your tickets on alaskaair.com and earn free travel faster (see "Earn Bonus Miles" below).

**Get Connected.** You can now purchase tickets with itineraries of up to eight flights at alaskaair.com. You can also buy tickets with connections on Northwest Airlines ®, American Airlines®, Continental Airlines® and United Airlines®.

**Find the lowest fare at alaskaair.com.** We'll show you the lowest fare available at your specified travel time, as well as other low-fare options available that day.

**Change your life with 24-Hour Web Check-In.** Skip the hassle at the airport and check in from your home or office computer, Web-enabled cell phone or wireless Palm device – and earn 1,000 Mileage Plan Bonus miles the first time you use 24-Hour Web Check-In.

**Be in the know.** Subscribe to our weekly email at alaskaair.com and get the latest information, special offers and great deals.

**Don't miss Web Specials.** Visit alaskaair.com for exclusive low fares each week.

**Select the perfect seat.** View seat locations, choose your favorite seat, and change existing seat assignments at alaskaair.com.

**Get the latest flight information.**  With alaskatracker, you can check on a flight's airspeed, altitude, location, type of aircraft, time of lift-off and estimated time of touchdown.

**Stop filling out forms!** Store your contact information and preferences in your MyAlaskaAir account. Earn 1,000 Mileage Plan Bonus Miles just for opening an account.

**Attention business travelers!** Small or medium-sized businesses can book corporate travel through EasyBiz and earn two miles for every dollar spent. http://easybiz.alaskaair.com.

**Enjoy a perfect vacation.** Purchase your Alaska Airlines Vacations package at alaskaair.com and earn 1,500 Mileage Plan Bonus Miles.

**Looking for something to do?** Peruse our City Guides for the best in restaurants, attractions, and shopping, and get the latest weather reports.

**...And much, much more.** It's one-stop shopping for all your travel needs at alaskaair.com.

# Earn 500 Miles

## for subscribing to our e-mail newsletter

### View Details



## Earn Bonus Miles at alaskaair.com*

**4,000 Miles**: The first time you book and purchase your ticket at alaskaair.com.

**1,000 Miles**: Each subsequent time you book and purchase your ticket at alaskaair.com.

**1,000 Miles**: When you redeem your Mileage Plan award** at alaskaair.com.

**1,500 Miles**: When you book your vacation package at alaskaair.com.

**1,000 Miles**: The first time you check in online with alaskaair.com's 24-Hour Web Check-In.

**500 Miles**: When you enroll in Alaska Airlines Mileage Plan on alaskaair.com.

**500 Miles**: When you subscribe to the alaskaair.com e-mail newsletter.

**Up to 5,000 Miles**: With the Alaska Airlines Visa card, earn one mile for every dollar charged. Receive 3,000 miles the first time you use our Classic or Gold card, or 5,000 miles with our Platinum card.

* Bonuses apply in conjunction with flight credit to Alaska Airlines Mileage Plan accounts only. Bonuses are subject to change and some restrictions apply.

** Bonus applies to Alaska Airlines and Horizon Air Mileage Plan awards only.

Check in online at alaskaair.com
Earn 1,000 Mileage Plan Bonus Miles the first time you use 24-Hour Web Check-In! View Details
at alaskaair.com

## Austin TX (Cont)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Dallas/Ft Worth TX (DFW)** | | | | | 190 miles | |
| 1:00p | 2:01p ✦ 1429 | M80 | Daily | 0 | | |
| *Above Disc. Apr3* | | | | | | |
| 1:59p | 3:02p ✦ 1429 | M80 | X6 | 0 | | |
| *Above Disc. Apr3* | | | | | | |
| 2:00p | 3:03p ✦ 1713 | M80 | Daily | 0 | | |
| *Above Disc. Apr3* | | | | | | |
| 3:00p | 4:00p ✦ 1904 | M80 | Daily | 0 | | |
| **To: Los Angeles CA (LAX)** | | | | | 1240 miles | |
| 7:10a | 8:18a ✦ 1880 | M80 | X6 | 0 | F | |
| *Above Eff. Apr3* | | | | | | |
| 7:28a | 8:41a ✦ 1880 | M80 | Daily | 0 | F | |
| *Above Disc. Apr2* | | | | | | |
| 1:21p | 2:32p ✦ 1897 | M80 | X6 | 0 | F | |
| 5:50p | 7:02p ✦ 1901 | M80 | Daily | 0 | F | |
| *Above Disc. Apr3* | | | | | | |
| 6:10p | 7:14p ✦ 1901 | M80 | X6 | 0 | F | |
| *Above Disc. Apr3* | | | | | | |
| **To: San Jose CA (SJC)** | | | | | 1475 miles | |
| 6:50a | 8:33a ✦ 1986 | M80 | X67 | 0 | F | |
| *Above Disc. Apr3* | | | | | | |
| 7:05a | 8:46a ✦ 1986 | M80 | X67 | 0 | F | |
| *Above Eff.Apr4* | | | | | | |
| 9:15a | 10:59a ✦ 1398 | M80 | Daily | 0 | F | |
| *Above Feb21-Apr2* | | | | | | |
| 9:30a | 11:08a ✦ 1398 | M80 | X6 | 0 | F | |
| *Above Disc. Apr3* | | | | | | |
| 4:52p | 6:34p ✦ 1985 | M80 | X6 | 0 | F | |
| *Above Eff.Feb21* | | | | | | |

## Baltimore MD (BWI)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Boston MA (BOS)** | | | | | 369 miles | |
| 6:00a | 7:20a ★ 4645 | ER4 | X7 | 0 | | |
| 8:33a | 9:50a ★ 4358 | ER4 | X6 | 0 | | |
| 10:45a | 12:00N ★ 4648 | ER4 | Daily | 0 | | |
| 12:21p | 1:36p ★ 4617 | ER4 | X6 | 0 | | |
| 1:58p | 3:14p ★ 4494 | ER4 | X6 | 0 | | |
| 3:17p | 4:35p ★ 4002 | ER4 | X7 | 0 | | |
| 4:49p | 6:09p ★ 4759 | ER4 | X67 | 0 | | |
| 7:48p | 9:02p ★ 4740 | ER4 | X6 | 0 | | |
| **To: Chicago - O'Hare IL (ORD)** | | | | | 620 miles | |
| 7:29a | 8:45a ★ 1417 | M80 | Daily | 0 | | |
| *Above Disc. Apr3* | | | | | | |
| 7:43a | 8:51a ★ 1417 | M80 | X6 | 0 | | |
| *Above Disc. Apr2* | | | | | | |
| 3:36p | 4:51p ★ 1604 | M80 | Daily | 0 | | |
| *Above Eff. Feb21* | | | | | | |
| 5:48p | 7:15p ★ 1040 | M80 | X6 | 0 | | |
| *Above Disc. Apr3* | | | | | | |
| 5:55p | 7:10p ★ 1547 | M80 | X6 | 0 | | |
| *Above Eff.Apr21* | | | | | | |

## Bangor ME (BGR)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Boston MA (BOS)** | | | | | 201 miles | |
| 5:10a | 6:08a ★ 4620 | ER3 | X7 | 0 | | |
| 5:54a | 6:50a ★ 4323 | ER3 | X67 | 0 | | |
| 6:23a | 7:20a ★ 4323 | ER3 | 7 | 0 | | |
| 7:50a | 8:50a ★ 4613 | ER3 | Daily | 0 | | |
| 8:20a | 9:19a ★ 4022 | ER3 | 7 | 0 | | |
| 12:50p | 1:47p ★ 4322 | ER3 | X6 | 0 | | |
| 1:23p | 2:21p ★ 4322 | ER3 | 6 | 0 | | |
| 2:45p | 3:42p ★ 4631 | ER3 | 67 | 0 | | |
| *Above Exc. Feb26* | | | | | | |

## Barrow AK (BRW)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Anchorage AK (ANC)** | | | | | 723 miles | |
| 10:31a | 1:18p 144 | 73M | X13 | 1 | S | |
| 7:46p | 10:28p 146 | 73M | Daily | 1 | | |
| **To: Fairbanks AK (FAI)** | | | | | 502 miles | |
| 10:31a | 11:49a 144 | 73M | X13 | 0 | S | |
| 7:46p | 9:02p 146 | 73M | Daily | 0 | | |

## Bellingham WA (BLI)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Seattle/Tacoma WA (SEA)** | | | | | 93 miles | |
| 5:20a | 6:00a ✦ 2041 | DH8 | Daily | 0 | | |
| 9:10a | 9:50a ✦ 2171 | DH8 | Daily | 0 | | |
| 11:30a | 12:10p ✦ 2249 | DH8 | Daily | 0 | | |
| 1:45p | 2:25p ✦ 2145 | DH8 | Daily | 0 | | |
| 3:20p | 4:00p ✦ 2119 | DH8 | Daily | 0 | | |
| 5:20p | 5:58p ✦ 2137 | DH8 | Daily | 0 | | |
| 7:30p | 8:10p ✦ 2157 | DH8 | Daily | 0 | | |

## Bethel AK (BET)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Anchorage AK (ANC)** | | | | | 397 miles | |
| 7:54a | 10:26a 42 | 73M | X7 | 1 | | |
| 12:27p | 1:37p 48 | 73M | 1 | 0 | | |
| 1:00p | 2:10p 48 | 73M | 5 | 0 | | |
| 3:52p | 5:02p 44 | 73M | Daily | 0 | | |
| 7:44p | 8:49p 46 | 73M | Daily | 0 | | |
| **To: Chefornak AK (CYF)** | | | | | 94 miles | |
| 8:40a | 9:35a ✦ 4860 | DHT | Daily | 1 | | |
| 4:10p | 4:50p ✦ 4869 | DHT | X6 | 0 | | |
| **To: Chevak AK (VAK)** | | | | | 135 miles | |
| 12:20p | 1:40p ✦ 4858 | DHT | X67 | 1 | | |
| 4:25p | 5:25p ✦ 4867 | DHT | Daily | 1 | | |
| **To: Goodnews Bay AK (GNU)** | | | | | 115 miles | |
| 12:30p | 1:20p ✦ 4866 | DHT | Daily | 0 | | |
| **To: Hooper Bay AK (HPB)** | | | | | 152 miles | |
| 8:50a | 10:15a ✦ 4861 | DHT | Daily | 1 | | |
| 12:20p | 1:08p ✦ 4858 | DHT | X67 | 0 | | |
| 4:25p | 5:45p ✦ 4867 | DHT | Daily | 1 | | |
| **To: Kipnuk AK (KPN)** | | | | | 95 miles | |
| 8:40a | 9:15a ✦ 4860 | DHT | Daily | 0 | | |
| 4:10p | 5:10p ✦ 4869 | DHT | X6 | 1 | | |
| **To: Kodiak AK (ADQ)** | | | | | 390 miles | |
| 7:54a | 8:59a 42 | 73M | X7 | 0 | | |
| **To: Kongiganak AK (KKH)** | | | | | 67 miles | |
| 9:00a | 9:50a ✦ 4863 | DHT | Daily | 1 | | |
| 4:06p | 5:10p ✦ 4864 | DHT | X67 | 1 | | |
| **To: Kwigillingok AK (KWK)** | | | | | 77 miles | |
| 4:06p | 4:45p ✦ 4864 | DHT | X67 | 0 | | |
| **To: Mekoryuk AK (MYU)** | | | | | 153 miles | |
| 8:30a | 9:35a ✦ 4862 | DHT | Daily | 0 | | |
| **To: Newtok AK (WWT)** | | | | | 95 miles | |
| 12:40p | 2:15p ✦ 4865 | DHT | Daily | 2 | | |
| **To: Nightmute AK (NME)** | | | | | 98 miles | |
| 12:40p | 1:25p ✦ 4865 | DHT | Daily | 1 | | |
| **To: Platinum AK (PTU)** | | | | | 122 miles | |
| 12:30p | 1:40p ✦ 4866 | DHT | Daily | 1 | | |
| **To: Quinhagak AK (KWN)** | | | | | 70 miles | |
| 12:30p | 2:10p ✦ 4866 | DHT | Daily | 1 | | |
| **To: Scammon Bay AK (SCM)** | | | | | 144 miles | |
| 8:50a | 9:50a ✦ 4861 | DHT | Daily | 0 | | |
| **To: Toksook Bay AK (OOK)** | | | | | 112 miles | |
| 12:40p | 1:45p ✦ 4865 | DHT | Daily | 1 | | |
| 4:15p | 5:05p ✦ 4868 | DHT | Daily | 1 | | |
| **To: Tuntutuliak AK (WTL)** | | | | | 41 miles | |
| 9:00a | 9:20a ✦ 4863 | DHT | Daily | 0 | | |
| **To: Tununak AK (TNK)** | | | | | 117 miles | |
| 8:30a | 10:05a ✦ 4862 | DHT | Daily | 1 | | |
| 4:15p | 5:25p ✦ 4868 | DHT | Daily | 1 | | |

## Billings MT (BIL)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Boise ID (BOI)** | | | | | 408 miles | |
| 8:30a | 11:40a ✦ 3393 | SWM | Daily | 1 | | |
| 12:15p | 2:05p ✦ 3395 | SWM | 7 | 0 | | |
| **To: Glasgow MT (GGW)** | | | | | 189 miles | |
| 10:15a | 11:12a ✦ 3420 | SWM | X67 | 0 | | |
| 6:35p | 8:07p ✦ 3418 | SWM | Daily | 1 | | |
| **To: Glendive MT (GDV)** | | | | | 200 miles | |
| 1:45p | 3:13p ✦ 3424 | SWM | X67 | 1 | | |
| **To: Glendive MT (Con't)** | | | | | | |
| 6:55p | 8:16p ✦ 3428 | | Daily | 1 | | |
| **To: Havre MT (HVR)** | | | | | 197 miles | |
| 2:00p | 3:35p ✦ 3422 | SWM | X67 | 1 | | |
| 6:45p | 8:16p ✦ 3426 | SWM | Daily | 1 | | |
| **To: Lewistown MT (LWT)** | | | | | 96 miles | |
| 2:00p | 2:39p ✦ 3422 | SWM | Daily | 0 | | |
| 6:45p | 7:24p ✦ 3426 | SWM | Daily | 0 | | |
| **To: Miles City MT (MLS)** | | | | | 134 miles | |
| 1:45p | 2:28p ✦ 3424 | SWM | X67 | 0 | | |
| 6:55p | 7:37p ✦ 3428 | SWM | Daily | 0 | | |
| **To: Moses Lake WA (MWH)** | | | | | 521 miles | |
| 8:30a | 3:25p ✦ 3393 | SWM | X6 | 2 | | |
| **To: Portland OR (PDX)** | | | | | 678 miles | |
| 1:35p | 2:45p ✦ 2417 | DH4 | Daily | 0 | | |
| **To: Seattle/Tacoma WA (SEA)** | | | | | 662 miles | |
| 6:00a | 7:15a ✦ 2411 | DH4 | Daily | 0 | | |
| 6:45p | 7:59p ✦ 2419 | DH4 | X6 | 0 | | |
| **To: Sidney MT (SDY)** | | | | | 244 miles | |
| 9:00a | 10:07a ✦ 3414 | SWM | X67 | 0 | | |
| 1:05p | 2:12p ✦ 3444 | SWM | X6 | 0 | | |
| 7:10p | 8:17p ✦ 3416 | SWM | X6 | 0 | | |
| **To: Wolf Point MT (OLF)** | | | | | 211 miles | |
| 10:15a | 11:50a ✦ 3420 | SWM | X67 | 1 | | |
| 6:35p | 7:29p ✦ 3418 | SWM | Daily | 0 | | |

## Bloomington IL (BMI)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Chicago - O'Hare IL (ORD)** | | | | | 116 miles | |
| 7:10a | 8:01a ★ 4770 | ER4 | Daily | 0 | | |
| 9:58a | 10:45a ★ 4282 | ER4 | Daily | 0 | | |
| *Above Apr. Apr2* | | | | | | |
| 1:07p | 1:57p ★ 4750 | ER4 | X6 | 0 | | |
| *Above Eff. Apr3* | | | | | | |
| 1:39p | 2:28p ★ 4750 | ER4 | Daily | 0 | | |
| *Above Eff. Apr3* | | | | | | |
| 5:50p | 6:43p ★ 4128 | ER4 | Daily | 0 | | |

## Boise ID (BOI)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Billings MT (BIL)** | | | | | 408 miles | |
| 12:45p | 2:35p ✦ 3386 | SWM | 6 | 0 | | |
| 3:25p | 6:13p ✦ 3394 | SWM | Daily | 1 | | |
| **To: Idaho Falls ID (IDA)** | | | | | 208 miles | |
| 9:25a | 10:21a ✦ 2202 | DH8 | Daily | 0 | | |
| 6:20p | 7:16p ✦ 2216 | DH8 | 6 | 0 | | |
| 9:10p | 10:06p ✦ 2204 | DH8 | X6 | 0 | | |
| **To: Lewiston ID (LWS)** | | | | | 198 miles | |
| 7:55a | 7:55a ✦ 2192 | DH8 | Daily | 0 | | |
| 1:55p | 1:55p ✦ 2164 | DH8 | Daily | 0 | | |
| 5:45p | 5:45p ✦ 2198 | DH8 | X6 | 0 | | |
| **To: Los Angeles CA (LAX)** | | | | | 675 miles | |
| 6:15a | 7:40a ✦ 2385 | DH4 | Daily | 0 | | |
| *Above Eff. Mar6* | | | | | | |
| 7:05a | 8:10a ✦ 2547 | CR7 | Daily | 0 | | |
| *Above Disc. Mar5* | | | | | | |
| 12:40p | 1:37p ✦ 2557 | CR7 | 6 | 0 | | |
| *Above Disc. Mar26* | | | | | | |
| 6:35p | 7:59p ✦ 2389 | DH4 | Daily | 0 | | |
| *Above Eff. Mar6Exc. Mar12,Mar19,Mar26* | | | | | | |
| 6:57p | 7:59p ✦ 2551 | CR7 | X6 | 0 | | |
| *Above Disc. Mar4* | | | | | | |
| **To: Missoula MT (MSO)** | | | | | 254 miles | |
| 3:25p | 4:45p ✦ 3394 | SWM | Daily | 0 | | |
| **To: Moses Lake WA (MWH)** | | | | | 293 miles | |
| 3:00p | 3:25p ✦ 3393 | SWM | X6 | 0 | | |
| **To: Pocatello ID (PIH)** | | | | | 188 miles | |
| 9:25a | 11:01a ✦ 2202 | DH8 | Daily | 1 | | |
| 2:25p | 3:11p ✦ 2361 | DH4 | Daily | 0 | | |
| 6:20p | 7:52p ✦ 2216 | DH8 | 6 | 1 | | |
| 9:10p | 10:42p ✦ 2204 | DH8 | X6 | 1 | | |
| **To: Portland OR (PDX)** | | | | | 343 miles | |
| 6:00a | 6:20a ✦ 2364 | DH4 | X7 | 0 | | |
| **To: Portland OR (Con't)** | | | | | | |
| 8:00a | 8:10a ✦ 2536 | CR7 | 7 | 0 | | |
| *Above Disc. Feb27* | | | | | | |
| 8:00a | 8:10a ✦ 2466 | CR7 | 7 | 0 | | |
| *Above Mar6-Mar27* | | | | | | |
| 9:35a | 9:54a ✦ 2320 | DH4 | X7 | 0 | | |
| 11:40a | 11:59a ✦ 2422 | DH4 | Daily | 0 | | |
| *Above Eff. Mar7Exc. Mar12,Mar19,Mar26* | | | | | | |
| 1:00p | 1:10p ✦ 2522 | CR7 | Daily | 0 | | |
| *Above Disc. Mar5* | | | | | | |
| 4:15p | 4:34p ✦ 2426 | DH4 | 6 | 0 | | |
| *Above Mar12-Mar26* | | | | | | |
| 5:50p | 6:17p ✦ 2362 | DH4 | Daily | 0 | | |
| 8:15p | 8:24p ✦ 2458 | CR7 | X6 | 0 | | |
| *Above Eff. Apr3* | | | | | | |
| 8:40p | 8:49p ✦ 2520 | CR7 | Daily | 0 | | |
| *Above Feb20-Mar5Exc. Feb26* | | | | | | |
| 8:40p | 8:49p ✦ 2476 | CR7 | X6 | 0 | | |
| *Above Mar6-Apr15* | | | | | | |
| **To: Sacramento CA (SMF)** | | | | | 437 miles | |
| 12:40p | 1:00p ✦ 2501 | CR7 | Daily | 0 | | |
| *Above Disc. Mar5* | | | | | | |
| 12:40p | 1:00p ✦ 2461 | CR7 | Daily | 0 | | |
| *Above Mar6-Apr2* | | | | | | |
| 12:40p | 1:00p ✦ 2463 | CR7 | X6 | 0 | | |
| *Above Disc. Apr3* | | | | | | |
| 9:20p | 9:49p ✦ 2303 | DH4 | X6 | 0 | | |
| **To: Salt Lake City UT (SLC)** | | | | | 290 miles | |
| 8:05a | 9:09a ★ 6121 | 733 | 7 | 0 | | |
| 1:15p | 2:17p ★ 6018 | 733 | X6 | 0 | | |
| *Above Eff. Apr1* | | | | | | |
| 1:15p | 2:18p ★ 6108 | 733 | X6 | 0 | | |
| *Above Mar2-Mar31* | | | | | | |
| 2:30p | 3:33p ★ 6108 | 733 | X6 | 0 | | |
| *Above Disc. Mar1* | | | | | | |
| **To: San Jose CA (SJC)** | | | | | 523 miles | |
| 11:20a | 12:00N ✦ 2571 | CR7 | X6 | 0 | | |
| *Above Feb20-Apr1* | | | | | | |
| 11:20a | 12:00N ✦ 2571 | CR7 | 6 | 0 | | |
| *Above Apr2-Apr2* | | | | | | |
| 11:20a | 12:00N ✦ 2521 | CR7 | X6 | 0 | | |
| *Above Eff. Apr3* | | | | | | |
| 11:40a | 12:35p ✦ 2403 | DH4 | 6 | 0 | | |
| 4:05p | 4:45p ✦ 2523 | CR7 | X6 | 0 | | |
| *Above Disc. Apr1Exc. Mar12,Mar19,Mar26* | | | | | | |
| 4:30p | 5:10p ✦ 2573 | CR7 | Daily | 0 | | |
| *Above Disc. Apr1Exc. Mar12,Mar19,Mar26* | | | | | | |
| **To: Seattle/Tacoma WA (SEA)** | | | | | 398 miles | |
| 6:15a | 6:50a ✦ 2369 | DH4 | X7 | 0 | | |
| *Above Disc. Mar5* | | | | | | |
| 6:30a | 6:50a 514 | M80 | X7 | 0 | | |
| *Above Disc. Mar7* | | | | | | |
| 9:15a | 9:50a ✦ 2391 | DH4 | Daily | 0 | | |
| 11:00a | 11:30a ✦ 2407 | DH4 | Daily | 0 | | |
| *Above Disc. Mar5* | | | | | | |
| 11:50a | 12:20p ✦ 2407 | DH4 | Daily | 0 | | |
| *Above Disc. Mar5* | | | | | | |
| 2:10p | 2:33p 362 | M80 | Daily | 0 | | |
| 5:56p | 6:19p 396 | M80 | Daily | 0 | | |
| 8:55p | 9:30p ✦ 2399 | DH4 | X6 | 0 | | |
| **To: Spokane WA (GEG)** | | | | | 287 miles | |
| 9:00a | 9:05a ✦ 2300 | DH4 | X7 | 0 | | |
| 5:10p | 5:12p ✦ 2302 | DH4 | Daily | 0 | | |

## Boston MA (BOS)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Baltimore MD (BWI)** | | | | | 369 miles | |
| 6:25a | 7:59a ★ 4715 | ER4 | X67 | 0 | | |
| 8:42a | 10:15a ★ 4681 | ER4 | X6 | 0 | | |
| 10:22a | 11:51a ★ 4757 | ER4 | X6 | 0 | | |
| 12:00N | 1:28p ★ 4675 | ER4 | X6 | 0 | | |
| 1:20p | 2:47p ★ 4003 | ER4 | X7 | 0 | | |
| 2:46p | 4:19p ★ 4758 | ER4 | X67 | 0 | | |
| 5:45p | 7:18p ★ 4512 | ER4 | Daily | 0 | | |
| 6:55p | 8:29p ★ 4646 | ER4 | X6 | 0 | | |

✦ = Operated by Horizon Air Industries. ★ = Operated by partner carrier. All other flights operated by Alaska Airlines.

Check out our new Check-In Options!
Earn 1,000 Mileage Plan Bonus Miles the first time you use 24-Hour Web Check-In! View Details
at alaskaair.com

## Boston MA (Cont)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Bangor ME (BGR)** | | | | | 201 miles | |
| 11:15a | 12:09p ★ 4319 | ER3 | X6 | 0 | |
| 12:00N | 12:53p ★ 4319 | ER3 | 6 | 0 | |
| 1:20p | 2:13p ★ 4739 | ER3 | 67 | 0 | |
| Above Exc. Feb26 | | | | | |
| 6:50p | 7:50p ★ 4327 | ER3 | 6 | 0 | |
| 7:55p | 8:53p ★ 4327 | ER3 | X6 | 0 | |
| 8:50p | 9:44p ★ 4619 | ER3 | Daily | 0 | |
| 10:00p | 10:54p ★ 4614 | ER3 | X6 | 0 | |
| **To: Chicago - O'Hare IL (ORD)** | | | | | 865 miles | |
| 5:44a | 7:32a ★ 1159 | M80 | X7 | 0 | |
| Above Disc. Apr2 | | | | | |
| 6:00a | 7:41a ★ 1101 | M80 | X67 | 0 | |
| Above Eff. Apr4 | | | | | |
| 6:52a | 8:41a ★ 1101 | M80 | Daily | 0 | |
| Above Eff. Apr3 | | | | | |
| 7:51a | 9:36a ★ 1197 | M80 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| 8:35a | 10:28a ★ 1197 | M80 | Daily | 0 | |
| Above Disc. Apr2 | | | | | |
| 8:40a | 10:23a ★ 1159 | M80 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| 3:38p | 5:30p ★ 1117 | M80 | Daily | 0 | |
| 5:13p | 7:02p ★ 1046 | M80 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| 6:27p | 8:18p ★ 1069 | 738 | X6 | 0 | |
| **To: Columbus OH (CMH)** | | | | | 639 miles | |
| 6:45a | 8:53a ★ 4592 | ER4 | X7 | 0 | |
| 9:30a | 11:40a ★ 4551 | ER3 | X6 | 0 | |
| 5:15p | 7:23p ★ 4593 | ER4 | Daily | 0 | |
| 8:45p | 10:49p ★ 4490 | ER3 | X6 | 0 | |
| **To: Los Angeles CA (LAX)** | | | | | 2608 miles | |
| 8:00a | 11:23a ★ 1287 | 738 | Daily | 0 | F |
| 11:50a | 3:11p ★ 1270 | 738 | Daily | 0 | F |
| 3:45p | 7:08p ★ 1265 | 738 | Daily | 0 | F |
| Above Eff. Apr3 | | | | | |
| 4:00p | 7:17p ★ 1265 | 738 | X6 | 0 | F |
| Above Feb21-Apr2 | | | | | |
| 5:30p | 8:54p ★ 1276 | 738 | Daily | 0 | F |
| **To: New York - Kennedy NY (JFK)** | | | | | 186 miles | |
| 9:15a | 10:26a ★ 4784 | ER3 | Daily | 0 | |
| 10:30a | 11:38a ★ 4032 | ER3 | 67 | 0 | |
| 2:30p | 3:42p ★ 4781 | ER3 | Daily | 0 | |
| 3:40p | 4:55p ★ 4775 | ER3 | Daily | 0 | |
| 4:00p | 5:10p ★ 4027 | ER3 | 6 | 0 | |
| 4:45p | 5:59p ★ 4788 | ERD | X67 | 0 | |
| Above Feb21-Apr1 | | | | | |
| 4:45p | 5:59p ★ 4788 | ERD | X6 | 0 | |
| Above Apr3-Apr8 | | | | | |
| 5:00p | 6:16p ★ 4788 | ER3 | 67 | 0 | |
| Above Apr2 | | | | | |
| 8:00p | 9:17p ★ 4727 | ER3 | Daily | 0 | |
| **To: Newark NJ (EWR)** | | | | | 200 miles | |
| 7:30a | 8:50a ★ 4457 | ER3 | X67 | 0 | |
| 10:30a | 11:48a ★ 4768 | ER4 | X7 | 0 | |
| 1:45p | 3:10p ★ 4488 | ERD | Daily | 0 | |
| 4:59p | 6:22p ★ 4585 | ER3 | Daily | 0 | |
| 7:20p | 8:43p ★ 4537 | ER3 | X6 | 0 | |
| **To: Norfolk VA (ORF)** | | | | | 468 miles | |
| 6:05a | 7:43a ★ 4745 | ER3 | X67 | 0 | |
| 7:10a | 8:49a ★ 4278 | ERD | 6 | 0 | |
| 8:39a | 10:15a ★ 4278 | ER3 | X6 | 0 | |
| 1:00p | 2:31p ★ 4741 | ERD | Daily | 0 | |
| 5:35p | 7:12p ★ 4295 | ER3 | X67 | 0 | |
| 6:10p | 7:52p ★ 4295 | ERD | 6 | 0 | |
| 8:05p | 9:41p ★ 4701 | ERD | X6 | 0 | |
| **To: Raleigh/Durham NC (RDU)** | | | | | 612 miles | |
| 6:46a | 8:51a ★ 4005 | ER3 | X67 | 0 | |
| 8:00a | 10:04a ★ 4697 | ER3 | Daily | 0 | |
| 9:00a | 11:07a ★ 4304 | ER3 | Daily | 0 | |
| 10:49a | 12:45p ★ 4726 | ER3 | X6 | 0 | |
| Above Disc. Apr2 | | | | | |
| 11:00a | 1:03p ★ 4726 | ER3 | Daily | 0 | |
| Above Disc. Mar27 | | | | | |

### To: Raleigh/Durham NC (Con't)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| 12:15p | 2:14p ★ 4733 | ERD | 7 | 0 | |
| Above Eff. Mar6 | | | | | |
| 12:55p | 2:52p ★ 4733 | ER3 | Daily | 0 | |
| Above Disc. Mar5 | | | | | |
| 12:55p | 2:52p ★ 4733 | ER3 | X7 | 0 | |
| Above Eff. Mar7 | | | | | |
| 2:16p | 4:18p ★ 4679 | ER4 | X6 | 0 | |
| 4:00p | 6:04p ★ 4742 | ER3 | Daily | 0 | |
| 7:15p | 9:18p ★ 4321 | ERD | X6 | 0 | |
| **To: Richmond VA (RIC)** | | | | | 474 miles | |
| 7:35a | 9:19a ★ 4483 | 67 | 0 | |
| 8:05a | 9:47a ★ 4483 | ER3 | X67 | 0 | |
| 8:30p | 10:09p ★ 4314 | ER3 | X6 | 0 | |
| **To: San Diego CA (SAN)** | | | | | 2585 miles | |
| 5:10p | 8:26p ★ 1277 | 738 | Daily | 0 | F |
| **To: San Francisco CA (SFO)** | | | | | 2700 miles | |
| 6:00a | 11:22a ★ 1101 | M80 | X67 | 1 | F |
| Above Eff. Apr4 | | | | | |
| 9:10a | 12:43p ★ 1269 | 757 | X6 | 0 | F |
| 2:35p | 5:58p ★ 1080 | 757 | X6 | 0 | F |
| Above Eff. Apr3 | | | | | |
| 6:50p | 10:23p ★ 1274 | 757 | Daily | 0 | F |
| **To: Seattle/Tacoma WA (SEA)** | | | | | 2491 miles | |
| 8:40a | 1:30p ★ 1159 | M80 | X6 | 1 | F |
| Above Eff. Apr3 | | | | | |
| 6:02p | 9:17p ★ 15 | 739 | Daily | 0 | D |
| **To: Toronto ON Canada (YYZ)** | | | | | 445 miles | |
| 8:27a | 10:20a ★ 4753 | ER3 | X7 | 0 | |
| 10:49a | 12:40p ★ 4007 | ER3 | Daily | 0 | |
| 12:28p | 2:20p ★ 4755 | ER3 | X6 | 0 | |
| 3:51p | 5:45p ★ 4756 | ER3 | Daily | 0 | |
| 9:42p | 11:25p ★ 4692 | ER3 | Daily | 0 | |

## Bozeman MT (BZN)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Butte MT (BTM)** | | | | | 65 miles | |
| 3:10p | 3:37p ✈ 2328 | DH4 | Daily | 0 | |
| 9:00p | 9:30p ✈ 2350 | DH4 | Daily | 0 | |
| Above Eff. Apr3 | | | | | |
| 11:15p | 11:44p ✈ 2350 | DH4 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| **To: Los Angeles CA (LAX)** | | | | | 903 miles | |
| 6:30p | 8:10p ★ 2581 | CR7 | 6 | 0 | |
| Above Disc. Mar26 | | | | | |
| **To: Seattle/Tacoma WA (SEA)** | | | | | 542 miles | |
| 8:05a | 9:00a ✈ 2381 | DH4 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| 8:25a | 9:20a ✈ 2381 | DH4 | Daily | 0 | |
| Above Disc. Apr2 | | | | | |
| 3:10p | 4:50p ✈ 2328 | DH4 | Daily | 1 | |

## Buffalo NY (BUF)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Chicago - O'Hare IL (ORD)** | | | | | 472 miles | |
| 6:17a | 7:00a ★ 4680 | ER4 | Daily | 0 | |
| 7:43a | 8:37a ★ 4347 | ER4 | 7 | 0 | |
| Above Disc. Mar27 | | | | | |
| 7:58a | 8:46a ★ 4347 | CR7 | X7 | 0 | |
| Above Eff. Mar28 | | | | | |
| 7:58a | 8:46a ★ 4347 | CR7 | X6 | 0 | |
| Above Apr3-Apr8 | | | | | |
| 4:13p | 5:00p ★ 4704 | ER4 | Daily | 0 | |
| 6:23p | 7:19p ★ 4337 | ER4 | X6 | 0 | |

## Burbank CA (BUR)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Portland OR (PDX)** | | | | | 818 miles | |
| 9:20a | 11:30a ✈ 2506 | CR7 | Daily | 0 | |
| Above Disc. Mar5 | | | | | |
| 9:20a | 11:30a ✈ 2458 | CR7 | Daily | 0 | |
| Above Mar6-Apr2 | | | | | |
| 9:20a | 11:30a ✈ 2452 | CR7 | Daily | 0 | |
| Above Eff. Apr3 | | | | | |
| 1:40p | 3:50p ✈ 2502 | CR7 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |

## Butte MT (BTM)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Bozeman MT (BZN)** | | | | | 65 miles | |
| 7:10a | 7:42a ✈ 2381 | DH4 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| 7:30a | 8:02a ✈ 2381 | DH4 | Daily | 0 | |
| Above Disc. Apr2 | | | | | |
| **To: Seattle/Tacoma WA (SEA)** | | | | | 607 miles | |
| 7:10a | 9:00a ✈ 2381 | DH4 | X6 | 1 | |
| Above Eff. Apr3 | | | | | |
| 7:30a | 9:20a ✈ 2381 | DH4 | Daily | 1 | |
| Above Disc. Apr2 | | | | | |
| 4:07p | 4:50p ✈ 2328 | DH4 | Daily | 0 | |

## Calgary AB Canada (YYC)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Los Angeles CA (LAX)** | | | | | 1208 miles | |
| 7:00a | 9:28a ★ 698 | 734 | Daily | 0 | |
| 12:30p | 4:22p ★ 524 | 734 | Daily | 1 | |
| **To: Seattle/Tacoma WA (SEA)** | | | | | 451 miles | |
| 6:30a | 7:20a ✈ 2329 | DH4 | Daily | 0 | |
| 12:30p | 12:59p ★ 524 | 734 | Daily | 0 | |
| 5:45p | 6:30p ✈ 2333 | DH4 | Daily | 0 | |
| Above Disc. Apr2 | | | | | |
| 6:05p | 6:48p ✈ 2333 | DH4 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |

## Cancun Mexico (CUN)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Los Angeles CA (LAX)** | | | | | 2119 miles | |
| 5:00p | 8:32p ★ 225 | 739 | Daily | 0 | S |
| **To: Seattle/Tacoma WA (SEA)** | | | | | 2687 miles | |
| 5:00p | 0:26a+1 ★ 225 | 739 | Daily | 1 | S |

## Cedar Rapids IA (CID)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Chicago - O'Hare IL (ORD)** | | | | | 195 miles | |
| 6:18a | 7:19a ★ 4140 | ER4 | X6 | 0 | |
| 8:02a | 9:00a ★ 4305 | ERD | Daily | 0 | |
| 2:11p | 3:14p ★ 4558 | ER4 | Daily | 0 | |
| 4:41p | 5:43p ★ 4192 | ER4 | Daily | 0 | |
| 6:56p | 8:01p ★ 4172 | ER4 | X6 | 0 | |
| Above Disc. Apr1 | | | | | |
| 7:10p | 8:08p ★ 4172 | ER4 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| 6:18a | 10:12a ★ 4140 | ER4 | X6 | 1 | |

## Champaign IL (CMI)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Chicago - O'Hare IL (ORD)** | | | | | 135 miles | |
| 7:06a | 8:01a ★ 4189 | ER4 | Daily | 0 | |
| Above Exc. Feb20/Mar2/Apr2 | | | | | |
| 7:20a | 8:15a ★ 4189 | ER4 | Daily | 0 | |
| Above Mar2/Apr2 | | | | | |
| 8:14a | 9:10a ★ 4297 | ER4 | Daily | 0 | |
| 3:00p | 3:55p ★ 4683 | ER4 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| 3:29p | 4:26p ★ 4683 | ER4 | 6 | 0 | |
| 5:41p | 6:44p ★ 4173 | ER4 | X6 | 0 | |

## Charlotte NC (CLT)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Chicago - O'Hare IL (ORD)** | | | | | 600 miles | |
| 6:40a | 7:45a ★ 4080 | ER4 | Daily | 0 | |
| 2:38p | 3:52p ★ 4184 | ER4 | Daily | 0 | |
| 5:57p | 7:15p ★ 4185 | ER4 | X6 | 0 | |
| Above Disc. Apr1 | | | | | |
| 6:09p | 7:15p ★ 4185 | ER4 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |

## Chefornak AK (CYF)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Bethel AK (BET)** | | | | | 94 miles | |
| 9:45a | 10:20a ✈ 4860 | DHT | Daily | 0 | |
| 5:00p | 5:55p ✈ 4869 | DHT | X6 | 1 | |
| **To: Kipnuk AK (KPN)** | | | | | 17 miles | |
| 5:00p | 5:10p ✈ 4869 | DHT | X6 | 0 | |

## Chevak AK (VAK)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Bethel AK (BET)** | | | | | 135 miles | |
| 10:50a | 11:50a ✈ 4861 | DHT | Daily | 0 | |
| 1:50p | 2:50p ✈ 4858 | DHT | X67 | 0 | |
| **To: Hooper Bay AK (HPB)** | | | | | 18 miles | |
| 5:30p | 5:45p ✈ 4867 | DHT | Daily | 0 | |
| **To: Scammon Bay AK (SCM)** | | | | | 21 miles | |
| 5:30p | 6:05p ✈ 4867 | DHT | Daily | 1 | |

## Chicago - O'Hare IL (ORD)

| Leave | Arrive | Flight | Type | Freq | Stops | Meal |
|---|---|---|---|---|---|---|
| **To: Albany NY (ALB)** | | | | | 721 miles | |
| 6:52a | 9:46a ★ 4211 | ERD | Daily | 0 | |
| 2:16p | 5:12p ★ 4214 | ERD | X6 | 0 | |
| Above Feb21-Mar1 | | | | | |
| 2:32p | 5:33p ★ 4214 | ERD | Daily | 0 | |
| Above Exc. Feb20-Feb25,Feb27-Apr2 | | | | | |
| 2:47p | 5:46p ★ 4214 | ERD | Daily | 0 | |
| Above Mar2-Apr2 | | | | | |
| 8:00p | 10:56p ★ 4216 | 67 | 0 | |
| Above Disc.Apr2Exc. Feb20 | | | | | |
| **To: Anchorage AK (ANC)** | | | | | 2841 miles | |
| 6:00p | 0:04a+1 ★ 197 | 734 | Daily | 1 | D |
| Above Disc.Feb27 | | | | | |
| 7:00p | 10:53p ★ 131 | 73G | Daily | 0 | D |
| Above Eff. Mar1 | | | | | |
| 7:20p | 11:13p ★ 131 | 73G | Daily | 0 | D |
| Above Disc.Feb28 | | | | | |
| **To: Austin TX (AUS)** | | | | | 979 miles | |
| 8:10a | 10:56a ★ 1113 | M80 | Daily | 0 | |
| Above Feb22-Apr2 | | | | | |
| 8:17a | 11:03a ★ 1089 | M80 | X67 | 0 | |
| Above Apr3-Apr8 | | | | | |
| 2:45p | 5:29p ★ 1545 | M80 | Daily | 0 | |
| 6:56p | 9:44p ★ 1694 | M80 | X6 | 0 | |
| Above Apr2 | | | | | |
| 9:13p | 11:57p ★ 1056 | M80 | X6 | 0 | |
| **To: Baltimore MD (BWI)** | | | | | 620 miles | |
| 6:35a | 9:20a ★ 1787 | M80 | X7 | 0 | |
| 2:14p | 5:13p ★ 1564 | M80 | X6 | 0 | |
| Above Eff. Apr3 | | | | | |
| 7:36p | 10:28p ★ 1257 | M80 | X6 | 0 | |
| Above Disc. Apr2 | | | | | |
| 8:07p | 10:54p ★ 1757 | M80 | Daily | 0 | |
| Above Disc. Apr2 | | | | | |
| **To: Bloomington IL (BMI)** | | | | | 116 miles | |
| 8:40a | 9:30a ★ 4771 | ER4 | Daily | 0 | |
| Above Disc. Apr2 | | | | | |
| 4:32p | 5:21p ★ 4123 | ER4 | Daily | 0 | |
| 8:40p | 9:26p ★ 4689 | ER4 | X6 | 0 | |
| Above Eff. Feb21 | | | | | |
| **To: Boston MA (BOS)** | | | | | 865 miles | |
| 6:26a | 9:39a ★ 1647 | M80 | X67 | 0 | |
| 7:03a | 10:15a ★ 1647 | 738 | X7 | 0 | |
| Above Disc. Apr2 | | | | | |

✈ = Operated by Horizon Air Industries. ★ = Operated by partner carrier. All other flights operated by Alaska Airlines.

Reservations: *alaskaair.com*   or 1-800-ALASKAAIR (800-252-7522) or 1-800-547-9309 (Horizon Air)   3

Not Reported in N.E.2d                                                                                      Page 1
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

C

Related Andrews Newsletter Articles

Only the Westlaw citation is currently available.

Superior Court of Massachusetts, Suffolk County.
CITY OF BOSTON & another, [FN1] Plaintiffs,
v.
SMITH & WESSON CORP. & others, [FN2] Defendants.

FN1. Boston Public Health Commission

FN2. Beretta U.S.A. Corp., B.L. Jennings Inc, Browning Arms Co., Inc., Bryco Arms Corp., Charter Arms Corp., Colt's Manufacturing Co-, Inc., Davis Industries, Inc., Firearms Import & Export Corp., Glock, Inc., Harrington & Richardson Corp., Heritage Manufacturing, Inc., Hi-Point Firearms, International Armament Corp d/b/a Interarms, Inc., Kel-Tec CNC Industries, Inc., Import Sports, Inc. d/b/a/ SGS Importers International, Inc., Lorcin Engineering Co., Inc., Marlin Firearms Co., OF. Mossberg & Sons, Inc., Navegar, Inc. d/b/a Intratec, Phoenix Arms, Inc., U.S. Repeating Arms Co., Inc., Remington Arms Company, Inc., Savage Arms, Inc, Sigarms, Inc., Sturm, Ruger & Company, Inc., Sundance Industries Corp., Taurus International Manufacturing, Inc., American Shooting Sports Council, Inc., National Shooting Sports Foundation, Inc., Sporting Arms & Ammunition Manufacturers Institute, Inc., Does 1-50 are unknown business entities that manufacture firearms distributed, marketed, sold, and/or possessed within Boston. Does 51-100 are unknown business entities that are retailers of firearms found in Boston- Does 101-225 are unknown business entities that distribute and/or market firearms found within Boston. Does 226-250 are unknown business entities that are industry trade associations composed of firearms manufacturers, distributors, and retailers.

**No. 99-02590.**

November 21, 2000.

Memorandum and Order on the Defendant Trade
Associations' Motion to Dismiss for
Lack of Personal Jurisdiction

*INTRODUCTION*

This is an action by the City of Boston and the Boston Public Health Commission (collectively "Boston" or the "City") against various firearms manufacturers, distributors, sellers and promoters, including firearms industry trade associations. This matter is before the court on the defendants', American Shooting Sports Council, Inc. ("ASSC"), National Shooting Sports Foundation, Inc. ("NSSF"), and Sporting Arms and Ammunition Manufacturers' Institute, Inc. ("SAAMI") (collectively "the Trade Associations"), motion to dismiss for lack of personaal jurisdiction pursuant to Mass. R. Civ. P. 12(b)(2). After hearing and review, for the reasons discussed below the Trade Associations' Motion to Dismiss for Lack of Jurisdiction Over the Person is *DENIED.*

*BACKGROUND*

**\*1** The parties' affidavits and depositions in addition to the facts pleaded in the complaint (which may be taken for the purposes of this motion as true), establishes the following: [FN3]

FN3. "A determination of jurisdiction-or the lack of it-may rest on the facts alleged in the complaint." *Kleinerman, v. Morse,* 26 Mass. App. Ct. 819, 821 n. 4 (1989); see *Gunner v. Elmwood Dodge, Inc.,* 24 Mass. App. Ct. 96, 96 (1984).

On June 3, 1999, Boston commenced suit in this court against twenty-eight firearms manufacturers and distributors and three gun industry trade associations. The First Amended Complaint, filed on January 23, 2000, contains six counts: public nuisance (Count I); negligent distribution and marketing (Count II); breach of warranty through defective design (Count III); breach of warranty through failure to warn (Count IV); negligence (Count V); and unjust enrichment (Count VI). The City also seeks injunctive relief.

In the First Amended Complaint, the City alleges that the gun manufacturers and distributors have acted in concert

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in N.E.2d                                                                              Page 2
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

with the Trade Associations to discourage the development and implementation of means to prevent firearms from being fired by unauthorized or prohibited users. The complaint alleges that the Trade Associations failed to develop and implement safety features; failed to provide adequate warnings, including the importance of proper gun storage, and failed to provide or implement the means to prevent their guns from being fired by unauthorized users. First Amended Complaint at 21.

The Trade Associations have moved to be dismissed from this case arguing that the court lacks personal jurisdiction over them. In opposition, the City argues that the court has specific or general jurisdiction over the Trade Associations. Specifically, the City argues that this motion must be denied because the Trade Associations have purposefully availed themselves of the benefits and protection of the laws of this state; have ongoing business relations with residents of their Commonwealth; and have "continuously conveyed inaccurate and misleading information regarding firearms directly to Massachusetts residents." It is, therefore, necessary to look at each trade association's contacts with this Commonwealth to ascertain whether jurisdiction over the Trade Associations is proper.

A) NSSF

NSSF was formed in 1961 to promote a public relations campaign for the gun industry and to increase participation in the shooting sports by supplying information to the public. NSSF has a headquarters in Newtown, Connecticut, a Director of Government Relations office in the greater Washington, D.C. area, and a media relations office in Atlanta, Georgia. In 1999, NSSF had 1,656 firearms manufacturer, distributor and dealer members. Of those total members, thirty-six were located in Massachusetts generating $35,000 in membership dues. [FN4] It regularly sends its Massachusetts members mailings and a monthly newsletter,=. In addition to the membership fees, NSSF derived and continues to derive revenue from Massachusetts residents through literature, bumper sticker, video, and magazine sales, [FN5] advertisements in its publications and Web sites, [FN6] and the Shooting, Hunting, Outdoor Trade Show ("SHOT Show"). [FN7]

FN4. Approximately 2.17% of NSSF members are domiciled in this forum. This percentage, the City alleges, approximates the representative percentage of Massachusetts residents in the national population, which amounts to 2.26%.

FN5. Specifically, NSSF derived approximately $1,300 in literature sales in this Commonwealth for the three year period prior to the filing of the complaint.

FN6. At the very least, NSSF has received approximately $3,000 in revenue from advertisement sales to Smith & Wesson, a Massachusetts corporation. This does not take into account potentially significant advertising revenues from Massachusetts advertisers in *SHOT Business* and the SHOT Show guide.

FN7. Yearly, NSSF sponsors a national trade show known as the SHOT Show. Members of the general public are not admitted. NSSF maintains a booth at the SHOT Show- At the show, a NSSF membership application is included in the SHOT Show official Directory and Buyers' Guide. NSSF has no record or recollection of 9 Massachusetts resident joining NSSF through the show.

**\*2** NSSF publishes a wide variety of information on the shooting sports. [FN8] One of its publications, *SHOT Business,* is circulated by a Massachusetts corporation. These publications are available to residents of Massachusetts for free or at a nominal cost. From 1997 to 1999, Massachusetts purchased at least $1,300 in literature annually. Because the cost of the literature is nominal or at no cost to the purchaser, to derive this figure substantial amounts of literature were sent into this Commonwealth. In the year 1999 alone, NSSF sent over 100,000 publications to Massachusetts residents. In addition, that same year, over 250 Massachusetts residents and corporations received NSSF magazines.

FN8. Its publications include *Welcome to the Shooting Sports, A Parent's Guide to Recreational Shooting For Youngsters, We Support 986,000*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d                                                                          Page 3
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

*Jobs, Firearms Responsibility in the Home, Firearms Safety Depends on You, Firearms Acquisition & Disposition Record Book, Firearms Safety Posters The Hunter In Conservation, The Hunter and Conservation, The Ethical Hunter, What They Say About Hunting, Hunter's Pocket Fact Card, Directory of Hunting Resorts, Bumper Stickers, NSSF's Directory of Public Shooting Ranges, Here's Something to Shoot For, How to Develop New Places to Shoot, New Friends, New Members, Faculty Development/Sportmen's Clubs, Complete Action, National Hunting & Fishing Review, NHF Day Action Manual, NSSF Reports, Range Report* and *SHOT Business.*

For ten years, a Massachusetts domiciliary, Smith & Wesson, has been represented on the Board of Directors of NSSF. On occasion, NSSF has traveled to Massachusetts on business. [FN9] Indeed, NSSF employees have made at least ten business trips to Massachusetts since 1995. Moreover, NSSF has held at least thirteen events in this forum during the past six years. [FN10]

FN9. In 1984, the NSSF Board met in Massachusetts.

FN10. The NSSF sponsored Chevy Truck Sportsman's Team Challenge was held in Massachusetts on September 18 and 19. 1999, September 19 and 20, 1998, September 6 and 7, 1997, June 22 and 23, 1996, September 7 and 8, 1996, October 7 and 8, 1995 and October 9, 1994 and the NSSF annual Summer Biathlon was held in this forum yearly from 1992 to 1997.

As part of Project HomeSafe, NSSF distributes safety brochures and free gun locks to cities, including Boston and six other cities in Massachusetts. The group sponsors national programs that are attended by Massachusetts residents; thereby derivatively obtaining revenue from the citizens of this Commonwealth. It also has cooperated with the Massachusetts Department of Environmental Protection in the development of information on management of lead at shooting ranges.

NSSF operates twelve Internet Web sites, which are accessed by Massachusetts residents, including www.nssf.org, which it has operated since 1997. [FN11] The primary Web site, www.nssf.org, includes a Web page with membership information. [FN12] This Web page provides a link to the NSSF membership department. The main Web site, accessible to Massachusetts residents, also contains publications and advertisements regarding its insurance program, which is targeted to firearms retailers. Through the Web sites, Massachusetts users can register for the SHOT Show and fill out membership forms. Another of the NSSF Web sites, www.wheretoshoot.com, contains information on shooting ranges and gun clubs, including at least 135 Massachusetts facilities. [FN13]

FN11. The Web sites include, among others, www.nssf.org, www.wheretoshoot.org, www.huntinfo.org, www.rangeinfo.org, www.stepoutside.org, and www.shotshow.org.

FN12. This main Web site provides links to all NSSF Web sites.

FN13. Gun clubs may add their facilities to the Web site directory "Where to Shoot."

**\*3** NSSF had contracts with at least eighteen Massachusetts corporations. Since 1993, NSSF has paid approximately $270,000 to fourteen Massachusetts resident entities for goods and services derived from or performed in this forum. For example, Computer Fulfillment, Inc., a Massachusetts company, distributes *SHOT Business* to over 21,000 people, including many Massachusetts residents. In addition, NSSF conducts business with Massachusetts public relations, direct mail, business stationers, and award, plaque, and badge companies. Although none of the SHOT shows were held in this Commonwealth, between 1990 and 1994 Reed Exhibition Companies managed the SHOT Show from its Boston office. From that event, NSSFs annual share of the proceeds averaged $2.6 million.

NSSF also has safety and marksmanship programs for the Boy Scouts of America. It publishes firearms safety supplements in *Boys Life* and scouting magazines and awards patches to Boy Scouts in Massachusetts.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                      Page 4
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

Other national programs promoted by NSSF include an ESPN program entitled "Shooting Sports America," the Chevy Truck Sportsman's Team Challenge, National Hunting and Fishing Day, Summer Biathlon, and Step Outside. These programs are available to Massachusetts residents.

As part of its services, NSSF provides information on comprehensive liability insurance to Massachusetts retailers. At least one Massachusetts retailer has obtained insurance under the program.

B) ASSC

In 1989, ASSC was incorporated as the American Shooting Sports Coalition, Inc. in Florida. However, in 1992 it changed its name to the American Shooting Sports Council, Inc. Its purpose was to articulate before the executive, legislative, and judicial branches of local, state, and national governments the needs and interests of the shooting sports. In addition, ASSC educated the American public on the shooting sports industry to develop "a positive and representative image of the industry, and to dispel any misimpressions and inaccurate public perceptions." Since the filing of this suit, ASSC and NSSF have merged. On June 16, 1999, the Board of Governors of the NSSF and the Executive Committee of the ASSC signed a Unification Resolution in which NSSF would absorb the functions of the ASSC through a new Legislative Policy Council Division of the NSSF. Under that Resolution, NSSF agreed to pay $150,000 of ASSC's debts, to incorporate up to five ASSC Board members into the NSSF, and to hire professional lobbyists. Since July 1, 1999, ASSC has no offices, employees or activities. NSSF now has control over ASSC.

Formerly, in 1999, ASSC had thirteen members in Massachusetts, constituting nearly five percent of its total membership. Dues from these members amounted to approximately $33,675, or about nine percent of its total revenue for the year 1999. ASSC communicated with its Massachusetts members through its Web site, monthly newsletter, quarterly report and occasional additional mailings.

**\*4** ASSC made numerous business trips, at least 19 separate times during the last seven years, to Massachusetts in furtherance of its mission. The purposes of the trips include attendance at wholesale firearms distributors events, lobbying and meeting the press. Several such trips were for the purpose of lobbying the Massachusetts legislature and the executive branch to dissuade them from enacting gun control regulations. In addition, it traveled to this forum to participate in a lawsuit it filed challenging certain attorney general regulations. See *ASSC v. Attorney General, 429 Mass. 871, 871-872 (1999)* (ASSC and SAAMI argued that the Attorney General lacked authority to promulgate regulations that would "prohibit the commercial sale or transfer of handguns that fail to satisfy prescribed safety and performance requirements).

It also publishes and distributes informational material to its members. Although ASSC does not currently have a Web site, it formerly had one, in part, to solicit individuals to become members and to provide information about the gun industry, including gun control legislation.

C) SAAMI

SAAMI was founded in 1926 and is incorporated in New York. Its principal office is located in Newtown, Connecticut. SAAMI's missions include the promulgation and development of voluntary standards regarding the manufacture of sporting firearms and ammunition. It publishes more than 700 standards on firearms safety and quality. SAAMI publishes the following voluntary industry performance standards for commercial manufacturers:

```
Z.299.1  Pressure and Velocity of
Rimfire Sporting Ammunition
Z.299.2  Pressure and Velocity of
Shotshell Ammunition
Z.299.3  Pressure and Velocity of
Centerfire Pistol and Revolver
Ammunition
Z.299.5  Evaluation of New Firearm
Designs under Conditions of Abusive
        Mishandling
```

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                          Page 5
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

In addition to these publications, SAAMI has published and distributed, throughout the nation and this Commonwealth, more than 15,000,000 copies of a publication entitled "A Responsible Approach to Firearms Safety."

Since 1998 SAAMI has operated an Internet Web site, www.SAAMI.org. The Web site contains information on SAAMI programs and the voluntary standards. Through the Web site, Massachusetts residents may e-mail requests for further information or to order SAAMI literature, and may obtain telephone numbers and postal addresses to do the same. This literature is free or sold at a nominal cost. Massachusetts residents, on average, purchased less than $500.00 annually of SAAMI literature for the years 1997 through 1999. SAAMI also publishes safety and educational brochures. SAAMI has advertised, through use of safety and promotional messages, in the national media.

**\*5** In 1999 SAAMI had nine percent of its membership, two members. in Massachusetts. Their annual dues amounted to approximately $60,000 -- about six percent of SAAMI's annual revenues. These Massachusetts members held positions on SAAMI's Executive Committee.

SAAMI, like ASSC, actively participated in Massachusetts government. It filed a lawsuit against the Attorney General to block the implementation of various gun control regulations. See *ASSC v. Attorney- General,* 429 Mass. at 871- 872. In addition, SAAMI has cooperated with the Massachusetts Department of Environmental Protection in the development of information on management of lead at shooting ranges.

Robert Delfay acts as President and CEO for both SAAMI and NSSF, but draws a paycheck only from NSSF. In addition, Boston alleges that many other employees of NSSF provide free services to SAAMI. SAAMI and NSSF share the same address and the SAAMI telephone rings in the NSSF offices.

### DISCUSSION

Whether this court has personal jurisdiction over non-residents requires the court to answer two questions. First, does the court have jurisdiction under the Massachusetts long-arm statute? See *G.L. c. 223A, §§*

3(a)-(h). Second, would the court's exercise of jurisdiction be consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution? *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 767 (1994); *Connecticut Nat. Bank v. Hoover Treated Wood Products, Inc.,* 37 Mass. App. Ct. 231, 233 (1994). The plaintiff has the burden of demonstrating these requirements and "the statute is to be read with much generosity of breadth." *Telco Communications, Inc. v. New Jersey State Firemen's Mut Benev. Ass'n,* 41 Mass App. Ct. 225, 229 (1996). "When the assertion is challenged under Mass. R. Civ. P. 112(b)(2), it is the plaintiffs burden to establish sufficient facts on which to base jurisdiction." *Morrill v. Tong,* 390 Mass. 120, 129 (1983).

Jurisdiction over the person may be either specific or general. General jurisdiction is acquired where there are "continuous and systematic" contacts with the forum state *LTX Corp. v. Daewoo Corp.,* 979 F.Supp. 51, 58 (D.Mass 1997). To obtain specific jurisdiction under the long-arm statute, the cause of action must "arise from" the conduct upon which long-arm jurisdiction is sought. See *Carlson Corp. v. University of Vermont,* 380 Mass. 102, 106 (1988); *Heins v. Wilhelm Loh Wetzlar Optical Machinery GMBH & Co. KG,* 26 Mass. App. Ct. 14, 22 (1988). The court may exercise specific jurisdiction over a defendant in a suit arising out of or related to the defendant's contact with the forum. *Id.* This court will first determine whether jurisdiction is proper under the long-arm statute.

### I. Long-arm Statute

**\*6** The City correctly notes that "[d]ivining personal jurisdiction is more an art than a science." *Sawtelle v. Farrell,* 70 F.3d 1381, 1388 (1st Cir. 1995) (internal citations and quotations omitted). Whether jurisdiction will be found is a determination sensitive to the particular facts of each case. *Morrill,* 390 Mass. at 129. This court must construe the Massachusetts long-arm statute broadly in order to effectuate the Commonwealth's legitimate desire to protect its citizens. *Bartow v. Extec Screens and Crusher, Ltd.,* 53 F. Supp. 2d 518, 521 (D.Mass 1999). The Massachusetts long-arm statute provides in relevant part:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in

Not Reported in N.E.2d                                                                          Page 6
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

law or equity arising from the person's

(a) transacting any business in this commonwealth;

(b) contracting to supply services or things in this commonwealth;

(c) causing tortious injury by an act or omission in this commonwealth;

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth....

G.L c. 223A, § 3 (2000).

Here, the City claims that several subsections of the long-arm statute, any one of which individually may satisfy the first prong of this court's analysis, confer jurisdiction over the Trade Associations- Specifically, it claims that Sections 3(a), (b), (c), and (d) of the long-arm statute provide this court with jurisdiction over the Trade Associations.

A) Section 3(a)

1) Transacting Business in this Commonwealth

The plaintiff first argues that Section 3(a) of the Massachusetts long-arm statute confers personal jurisdiction over the Trade Associations. This court agrees.

Section 3(a), the "transacting any business" clause, permits the court's exercise of jurisdiction "if the defendant...transacted any business in the Commonwealth, and if the alleged cause of action arose from such transaction of business." *Good Hope Indus. v. Ryder Scott Co.,* 378 Mass. 1, 6 (1979); see G.L. c. 223A, § 3(a). A person transacts business in the Commonwealth if there are any "purposeful acts by an individual, whether personal, private, or commercial." *Ross v. Ross,* 371 Mass. 439, 441 (1976); see *Hahn v. Vermont Law School,* 698 F.2d 48, 50 (1st Cir. 1983) (a Vermont Law School was transacting business in this commonwealth when it purposefully mailed application information and an acceptance letter to a Massachusetts applicant); *Gunner,* 24 Mass. App. Ct. at 97 (automobile dealer's persistent dissemination of advertising

(both print and electronic) aimed at cultivating a market area in forum constitutes transacting business for purposes of Section 3(a)); *Balloon Bouquets, Inc. v. Balloon Telegram Delivery, Inc.,* 18 Mass. App. Ct, 935, 936-37 (1984) (transacting business requirement met where defendant solicited balloon delivery companies in Massachusetts -- at least four Massachusetts companies had become subscribers and were listed in the defendant's directory; it collected a fee from the four Massachusetts subscribers; it listed a toll-free number in Massachusetts; and it distributed several copies of trade newsletter quarterly.)

**\*7** The "transacting any business" clause of the long-arm statute is construed broadly. *Tatro,* 416 Mass. at 767. An isolated transaction or one with little impact on the commerce of the Commonwealth may be enough for the court to determine that the defendant has transacted business here. See *Id.; Good Hope IndusInc.,* 378 Mass. at 8 n. 13. [FN14] Actual physical presence of a defendant in this jurisdiction is not required to acquire personal jurisdiction under the "transacting business" clause. *Good Hope Indus., Inc.,* 378 Mass. at 11; see also *Tatro,* 416 Mass. at 768.

> FN14. The Supreme Judicial Court has suggested that even in two cases where the contacts with the Commonwealth were held to be constitutionally insufficient [citations omitted], the defendants might be viewed literally as having 'transacted business' within the Commonwealth." *Haddad v. Taylor,* 32 Mass. App. Ct. 332, 335 (1992) (quoting *Good Hope Indus., Inc.,* 378 Mass. at 8 n. 13.) (internal citations omitted)

ASSC. NSSF, and SAAMI were transacting business in this Commonwealth and purposefully availed themselves of the privileges and protection of this forum sufficient to meet the "transacting business" requirement of Section 3(a). "As used in the statute the term 'transacting business' does not require purely commercial activity but is used to embrace any purposeful actions performed in Massachusetts." *Johnson v. Witkowski,* 30 Mass App. Ct. 697, 713 (1991). Here, the Trade Associations participated in commercial activity and committed purposeful acts in this forum. The Trade Associations are in the business of advancing the needs of the gun industry. To do so they have had pervasive contacts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                    Page 7
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

with this forum.

a) ASSC

ASSC has transacted business in this Commonwealth
sufficient for purposes of §3(a) of the long-arm statute.
ASSC has travelled to Massachusetts no fewer than 19
times in the past seven years to conduct business in
furtherance of its purpose to develop a positive
representation of the gun industry. Indeed, many of these
trips were for the purposes of lobbying and testifying on gun
control regulations. This is ASSC's business -- a business
which attempts to foster in the citizens of this
Commonwealth and nationwide a positive perception of the
industry. To do this, it sent into the Commonwealth
informational materials and publications. ASSC also
maintained a Web site that attempted to solicit members,
including residents of this Commonwealth.

**\*8** Most telling of the contacts, however, is the fact that
ASSC availed itself of the protection of this state by
bringing a lawsuit to block the implementation of various
gun control regulations and lobbied concerning these
regulations. [FN15] This was done in furtherance of ASSC's
core business objectives and constitutes transacting
business.

> FN15. This court is not addressing whether the
> *Noerr-Pennington* doctrine would act as a bar to
> this case. See *Hamilton v. Accu-Tek*, 935 F.Supp.
> 1307, 1320 (N.D. NY 1996). "A core principle of
> the *Noerr-Pennington* doctrine is that lobbying
> alone cannot form the basis of liability, although
> such activity may have some evidentiary value."
> *Id;* see *Califomia Transport v. Trucking Unlimited*,
> 404 U.S. 508, 510 (1971) ("The right of access to
> the courts is indeed but one aspect of the right to
> petition"). There are some exceptions to this rule.
> *Id.* at 1317 (i.e. *Noerr-Penninciton* doctrine does
> not apply where political activity involved illegal,
> corrupt or unethical means). It would be premature
> on a motion to dismiss for lack of personal
> jurisdiction to determine the applicability of this
> doctrine because the complaint does not
> specifically allege that the cause of action stems

only directly from the lobbying activities, nor do
the plaintiffs make that argument in their filings in
opposition to the Trade Associations' motion. Proof
at trial may, of course, show otherwise and a
defense of lack of personal is never waived. See
*Morrill*, 390 Mass. at 125 ("a defendant who has
unsuccessfully challenged the court's jurisdiction
over him may proceed to the merits without
waiving his right to appellate review of the
question of jurisdiction.").

Finally, ASSC can be viewed as "transacting business"
when it acts in a commercial context. ASSC had five
percent of its membership, deriving $33,675, or nine percent
of its total revenue, in this Commonwealth.

These activities, combined, show that ASSC transacted
business in this Commonwealth.

b) NSSF

There can be little doubt that NSSF's purposeful contacts
with this forum meet the broad definition of transacting
business in this Commonwealth. In furtherance of its
business objectives to increase participation in the shooting
sports by supplying information to the public, it, *inter alia,*
sent over 100,000 publications to Massachusetts residents,
travelled to Massachusetts to conduct business on at least
ten occasions, and held at least thirteen events in this forum.

NSSF argues that it derives only a small amount of revenue
from its activities in this Commonwealth. That, however, is
not the test for transacting business, the term "transacting
business" does not require commercial activity-Rather, the
relevant inquiry is whether purposeful actions were
performed in Massachusetts. NSSF's business is unique in
that it attempts to alter or promote the gun industry's public
perception which is intangible. In doing so, however, its
membership fees will increase. For instance, simply because
the NSSF only derived $1,300 in 1999 from its literature
sales in this Commonwealth does not detract from the fact
that these 100,000 publications were effectuating its
business of promoting a public relations campaign and
increasing participation in the shooting sports.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

c) SAAMI

**\*9** SAAMI also has a number of contacts with the forum. In 1999 it had nine percent of its membership in Massachusetts and received $60,000 in dues. In addition, it distributed literature to the residents of this Commonwealth. SAAMI, like ASSC, actively participated in Massachusetts government when it sought to block the implementation of various gun control regulations by filing suit in this forum and aided in the development of information on management of lead at Massachusetts shooting ranges.

The question, then, is whether these activities amount to "doing business" for purposes of Section 3(a). This court finds that they do.

The Trade Associations are organizations that have acted in Massachusetts for pecuniary benefits. These benefits are derived from soliciting members in the forum and promoting gun use in the forum, thereby increasing membership dues. The contacts of the Trade Associations, here, closely resemble those in *Wright F. SherwinWilliams Co.,* 708 F. Supp. 705, 706 (W.D. PA 1989). In that case, the plaintiffs alleged that the Lead Industries Association concealed the dangers of lead exposure, misled the public and failed to provide adequate warnings. *Id.* at 705. The defendant trade association moved to dismiss for lack of personal jurisdiction. *Id.* The court held that the fact that the trade association, which had five to ten percent of its membership in the forum, had conducted seminars in the forum and had taken an active role in opposing or propounding legislation on two occasions within the state, was conducting business under a "transacting business" clause closely resembling the one in this forum. *Id.* at 707. Similarly, this court finds that the Trade Associations were transacting business in this Commonwealth. Each trade association, among many other contacts, maintained an Internet Web site, travelled to this forum to conduct business, participated in this forum's government, and sent numerous publications to this forum. After reviewing all of the relevant factors, this court finds that Boston has established sufficient facts on which to base that the Trade Associations were transacting business for purposes of Section 3(a) of the long-arm statute.

2) The "Arising from" Requirement

For purposes of the Section 3(a) of the Massachusetts long-arm statute, "a claim arises from a defendant's transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State." *Tatro,* 416 Mass. at 771. The "arising from" clause in Section 3(a) of the Massachusetts long-arm statute is to be construed generously in favor of asserting personal jurisdiction. *Lyle Richards Intern., Ltd. v. Ashworth, Inc.,* 132 F.3d 111, 114 1st Cir. 1997). The fact that the claim sounds in tort and that the business, transacted is contractual in character is not determinative. for 'the contractual contact is a "but for causative factor for the tort since it brought the parties within tortious "striking distance" of each other." *Connecticut Nat. Bank v. Hoover Treated Wood Products, Inc.,* 37 Mass. App. Ct. 231, 235 (1994) (quoting *Tatro,* 416 Mass. at 770) (quoting in turn from *Prejean v. Sonatrach,* Inc., 652 F.2d 1260, 1270 n. 21 (5th Cir. 1981)).

**\*10** Here, the City contends that it has established sufficient facts to meet the requirements of the "but for' causation test. [FN16] In contrast, the Trade Associations claim that nothing in this record "even remotely demonstrates (through anything other than the naked assertion of counsel) how any person suffered injury from any" contacts with this forum. However, in analyzing whether this court has personal jurisdiction, the test is not that the contact must directly injure a plaintiff, but whether the cause of action arises from the contacts with this forum. In establishing whether a claim arises from the defendant's transaction of business in this forum, the court applies a "but for" causation test which looks at whether defendant's contacts with this forum constitute "the first step in a train of events" that resulted in the injury. *Tatro,* 416 Mass. at 770. The relevant question then is whether the defendants', NSSF, ASSC and SAAMI, contacts with the forum constituted the first step resulting in the injury -- and not whether the contacts were the legal cause of the injury.

> FN16. The Trade Associations, in their reply memorandum, state that "most" -not all- of their contacts with this forum are "patently unrelated to any plausible claim of plaintiffs." It cites examples

Westlaw.

of contacts which do not give rise to the cause of action here, including NSSF's purchase of goods and services from Massachusetts companies, the contract to Computer Fulfillment for distribution of an NSSF publication, NSSF's partial sponsorship of the Chevy Truck Sportsman's Team Challenges and Summer Biathlon events and the defendants business trips to the commonwealth. While this court agrees that the first two examples do not give rise to the cause of action, it disagrees that such factors cannot be used in the personal jurisdiction analysis. *General Laws c. 223A, § 3(a)*, allows for jurisdiction if the defendant either directly or through an agent transacted any business in the Commonwealth, and if the alleged cause of arose from such transaction of business. *Good Hope Indus., Inc., 378 Mass. at 6*. The conduct on which long-arm jurisdiction is to be based must be materially related to the cause of action. Accordingly, contacts which did not give rise to the cause of action here, such as NSSF's purchase of goods and services and Computer Fulfillment's distribution of a NSSF publication, are not being considered in determining whether the requirements under *Section 3(a)* are satisfied. *Id.* at 10-11, fn. 17. Rather, such contacts, are to be used in the second-prong, due process, of the personal jurisdiction test, as they are "indicative of the defendant's intention to involve itself in Massachusetts commerce;" and whether the defendant ought to be expected to defend itself here. *Id.* As to the remaining factors, this court finds them to be related to the cause of action and thus, they may be use for both prongs.

**\*11** The City, in Paragraph 114 of its First Amended Complaint, alleges that:

Defendants have also acted in concert with each other and with Defendant trade associations, have tacitly agreed or cooperated, and/or colluded to adhere to industry-wide standards or customs with respect to, among other things
a. Their failure to develop and implement the means to prevent their guns from being fired by unauthorized users;
b. Discouraging the development and implementation of

the means to prevent guns from being fired by unauthorized or prohibited users;
c. Their failure to develop and implement other safety features; and
d. Their failure to issue adequate warnings alerting users of the risks of guns and to the importance of proper storage of guns.

Essentially, the City is claiming that the Trade Associations are part of the propaganda machine of the firearms industry. It argues that the Trade Associations have worked with, and on behalf of, the firearms industry--gun manufacturers and distributors--to effectuate the industry's "goals of increasing firearms use and sales by discouraging the development and implementation of safety features that would save lives and prevent both the unauthorized use of weapons and curb unintentional shootings" The City has put forth *a prima facie* showing that the Trade Associations' many contacts with this forum were the first step in a "train of events" that caused its injury. More specifically, Boston essentially claims that the Trade Associations' dissemination of or failure to disseminate information, promotion of gun use, efforts to block gun safety regulation and sponsorship of events in this Commonwealth each, individually and/or together, amounted to a first step which led to its injuries and thus, would meet the "but for' causation test. Given the generous construction of the "arising from" clause, which favors asserting personal jurisdiction, this court agrees with the City that its claims arise out of the defendants' business contacts with this commonwealth.

3) Government Contacts Rule

The Defendants argue that the court should not consider their contacts with the legislative and executive branches of the Commonwealth for ascertaining amenability to suit in this forum as this will contravene the "government contacts rule." Under that rule, they claim that "personal jurisdiction may not be founded upon certain contacts with governmental agencies," see *Holler v. Philip Morris Inc., 43 F. Supp. 2d 794, 801-2 n. 6 (N.D. Ohio 1998)*, such as the lobbying and litigation conducted by ASSC and SAAMI. The government contacts rule, which originated in the District of Columbia, has not been adopted in this jurisdiction. The "rule is based in part on the constitutional

right to petition the Government for redress of grievances" *Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 51 (2nd Cir. 1991) (quotations and citations omitted)

**\*12** This court declines to adopt the government contacts doctrine in the circumstances of this case. The Trade Associations' contacts with this forum were by no means limited to petitioning activities. That is not to say that in an appropriate case where a defendant's sole contacts with the forum were petitioning activities, the court would not recognize the doctrine. [FN17] Even still, this jurisdiction is not in the same position as the District of Columbia, which serves as the hub for unfettered petitioning activities for the nation. "The source of the exception lies in the unique character of the District [of Columbia] as the seat of national government and in the correlative need for unfettered access to federal department and agencies for the entire citizenry...To permit our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national forum." *Nix v. Hoke,* 62 F. Supp. 2d 110, 114 (1999) (citations and quotations omitted). The rationale and need behind this rule is obviously more pertinent in the confines of the District of Columbia than in this forum. See *Lamb v. Turbine Designs, Inc.,* 41 F. Supp. 2d 1362, 1365 (N.D. Ga. 1999).

> FN17. The doctrine is probably unnecessary in Massachusetts. Pure petitioning activities are protected by the Anti-SLAPP statute. G.L. c. 231, § 59H; *Duracraft v. Holmes Product Corp.,* 427 Mass. 156, 161 (1998).

Further, other jurisdictions have used government contacts including lobbying, *inter alia,* to assert jurisdiction over trade associations. See *Wright,* 708 F. Supp. at 707 (trade association has acted in forum to advance the interest of its members -- most importantly, it appeared in forum to be heard on two pieces of legislation); *Bennett v. J.C. Penney,* 603 F. Supp. 1186, 1189 (W.D. Mich. 1985) (lobbying constituted contact with forum). Similarly, this court, under the circumstances, shall use the defendants' government contacts as one of many factors used in assessing

jurisdiction.

The Trade Associations maintain that this court should follow the *City of Gary Indiana v. Smith & Wesson Corp,* Civil No. 45D05-0005-CT-243 (Lake Super. Ct. Indiana, October 12, 2000) court, and grant its motion to dismiss for lack of personal jurisdiction. This court does not know what, if any, contacts the Trade Associations had with the City of Gary and it is not persuaded by that court's reasoning, as there is no reasoning in the opinion. Rather, this court finds the court's reasoning in *White v. Smith & Wesson,* Civil Action No. L99 CV 1134 (N.D. Ohio January 27, 2000), persuasive. In that case, the court denied the Trade Associations' motion to dismiss for lack of personal jurisdiction on the ground that Trade Associations "purposefully availed themselves of the privilege of acting in Ohio and they have allegedly caused a consequence -- more dangerous firearms and improper warnings -- in Ohio." The court went on to state that "[b]y allegedly discouraging safety developments and proper warnings in Ohio, Defendants' activities allegedly resulted in harm to Cleveland's residents from unreasonably dangerous firearms." *Id.* at 10. The Ohio court found that the cause of action "arose from the Trade Associations' activities," or business in the forum because "citizens of Cleveland may not have been harmed if safety developments were not allegedly discouraged and the proper warnings were issued." *Id.* This court agrees with that analysis. Accordingly, the "arising from" requirement of Section 3(a) is met by the plaintiffs.

**\*13** This court is satisfied that the City has made the requisite *prima facie* showing under § 3(a).

B) Section 3(d)

It is also likely that the facts of this case bring it within § 3(d) of the long-arm statute as well. [FN18] Under § 3(d), the court has personal jurisdiction over: a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's...causing tortious injuries in this commonwealth by an act or omission outside this commonwealth if he [1] regularly does or solicits business, or [2] engages in any other persistent course of conduct, or [3] derives substantial revenue from goods used or

Not Reported in N.E.2d                                                                                      Page 11
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

consumed or services rendered, in this commonwealth.

> FN18. The City is also claiming that jurisdiction under the long-arm statute exists under subsection (b) and (c). Since this court has found jurisdiction based on sections (a) and (d), it finds it is not necessary to address the remaining grounds.

The first element under § 3(d) requires the City to demonstrate that the Trade Associations Defendants' acts or omission caused tortious injury inside the Commonwealth. *Cunningham v. Adrox, Inc., 40 Mass. App. Ct. 279, 281 (1996).* The City alleges that the Trade Association committed acts inside and outside the state that caused tortious injury (costs associated with unintentional shooting, suicides, and crimes in the City of Boston) in this state. It claims that the Trade Associations have disseminated inadequate safety standards and misinformation regarding the sale and manufacture of firearms within this forum. This, plaintiff claims, caused the tortious injury resulting in this cause of action. If the City can prove this claim, the City was "injured in" Massachusetts and this forum is where the City suffered as a result of the Defendants' alleged conduct.

The City must next show that the Trade Associations either "regularly do[] or solicit[] business" in this forum, or "engage[] in any other persistent course of conduct" in Massachusetts, or "derive[] substantial revenue from goods used or consumed or services rendered" in Massachusetts. "Because this clause is disjunctive, only one of its prongs needs to be satisfied." *Noonan v. Winston Co., 135 F.3d 85, 91 (1st Cir. 1998); Heins, 26 Mass. App. Ct. at 20.* This court finds that the City has made such a *prima facie* showing.

Under the law of this forum, it is well settled that "substantial revenue" is neither an absolute amount nor an absolute percentage of total sales. *Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 219 (1st Cir. 1989)* (citing *Heins, 26 Mass. App. Ct. at 21 n. 5).* "All that is required is literal satisfaction of the statutory requirement." *Id.* The "substantial revenue requirement" has been satisfied in circumstances less compelling than the ones here. See *Keds Corp., 888 F.2d at 219* (the sale of 6,000 pairs of shoes for

$15,000 meets the "substantial revenue" requirement); *Kolikof v. Samuelson, 488 F.Supp. 881, 884 (D.Mass. 1980)* (derives substantial revenue in Commonwealth where at least 3.2% of total sales have been made in Massachusetts); *Mark v. Obear and Sons, Inc., 313 F. Supp- 373, 375-376 (D. Mass. 1970)* ($5,000 or 0.5% of total sales is "substantial revenue" for purposes of Section 3(d) of the Massachusetts long-arm statute--"[a] contrary finding would tend to defeat the legislative purpose of protecting the rights of the citizens of the State.").

**\*14** Here, the City has shown sufficient facts to satisfy the clause's literal requirement that the Defendant Trade Associations derive substantial revenue from the Commonwealth. In 1999, SAAMI's annual membership dues in the forum amounted to $60,000, or 6% of total dues; ASSC's Massachusetts members paid $33,675 in annual dues, or 9% of total dues and NSSF was paid approximately $35,000 in dues. In addition, NSSF has derived approximately $1,300 annually in literature sales for the three year period prior to the filing of this complaint; and at least $3,000 in advertising sales from a Massachusetts corporation. Accordingly, this court concludes that the Trade Associations did derive substantial revenues in Massachusetts, thereby satisfying the jurisdictional requirements of G.L. c. 223A, § 3(d).

In any event, the Defendant Trade Associations either "regularly d[id] or solicit[ed] business" in this forum, or "engage[] in any other persistent course of conduct," satisfying § 3(d). The Trade Associations have solicited business through direct mailing, marketing campaigns, newsletters, and their Web sites. [FN19] This court is not basing jurisdiction in this forum solely on the basis of the Trade Associations' Internet Web sites. The Web sites, however, have been used as one factor in ascertaining whether the defendants are regularly soliciting business for purposes of § 3(d). Other courts have found that personal jurisdiction exists based on Internet Web sites. See Richard E. Kaye, *Internet Web Site Activities of Nonresident Person on Corporation as Conferring Personal Jurisdiction under Long-Arm Statutes and Due Process Clause, 81 A.L.R. 5th 41 (2000)* ("Internet Web Site Activities"). For example, a computer consulting company was found to regularly solicit

Not Reported in N.E.2d                                                                                    Page 12
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

business in this Commonwealth, for purposes Section 3(d) of the long-arm statute, where it maintained an internet Web site that could be continuously accessed by Massachusetts residents, and a part of its advertising listed another Massachusetts company as one if its new customers, who had company name recognition in the Commonwealth. *Hasbro Inc., v. Clue Computing, Inc.,* 994 F.Supp. 34, 39 (D. Mass. 1997). Moreover, in *Northern Light Technology, Inc. v. Northern Lights Club,* 97 F.Supp. 2d 96, 105-106 (D. Mass. 2000), the court found that defendants, who operated a Web site that enticed users to post a link on the site or to advertise on the site, were "regularly soliciting" business under Section 3(d).

> FN19. The NSSF advertises an insurance program to solicit business from firearms retailers. At least one Massachusetts retailer sought insurance through the NSSF program.

**\*15** "The traditional territorial notions of personal jurisdiction ... have been tested in recent years by technological advances, including commercial uses of the Internet and the World Wide Web," *Internet Web Site Activities!* 81 A.L.R. 5th at 61, often with mixed results depending on the facts and circumstances of the case. See B. Boland and D. Gwin, *The Internet and Personal Jurisdiction Under the Constitution: in what state, exactly is the Internet located?,* 44 B.B.J. January/February 2000, 16. The Trade Associations maintain that jurisdiction in this case should not be grounded upon the Internet Web sites because the sites are purely passive. Even still, a line of cases has emerged which finds that the creation of a passive Web site is one factor to establish personal jurisdiction with the forum. See *Better Boating Ass'n. Inc. v. BMG Chart Products Inc.,* Civil No. 97-3738E (Suffolk Super- Ct. July 10, 1998) (defendant's advertisement over World Wide Web and in national trade magazines are factors, among others, in asserting personal jurisdiction); *Internet Web Site Activities,* 81 A.L.R. 5th at 78-85 (citing cases in which a passive Web site plus additional contacts with forum state provided sufficient basis for assertion of personal jurisdiction). [FN20]

> FN20. For purposes of this analysis, the court is not taking into consideration the NSSF Web page

containing an interactive survey, which was not added to the site until January 2000.

Here, the Trade Associations operated Web sites that could be continually accessed by Massachusetts residents. The Web sites contained links between the trade associations. On one NSSF site, www.wheretoshoot.com, individual corporations could post their shooting ranges. This Web site listed approximately 138 Massachusetts shooting ranges. In addition, the Web sites solicited members to join and had membership Web pages. The NSSF/SAAMI Web Site contained an e-mail link to the membership department- Based on these facts, coupled with the solicitation through mailings and visits within this forum, this court concludes that requirements of § 3(d) are satisfied.

II. Due Process

Even "[i]f the literal requirements of the [long-arm] statute are satisfied, it also must be established that 'the exercise of jurisdiction under State law [is] consistent with basic due process requirements mandated by the United States Constitution." *Tatro, 416 Mass. at 767* (citation omitted). The Trade Associations' contacts with Massachusetts are also clearly sufficient to satisfy constitutional Due Process standards. See *id.* Jurisdiction is proper if the defendants also had minimum contacts with the forum state at the time of filing the complaint, such that "the assertion of jurisdiction over [defendants would] not offend 'traditional notions, of fair play and substantial justice'." *Tatro, 416 Mass. at 773* (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). "In practical terms, this means that an assertion of jurisdiction must be tested for its reasonableness, taking into account such factors as the burden on the defendant of litigating in the plaintiff's chosen forum, the forum state's interest in adjudicating the dispute, and the plaintiff's interest in obtaining relief." *Tatro, 416 Mass. at 773.* The minimum contacts test is neither mechanical nor quantitative; instead, a question of reasonableness is presented.

**\*16** Due process requirements are satisfied only if the defendant had fair warning that he could he hailed into this court. "This fair warning' required by the due process clause 'that a particular activity may subject [an individual] to the

Not Reported in N.E.2d                                                                          Page 13
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

jurisdiction of a foreign sovereign," *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985) (quoting Stevens, J., concurring in *Shaffer v. Heitner,* 433 U.S. 186, 218 (1977)), "is satisfied if the defendant has "purposefully directed" his activities at residents of the forum,'" *Teleco Communication, Inc.,* 41 Mass, App. Ct. at 233 (quoting *Burger King Corp.,* 471 U.S. at 472) (quoting from *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984)). "For the purpose of [the court's] examination here, these considerations coalesce around the following inquiry: whether there was some minimum contact with the Commonwealth which resulted from an affirmative, intentional act of the defendant, such that it is fair and reasonable to require the defendant to come into the State to defend the action." *Good Hope Indus, Inc., 378 Mass. at 7.*

The Trade Associations here did not participate in an isolated transaction without commercial consequences in this forum. *Id.* at 9. Nor are the Trade Associations' contacts fortuitous. Rather, the Defendant Trade Associations undertook purposeful activity in the forum-through mailings, paper and electronic publications, advertising, membership sales, solicitations, lobbying. and holding events in the forum -- such that the Trade Associations are not unsuspecting defendants who would be surprised by being hailed into court here. It is not unreasonable to require ASSC and SAAMI, who both attempted to block gun regulations and influence the policy in Massachusetts, to defend themselves in this forum because they have invoked the benefits and protections of our laws. In addition, the Trade Associations, *inter alia,* have solicited business from Massachusetts, residents through mailings, advertising and Web sites. Based on the various activities in Massachusetts, each Trade Association has purposefully availed itself of the privilege of conducting activities here.

In *Calder v. Jones,* 465 U.S. 783 (1984), a plaintiff brought suit in her home state, California, alleging that she had been harmed by an article appearing in the National Enquirer. The newspaper reporter and editor, residents of Florida, contended that personal jurisdiction in the libel action did not exist in California, even though the newspaper was circulated in that state. The court found that jurisdiction was proper in California and comported with due process

requirements as the intentional conduct of the defendants was calculated to cause injury to the plaintiff in California. *Id.* at 790.

**\*17** Similarly, plaintiffs argue that this court may properly maintain jurisdiction over the defendants because they have made misleading statements which are directed into this forum. They argue that the Trade Associations' purpose is to affect public perception in this forum, which they have attempted to do so with their various contacts with this forum. This court agrees.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, the contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice" *Burger King Corp.,* 471 U.S. at 476 (quotation omitted). In determining whether this requirement is met the court should look to the "Gestalt factors", namely, 1) the defendant's burden in appearing in the court; (2) the Commonwealth's interest in hearing the suit; (3) the plaintiffs' convenience and interest in effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interest of all interested states in promoting substantive social policies. *Id.* at 476-77. "The Gestalt factors are not ends in themselves, but they are, collectively, a means of assisting the courts in achieving substantial justice." *Ticketmaster-New York, Inc. v. Alioto,* 26 F.3d 201, 209 (1st Cir. 1994).

After reviewing all the relevant factors, this court concludes that it is fair and reasonable to compel the Trade Associations to defend themselves in Massachusetts. First, the defendants have all travelled to this forum on numerous occasions to conduct business. Indeed, NSSF has conducted at least thirteen events in the Commonwealth over the past six years. In addition, SAAMI and ASSC have travelled to this forum to bring suit challenging gun regulations. It would not be unreasonable in these circumstances for the Trade Associations to appear in this Commonwealth to defend this suit. Secondly, this forum has an interest in this suit because the citizens of this commonwealth have allegedly been harmed by the Trade Association

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                 Page 14
2000 WL 34018326 (Mass.Super.)
**(Cite as: 2000 WL 34018326 (Mass.Super.))**

Defendants' failure to implement or discourage safety features or implement adequate warnings. The injuries occurred in this Commonwealth and most of the persons harmed as well as all government agencies are located here. This leads to the third factor, and this court finds that it is more convenient for the resident plaintiffs to pursue this action in Massachusetts. Finally, this forum has an interest in protecting its interest and social policies, which are evidenced by the attorney general's regulations. The "Gestalt factors," taken together, weigh in favor of the plaintiffs.

ASSC, NSSF, and SAAMI all had on-going business dealings in this Commonwealth or had specific contacts with this forum that make it not unfair for them to be subject to jurisdiction here. The Trade Associations had a pervasive presence in this Commonwealth. The Trade Associations' contacts to the Commonwealth were extensive, and purposefully directed at the citizens of this commonwealth.

**\*18** By initiating and executing its business transactions in the Commonwealth, the defendants have "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253 (1958). The Trade Associations have "not shown that the burden placed upon it by the need to defend a suit in Massachusetts outweighs the Commonwealth's 'manifest interest in providing effect means of redress for its residents.'" *Balloon Bouquets, Inc.,* 18 Mass. App. Ct. at 937 (1984).

Here, requiring the Trade Associations to defend this action in Massachusetts comports with due process.

Finally, the City asserts that the Trade Associations' motion to dismiss for lark of personal jurisdiction should be denied because the Trade Associations have consented to jurisdiction in this court by bringing a lawsuit here in a related matter. It argues that the Trade Associations should, for purposes of jurisdictional analysis, be viewed as one entity. This court need not, however, address that issue because this court has otherwise found jurisdiction proper.

*ORDER*

For the foregoing reasons, this court *DENIES* the defendants', NSSF, ASSC, and SAAMI, motion to dismiss for lack of personal jurisdiction.

2 NO. 7 Andrews Gun Indus. Litig. Rep. 8

2 NO. 7 Andrews Gun Indus. Litig. Rep. 8

2 NO. 7 Andrews Gun Indus. Litig. Rep. 8

Related Andrews Newsletter Articles(Back to Top)

2 NO. 7 Andrews Gun Indus. Litig. Rep. 8

2000 WL 34018326 (Mass.Super.)

END OF DOCUMENT

2002 ANNUAL REPORT

*O beautiful*

FOR SPACIOUS SKIES,





AIR TRANSPORT ASSOCIATION

## OFFICERS

**Carol B. Hallett**
President and CEO

**Malcolm B. "Mac" Armstrong**
Senior Vice President,
Operations and Safety

**John M. Meenan**
Senior Vice President, Industry Policy

**Edward A. Merlis**
Senior Vice President,
Legislative and International Affairs

**Robert P. Warren**
Senior Vice President,
General Counsel and Secretary

**M. Bradley Ballance**
Vice President, E-Business

**James L. Casey**
Vice President and
Deputy General Counsel

**J. Donald Collier**
Vice President,
Engineering, Maintenance
and Materiel

**Albert H. Prest**
Vice President, Flight Operations

**Nestor N. Pylypec**
Vice President, Industry Services

**John R. Ryan**
Vice President, Air Traffic Management

**Michael D. Wascom**
Vice President, Communications

**Richard T. Brandenburg**
Treasurer and Chief Financial Officer

**David A. Swierenga**
Chief Economist

## TABLE OF CONTENTS

Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
Mission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
President's Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Industry Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
   Traffic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
   Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
   Fleet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
   Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
   Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
   Balance Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
Taxes and Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
Environmental Progress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
Facts and Figures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
Definitions of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Index of Charts and Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Member Airlines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

### CREDITS
Pages 1-26: Excerpt from America the Beautiful (1913 version), by Katharine Lee Bates.
Page 3: Landscape photograph Under the Rainbow, copyright Larry Kanfer, Minneapolis.

### REPORT CONTENT
Unless otherwise noted, the data provided in this report reflects the activity of 100 U.S. scheduled airlines (Major, National and Regional passenger and cargo airlines as defined by the U.S. Department of Transportation under Chapter 411 of Title 49 of the U.S. Code—see page 19 of this report).

In some cases numbers in this report may not total, due to rounding. Certain historical data has been restated to reflect the most current information available.

## ATA MISSION

The Air Transport Association of America, Inc. serves its member airlines and their customers by:

• Assisting the airline industry in continuing to provide the world's safest system of transportation

• Transmitting technical expertise and operational knowledge among member airlines to improve safety, service and efficiency

• Advocating fair airline taxation and regulation worldwide, ensuring a profitable and competitive industry

• Developing and coordinating industry actions that are environmentally beneficial, economically reasonable and technologically feasible

*Carl D. Donaway, Chairman and CEO, ABX Air, Inc.*

Seldom have the challenges facing global business been more starkly realized than during the past tumultuous year. Now, more than ever, our industry is being counted on to help meet these challenges. Cost efficiency, always in demand, has become an imperative to survival. Companies are increasingly demanding innovative ideas and flexible solutions. An intense dedication to customer service, now a competitive advantage, may soon become a prerequisite for success. The value equation I see emerging in this new marketplace is a combination of price, performance and people. Air transport companies that are best-equipped—financially, operationally and culturally—to deliver that value are likely to be the biggest winners in the fierce competition that lies ahead.





FOR AMBER
*Waves of grain,*

ALASKA AIRLINES, INC. *John F. Kelly, Chairman*

Despite one of the nation's and aviation's darkest moments, the men and women of Alaska Airlines clearly displayed the "right stuff" and responded with strength, spirit and good old-fashioned American gumption. Blessed to be able to keep our entire 11,000-member team intact, we resolved to climb up, build back and move forward. And we were good to our promise. So, we enter our 70th year as a company stronger than ever and determined to continue our commitment to be the best we can be for all those we serve.



3



### ALOHA AIRLINES, INC. *Glenn R. Zander, President and CEO*

For more than 50 years, Aloha Airlines has served the communities of Hawaii, growing its inter-island business as tourism and the Hawaii economy expanded. In the new millennium, Aloha commenced expansion out of its traditional niche, becoming the first airline to certify the Boeing 737-700 for 180-minute extended-range operations for twin-engine aircraft. Service has been inaugurated from various points in Hawaii to Oakland and Orange County, California; Las Vegas, Nevada; and several Central Pacific islands. Aloha's plans call for continued expansion into these areas, as traffic and tourism to Hawaii recover from the aftermath of the tragic events of September 11.

## FOR PURPLE
*mountain majesties*

### ATA GOALS

The Air Transport Association of America (ATA) is the nation's oldest and largest airline trade association. U.S. members account for 95 percent of the passenger and cargo traffic carried by U.S. scheduled airlines.

In an extraordinarily dynamic industry, the ATA enables marketplace rivals to pool their unparalleled experience, technical expertise and operational knowledge, so that the industry as a whole can better serve the public and improve airline safety, service and efficiency.

The ATA also represents its members on major aviation issues in the technical, legal and political arenas. Its activities are designed to advocate and support measures that enhance aviation safety, ensure efficiency, foster growth and protect the ability of the airline industry to invest in the future, in order to meet the emerging demands of customers.

While the ATA agenda of issues continuously changes, its major priorities remain constant. Those priorities include:
• Assisting the airline industry in providing the world's safest system of transportation

# AMERICA'S AIRLINES…FROM SEA TO SHINING SEA



Last year, my message was about the challenges that lay ahead for the United States airline industry, and the confidence we had in our ability to master those challenges. The challenges we foresaw then now seem small indeed following the unthinkable outrage of September 11, 2001. The world has changed—but the strength, the resilience and the spirit of the people of our great nation have bound us together more tightly than ever.

That quality of the American spirit is, perhaps, nowhere better exemplified than among the men and women of the airline industry. Following the silence of grounded airplanes and empty airports, they knew their duty—to bring people home, to bring families and friends together, to protect our freedom to fly, to re-start the engine of commerce on which we all depend, and to tie us together from sea to shining sea. And they did just that! With an absolute sense of commitment and purpose, they gave America back its wings.

*Carol Hallett, President and CEO*

The road to restoring fully the strength of the airlines will be long and arduous. The industry, on which so much of our local and national economic vitality depends, continues to face unprecedented challenges. Working closely with government leaders, steps have been and are being taken to overcome some of those challenges. Coming together, we will accomplish our mission—linking our smaller communities and our shining cities from coast to coast with safe, secure and affordable air transportation—and bringing America together as we have always done.



• Advocating the modernization of the Federal Aviation Administration (FAA) air traffic control system, to improve service for airline customers and to benefit the environment
• Improving and refining the protection and security of airline passengers and cargo against threats directed at the United States
• Encouraging appropriate government action, while seeking to prevent legislative and regulatory intervention that would penalize airlines and their customers by imposing rate, route, service and schedule controls on the industry
• Endeavoring to reduce the disproportionate share of taxes and fees paid by airlines and their customers at the federal, state and local levels
• Improving the industry's ability to attract the capital necessary to meet future demand
• Helping to shape international aviation policy, to ensure that U.S. and foreign carriers can compete on equal terms

During its more than 65-year history, the ATA has seen the airline industry grow from the small, pioneering companies of the 1930s into key players in the global transportation market. The ATA and its members continue to play a vital role in shaping the future of air transportation.

# AIR TRANSPORT ASSOCIATION (ATA) MEMBER AIRLINES—2002

## MEMBERS

**Airborne Express**
145 Hunter Drive
Wilmington, OH 45177
937-382-5591
Carl D. Donaway*
Chairman and CEO
ABX Air, Inc.

**Alaska Airlines, Inc.**
P.O. Box 68900
Seattle-Tacoma Int'l Airport
Seattle, WA 98168
206-433-3200
John F. Kelly*
Chairman

**Aloha Airlines, Inc.**
P.O. Box 30028
Honolulu, HI 96820
808-484-1111
Glenn R. Zander*
President and CEO

**America West Airlines, Inc.**
4000 E. Sky Harbor Blvd.
Phoenix, AZ 85034
480-693-0800
W. Douglas Parker*
Chairman, President and CEO
America West Airlines and AWHC

**American Airlines, Inc.**
P.O. Box 619616
DFW Airport, TX 75261
817-963-1234
Donald J. Carty*
Chairman and CEO
American Airlines and AMR

**American Trans Air, Inc.**
P.O. Box 51609
Indianapolis, IN 46251
317-247-4000
John P. Tague*
President and CEO

**Atlas Air, Inc.**
2000 Westchester Avenue
Purchase, NY 10577
914-701-8000
Richard H. Shuyler*
CEO

**Continental Airlines, Inc.**
1600 Smith Street
Houston, TX 77002
713-324-5000
Gordon M. Bethune*
Chairman and CEO

**Delta Air Lines, Inc.**
P.O. Box 20706
Atlanta, GA 30320
404-715-2600
Leo F. Mullin*
Chairman and CEO

**DHL Airways, Inc.**
P.O. Box 66633
Chicago, IL 60666
847-842-6300
Joseph R. O'Gorman*
Chairman, President and CEO

**Emery Worldwide Airlines**
One Emery Plaza
Vandalia, OH 45377
937-415-7500
Jerry Trimarco*
CEO

**Evergreen International
Airlines, Inc.**
3850 Three Mile Lane
McMinnville, OR 97128
503-472-0011
Anthony E. Bauckham*
President

**FedEx Corporation**
942 South Shady Grove Road
Memphis, TN 38120
901-369-3600
Frederick W. Smith*
Chairman and CEO

**Hawaiian Airlines**
P.O. Box 30008
Honolulu, HI 96820
808-835-3700
Paul J. Casey*1
Vice Chairman, President and CEO

**JetBlue Airways Corp.**
80-02 Kew Gardens Road
Kew Gardens, NY 11415
718-286-7900
David G. Neeleman*
CEO

**Midwest Express Airlines, Inc.**
6744 South Howell Avenue
Oak Creek, WI 53154
414-570-4000
Timothy E. Hoeksema*
Chairman, President and CEO

**Northwest Airlines, Inc.**
2700 Lone Oak Parkway
St. Paul, MN 55121
612-726-2111
Richard H. Anderson*
CEO

**Polar Air Cargo**
100 Oceangate, 15th Floor
Long Beach, CA 90802
562-528-7227
Jim Jensen*
President and COO

**Southwest Airlines Co.**
P.O. Box 36611, Love Field
Dallas, TX 75235
214-792-4000
Herbert D. Kelleher*
Chairman

**United Airlines, Inc.**
P.O. Box 66100
Chicago, IL 60666
847-700-4000
John W. Creighton, Jr.*
Chairman and CEO

**UPS Airlines**
1400 N. Hurstbourne Parkway
Louisville, KY 40223
502-329-3000
Thomas H. Weidemeyer*
President

**US Airways, Inc.**
2345 Crystal Drive
Arlington, VA 22227
703-872-7000
David N. Siegel*
President and CEO
US Airways Group, Inc.

## ASSOCIATE MEMBERS

**Aeromexico**
Paseo de la Reforma 445
12th Floor
Mexico City, D. F. 06500
Mexico
525-133-4004
Alfonso Pasquel
President and CEO

**Air Canada**
Air Canada Centre
P.O. Box 14000
Canada H4Y 1H4
514-422-5000
Robert A. Milton
President and CEO

**KLM Royal Dutch Airlines**
Amsterdamseweg 55
1182 GP, Amstelveen
The Netherlands
31-20-649-9123
Leo M. van Wijk
President and CEO

**Mexicana**
Xola 535, 30th Floor
Mexico City, D.F. 03100
Mexico
525-448-3000
Fernando Flores
President and CEO

---

* Member, ATA Board of Directors.
1 Effective May 17, 2002, John W. Adams assumed the titles of Chairman, President and CEO.



AIR TRANSPORT ASSOCIATION

**Air Transport Association of America, Inc.**
1301 Pennsylvania Avenue, NW - Suite 1100
Washington, DC  20004-1707
USA
202-626-4000

www.airlines.org

© 2002 Air Transport Association of America, Inc. All rights reserved.

**A839**

About Us



## What is the ATA?

**The ATA is the Air Transport Association of America.**

Founded by a group of 14 airlines meeting in Chicago in 1936, ATA was the first and remains the only trade organization of the principal U.S. airlines. In that capacity it has played a major role in all the major government decisions regarding aviation since its founding, including the creation of the Civil Aeronautics Board, the creation of the air traffic control system, airline deregulation, and most recently in dealing with the aftermath of the 9/11 attack on America.

ATA serves its member airlines and their customers by assisting the airline industry in providing the world's safest system of transportation; transmitting technical expertise and operational knowledge among member airlines to improve safety, service and efficiency; advocating fair airline taxation and regulation worldwide to foster an economically healthy and competitive industry; and by developing and coordinating industry actions that are environmentally beneficial, economically reasonable and technologically feasible.

The fundamental purpose of the association is to foster a business environment that will permit U.S. airlines to flourish. By working with members in the technical, legal and political arenas, ATA supports measures that enhance aviation safety, security and industry well-being. During its history, ATA has seen the airline industry and its members evolve from the small, pioneering companies of the 1930s into key players in the global transportation market. ATA and its members continue to play a vital role in shaping the future of air transportation.

ATA is recognized by Congress, state legislatures, the Department of Transportation, the Federal Aviation Administration, the Department of Homeland Security, the Transportation Security Administration, the press and the public for its professional and accomplished representation of the industry. As its members chart their futures in an ever changing market, ATA provides invaluable expertise, guidance and assistance.

The structure of ATA is similar to most airlines and provides an interface between the carriers and various government and private-sector organizations. Key departments within the association deal with operations and safety, engineering, maintenance and materiel, airport operations, security, air traffic management, cargo, e-business, economics, facilitation, federal and state government affairs, international affairs, legal affairs, passenger services, communications and public relations. Working with these established functions are a variety of ATA councils, committees, subcommittees and task forces – composed of experts from member airlines – formed to address industry issues.

Today, the Air Transport Association continues to represent the industry on major aviation issues before Congress, federal agencies, state legislatures and other governmental bodies. ATA continues to promote safety by coordinating industry and government safety programs, and serves as a focal point for industry efforts to standardize practices and enhance the efficiency of the air transport system.

Members Only | Help | Search | Site Map | Legal Notices
©1995-2005 The Air Transport Association of America, Inc. All Rights Reserved. ata@airlines.org

MASSACHUSETTS REPORT



THE ECONOMIC BENEFITS OF

# AVIATION

TO THE U.S. ECONOMY AND THE

POTENTIAL IMPACT OF

SERVICE DISRUPTIONS





THE ECONOMIC BENEFITS OF

# AVIATION

TO THE U.S. ECONOMY AND THE POTENTIAL

IMPACT OF SERVICE DISRUPTIONS

## OVERVIEW

Communities for Economic Strength Through Aviation (CESTA) is a national coalition of more than 500 members consisting of business associations, economic development authorities, airports, travel and tourism bureaus, and state and local community representatives. CESTA was formed to protect our nation's economy and our communities from the costs of passenger and cargo air service disruptions related to airline labor negotiations. These disruptions occur when a breakdown in negotiations leads to slowdowns and strikes, or, over the long term, when unsustainable labor agreements threaten the viability of service to small and medium-sized communities.

CESTA has attracted a diverse membership based on the commonly accepted premise that the movement of passengers and goods by air is essential to America's economy. But what is the economic importance of aviation for individual states? And how deep is the economic damage in the event of harmful service disruptions?

The answers to these important questions are contained on the following pages. This analysis, conducted for CESTA by The Campbell-Hill Aviation Group, Inc., applies conventional and accepted statistical methods to U.S. government economic data and existing studies to quantify the economic importance of aviation, by industry, at the state level.

The aviation industry is facing its most daunting financial challenge in history, marked by restructuring, bankruptcy, and massive job loss. The urgency of finding ways for this industry to right itself and meet the transportation needs of our economy without disruption could not be more clear.

This analysis fully demonstrates that states and communities rely heavily on aviation as an economic engine. It also shows in quantifiable terms that disruptions in air service pose real economic threats to states and communities.



## KEY FINDINGS

This analysis makes the following key points:

**Aviation's economic benefits reach into every state and local economy, boosting gross domestic product (GDP) and personal earnings, and creating jobs.** The statewide impact is examined in three ways:

1. **GDP**, which measures the direct impact on output and employment of the aviation industry, combined with the indirect impact of aviation on the output and employment of other industries that rely on aviation.[1]

2. **Personal Earnings**, which is the sum of the wages and salaries paid to all employed persons produced by the direct and indirect impacts of aviation, and the induced impact of such wages and salaries on household income.

3. **Jobs**, which includes the number of people employed directly by the aviation industry, the aviation-oriented share of those that are employed in sectors that support the industry, and those working in other industries that benefit indirectly from aviation. For example in Louisiana, aviation generates more than 4,000 agriculture jobs, which is 13 percent of the state's total employment in agriculture.

To put the economic importance of aviation in a national context, state-by-state aviation GDP, personal earnings, and employment are ranked by absolute size. Equally useful is ranking aviation as a percentage of the state's economy, which shows the level of importance to each particular state relative to all other states. For example, at $12.7 billion, Nevada ranks 24th in aviation-related GDP in absolute dollars. But aviation accounts for 19 percent of the state's total GDP, giving Nevada the No. 1 ranking when comparing this percentage with other states.

**Disruptions in air service cause harmful economic losses for states and local communities.** The study assesses the daily economic costs of 10, 25, 50, 75, and 100 percent reductions in air service benefits. Because of the many variables that characterize actual disruptions in service – strike, slowdown, service cutback, type of airline, duration of strike, transportation alternatives – it is impossible to determine the precise economic impact.

However, these statistics describe the potential economic damages that would result from varying levels of disruptions in service. For example, in Florida, Delta Air Lines carries 26 percent of the originating passengers. While no exact correlation can be made, we can look at a 25 percent reduction in aviation-related benefits as a proxy for the potential harm to Florida's economy if that level of service were to be eliminated.

The economic costs of strikes and other disruptions can be expressed in several different ways. Because strikes and other disruptions are often measured in days, we have calculated economic costs in three ways:

1. **Lost GDP Per Day**, which measures the estimated daily loss of aviation-related output and employment.

2. **Lost Personal Earnings Per Day**, which measures the estimated daily loss of wages and salaries paid to all aviation-related employees and the impact of such wages and salaries on household income.

3. **Lost Employment Productivity**, which measures the estimated daily loss in man-hours from aviation-related jobs.

For example, if a disruption in air service caused a 25 percent reduction in benefits, Florida would lose $30.9 million per day in GDP, $9.4 million per day in personal earnings, and 1.4 million man-hours per day in employment productivity.



## METHODOLOGY

The economic impact of commercial aviation comprises all sectors of commercial aviation, including scheduled passenger and freight, general aviation, and aircraft manufacturing.[2] It includes direct, indirect, and induced impacts. Total U.S. impacts for the year 2000 were $904 billion in output, $258 billion in personal earnings, and 11.2 million jobs.[3] The economic impact of aviation by state is calculated in several analytical steps based on economic activity by sector (e.g., agriculture, manufacturing, transportation).

The national economic impact of commercial aviation is assigned by industry group using distributions in the year 2000 Wilbur Smith Associates study, "The Economic Impact of Civil Aviation."[4] National impacts by industry group are then allocated to the 50 states and the District of Columbia based on the distribution of gross state product, personal earnings, and employment for each economic sector.[5] At the national level, for example, the agriculture industry group accounts for 1.57 percent of the economic impact of commercial aviation, or $14.2 billion (1.57 percent x $904 billion). If California accounts for 18.1 percent of the nation's agricultural output, the amount of aviation impact on California attributable to agriculture would be $2.6 billion. Aviation's impact on each additional economic sector is calculated similarly and summed to determine the total aviation economic impact for each state.

Any questions regarding CESTA should be directed to info@cestacoalition.org, and any questions regarding the methodology employed in this analysis should be directed to The Campbell-Hill Aviation Group, Inc., at chag@air-econ.com.

---

[1] For the purpose of this analysis, "GDP" reflects the sum of gross state products, excluding output associated with mining and government.

[2] The Campbell-Hill Aviation Group estimates that, on a national basis, passenger airlines produced approximately 75 percent of economic benefits and all-cargo/express airlines produced approximately 25 percent.

[3] "The National Economic Impact of Civil Aviation," Global Insight/The Campbell-Hill Aviation Group, July 2002, http://www.globalinsight.com.

[4] "Economic Impact of Civil Aviation," Wilbur Smith Associates, 2000, http://www.airlines.org/public/industry/bin/WilburSmith.pdf, Exhibit 8, p. 7.

[5] U.S. Department of Commerce, Bureau of Economic Analysis, Year 2000 Regional Accounts Data, Gross State Product Data; Agriculture, Forest, Fisheries, Farms, Agricultural Services; http://www.bea.gov/bea/regional/gsp.





# MASSACHUSETTS

## Benefits of Aviation and Costs of Potential Service Disruption



### Annual Statewide Economic Importance of Aviation and National Rankings

| MASSACHUSETTS | Aviation Impact | U.S. Rank | Share of State Total | U.S. Rank |
|---|---|---|---|---|
| GDP | $23.7 billion | 12th | 9% of state GDP | 45th |
| Personal earnings | $7.6 billion | 11th | 5% of state personal earnings | 45th |
| Employment | 256,300 jobs | 13th | 7% of state employment | 46th |

### If a disruption in air service caused a 25% reduction in benefits, Massachusetts would lose:

- $16.2 million per day in GDP
- $5.2 million per day in personal earnings
- 513,000 man-hours per day in employment productivity





## Annual Aviation Impact on Massachusetts's Economy

| MASSACHUSETTS | GDP ($ million) Total Impact | Personal Earnings ($ million) Total Impact | Employment (000 jobs) Total Impact |
|---|---|---|---|
| Agriculture | $162 | $62 | 5.3 |
| Construction | $789 | $254 | 7.9 |
| Manufacturing | $3,928 | $1,078 | 24.1 |
| Transportation | $2,303 | $783 | 11.1 |
| Communications | $353 | $90 | 1.8 |
| Utilities | $441 | $66 | 1.0 |
| Wholesale Trade | $965 | $362 | 7.9 |
| Retail Trade | $1,370 | $581 | 32.6 |
| Real Estate | $2,212 | $88 | 4.5 |
| Finance/Insurance | $1,553 | $601 | 11.8 |
| Lodging/Entertainment | $2,373 | $778 | 67.2 |
| Business Services | $3,354 | $1,628 | 38.8 |
| Health Services | $1,102 | $562 | 17.3 |
| Personal/Other Services | $2,816 | $667 | 24.8 |
| Total | $23,721 | $7,601 | 256.3 |
| National Rank for Total * | 12 | 11 | 13 |

*State ranking out of 50 states plus District of Columbia



## Estimated Daily Loss to Massachusetts's Economy Due to Reduction in Aviation Benefits

| MASSACHUSETTS | Reduction in Aviation Benefits | | | | | |
|---|---|---|---|---|---|---|
| | **10%** | **15%** | **25%** | **50%** | **75%** | **100%** |
| **GDP ($ million)** | $6.5 | $9.7 | $16.2 | $32.4 | $48.6 | $64.8 |
| **Personal earnings ($ million)** | $2.1 | $3.1 | $5.2 | $10.4 | $15.6 | $21.0 |
| **Employment productivity (000 man-hours)** | 205 | 308 | 513 | 1,025 | 1,538 | 2,050 |



**Loss Per Day in GDP**







## Massachusetts Passenger Traffic



* Year ended March 2002, Source: USDOT



Source: GCR's 2003 ACAIS

## CY 2003 Commercial Service Airports

| RO | ST | Locid | Airport Name | City | Svc Lvl | Hub | CY 2003 Enplanements |
|----|----|-------|--------------|------|---------|-----|----------------------|
| SO | GA | ATL | Hartsfield - Jackson Atlanta Intl | Atlanta | P | L | 38,893,670 |
| GL | IL | ORD | Chicago O'Hare Intl | Chicago | P | L | 32,920,387 |
| WP | CA | LAX | Los Angeles Intl | Los Angeles | P | L | 26,239,584 |
| SW | TX | DFW | Dallas/Fort Worth Intl | Fort Worth | P | L | 24,976,683 |
| WP | AZ | PHX | Phoenix Sky Harbor Intl | Phoenix | P | L | 18,252,853 |
| NM | CO | DEN | Denver Intl | Denver | P | L | 17,969,754 |
| WP | NV | LAS | McCarran Intl | Las Vegas | P | L | 17,097,738 |
| SW | TX | IAH | George Bush Intercontinental | Houston | P | L | 16,134,684 |
| GL | MN | MSP | Minneapolis - St Paul Intl Wold - Chamberlain | Minneapolis | P | L | 16,022,988 |
| GL | MI | DTW | Detroit Metropolitan Wayne County | Detroit | P | L | 15,754,017 |
| EA | NY | JFK | John F Kennedy Intl | New York | P | L | 15,676,352 |
| EA | NJ | EWR | Newark Liberty Intl | Newark | P | L | 14,628,708 |
| SO | FL | MIA | Miami Intl | Miami | P | L | 14,198,321 |
| WP | CA | SFO | San Francisco Intl | San Francisco | P | L | 14,079,173 |
| SO | FL | MCO | Orlando Intl | Orlando | P | L | 13,375,162 |
| NM | WA | SEA | Seattle - Tacoma Intl | Seattle | P | L | 13,109,153 |
| EA | PA | PHL | Philadelphia Intl | Philadelphia | P | L | 11,870,928 |
| SO | NC | CLT | Charlotte/Douglas Intl | Charlotte | P | L | 11,465,366 |
| EA | NY | LGA | La Guardia | New York | P | L | 11,367,309 |
| NE | MA | BOS | General Edward Lawrence Logan Intl | Boston | P | L | 11,087,799 |
| SO | KY | CVG | Cincinnati/Northern Kentucky Intl | Covington | P | L | 10,449,930 |
| CE | MO | STL | Lambert - St Louis Intl | St Louis | P | L | 9,922,456 |
| EA | MD | BWI | Baltimore - Washington Intl | Glen Burnie | P | L | 9,768,040 |
| WP | HI | HNL | Honolulu Intl | Honolulu | P | L | 9,044,409 |
| NM | UT | SLC | Salt Lake City Intl | Salt Lake City | P | L | 8,958,003 |
| GL | IL | MDW | Chicago Midway Intl | Chicago | P | L | 8,687,215 |
| SO | FL | FLL | Fort Lauderdale/Hollywood Intl | Fort Lauderdale | P | L | 8,682,781 |
| EA | VA | IAD | Washington Dulles Intl | Chantilly | P | L | 8,050,506 |
| SO | FL | TPA | Tampa Intl | Tampa | P | L | 7,672,533 |
| WP | CA | SAN | San Diego Intl | San Diego | P | L | 7,565,196 |
| EA | PA | PIT | Pittsburgh Intl | Pittsburgh | P | L | 7,113,460 |
| EA | VA | DCA | Ronald Reagan Washington National | Arlington | P | L | 6,813,148 |
| WP | CA | OAK | Metropolitan Oakland Intl | Oakland | P | L | 6,638,343 |
| | | | 33 | L Total | | | 464,486,847 |
| NM | OR | PDX | Portland Intl | Portland | P | M | 6,059,860 |
| SO | TN | MEM | Memphis Intl | Memphis | P | M | 5,411,496 |
| WP | CA | SJC | Norman Y Mineta San Jose Intl | San Jose | P | M | 5,104,201 |
| GL | OH | CLE | Cleveland - Hopkins Intl | Cleveland | P | M | 5,012,446 |
| CE | MO | MCI | Kansas City Intl | Kansas City | P | M | 4,860,047 |
| SO | PR | SJU | Luis Munoz Marin Intl | San Juan | P | M | 4,706,846 |
| SW | LA | MSY | Louis Armstrong New Orleans Intl | Metairie | P | M | 4,647,706 |
| WP | CA | SMF | Sacramento Intl | Sacramento | P | M | 4,390,847 |
| WP | CA | SNA | John Wayne Airport - Orange County | Santa Ana | P | M | 4,266,083 |
| SO | TN | BNA | Nashville Intl | Nashville | P | M | 3,943,236 |
| SO | NC | RDU | Raleigh - Durham Intl | Raleigh | P | M | 3,938,925 |
| SW | TX | HOU | William P Hobby | Houston | P | M | 3,703,767 |
| GL | IN | IND | Indianapolis Intl | Indianapolis | P | M | 3,673,648 |
| SW | TX | AUS | Austin - Bergstrom Intl | Austin | P | M | 3,177,889 |
| SW | TX | SAT | San Antonio Intl | San Antonio | P | M | 3,120,098 |
| GL | WI | MKE | General Mitchell Intl | Milwaukee | P | M | 3,114,864 |
| NE | CT | BDL | Bradley Intl | Windsor Locks | P | M | 3,098,556 |
| WP | CA | ONT | Ontario Intl | Ontario | P | M | 3,089,025 |
| GL | OH | CMH | Port Columbus Intl | Columbus | P | M | 3,050,585 |

PFC Approved Locations

as of January 31, 2005

Locations approved to collect at a $4.50 PFC level are indicated by a shaded row.

| Associated City | State | Airport Name | LOC ID | Hub Size | Level | Total Approved | Duration | Start Date | Est Expir Date |
|---|---|---|---|---|---|---|---|---|---|
| Cumberland | MD | Greater Cumberland Reg | CBE | | $3.00 | $150,000 | 5y | 7/1/1994 | 7/1/1999 |
| Cumberland | MD | Greater Cumberland Reg | CBE | | $3.00 | * | 6y8m | 10/1/1999 | 6/1/2006 |
| Hagerstown | MD | Hagerstown Reg | HGR | N | $3.00 | $308,867 | 2y7m | 8/1/1999 | 3/1/2002 |
| Hagerstown | MD | Hagerstown Reg | HGR | N | $4.50 | ** | 3y2m | 3/1/2002 | 1/1/2004 |
| Hagerstown | MD | Hagerstown Reg | HGR | N | $4.50 | $415,188 | 3y11m | 1/1/2004 | 12/1/2007 |
| Salisbury | MD | Salisbury-Ocean City Wicomico Reg | SBY | N | $3.00 | $440,892 | 3y5m | 2/1/2002 | 7/1/2005 |
| Boston | MA | Logan Intl | BOS | L | $3.00 | $927,353,000 | 23y11m | 11/1/1993 | 10/1/2017 |
| Worcester | MA | Worcester Reg | ORH | N | $3.00 | $220,780 | 5y | 10/1/1992 | 10/1/1997 |
| Worcester | MA | Worcester Reg | ORH | N | $3.00 | $1,414,973 | 7y3m | 9/1/1999 | 12/1/2006 |
| Alpena | MI | Alpena Co Reg | APN | N | $3.00 | $268,480 | 8y3m | 8/1/2001 | 11/1/2009 |
| Detroit | MI | Detroit City | DET | | $3.00 | $3,650,000 | 4y2m | 1/1/2000 | 3/1/2004 |
| Detroit | MI | Detroit Metro | DTW | L | $3.00 | $2,198,215,360 | 8y9m | 1/1/1993 | 10/1/2001 |
| Detroit | MI | Detroit Metro | DTW | L | $4.50 | ** | 24y7m | 10/1/2001 | 5/1/2026 |
| Detroit | MI | Detroit Metro | DTW | L | $4.50 | $709,097,156 | 6y5m | 5/1/2026 | 10/1/2032 |
| Escanaba | MI | Delta Co | ESC | CS | $3.00 | $165,898 | 5y | 2/1/1993 | 11/1/1997 |
| Escanaba | MI | Delta Co | ESC | CS | $3.00 | $182,700 | 1y11m | 8/1/1998 | 7/1/2000 |
| Escanaba | MI | Delta Co | ESC | CS | $3.00 | $117,900 | 2y5m | 10/1/2001 | 3/1/2004 |
| Escanaba | MI | Delta Co | ESC | CS | $4.50 | $40,000 | 1y10m | 3/1/2004 | 1/1/2006 |
| Flint | MI | Bishop Intl | FNT | S | $3.00 | $32,296,450 | 37y | 9/1/1993 | 10/1/2001 |
| Flint | MI | Bishop Intl | FNT | S | $4.50 | ** | 16y3m | 10/1/2001 | 1/1/2018 |
| Grand Rapids | MI | Gerald R  Ford Intl | GRR | S | $3.00 | $94,359,802 | 27y7m | 12/1/1992 | 7/1/2019 |
| Hancock | MI | Houghton Co Mem | CMX | N | $3.00 | $164,920 | 2y8m | 7/1/1993 | 3/1/1996 |
| Hancock | MI | Houghton Co Mem | CMX | N | $3.00 | $145,529 | 3y | 7/1/1996 | 7/1/1999 |
| Hancock | MI | Houghton Co Mem | CMX | N | $3.00 | $483,044 | 7y7m | 10/1/1999 | 5/1/2007 |
| Iron Mountain Kingsford | MI | Ford | IMT | CS | $3.00 | $204,029 | 8y3m | 9/1/1995 | 12/1/2003 |
| Ironwood | MI | Gogebic Co | IWD | | $3.00 | $74,690 | 13y2m | 8/1/1993 | 10/1/2006 |
| Kalamazoo | MI | Kalamazoo/Battle Crk | AZO | N | $3.00 | $1,191,749 | 3y2m | 4/1/1997 | 6/1/2000 |
| Kalamazoo | MI | Kalamazoo/Battle Crk | AZO | N | $3.00 | $5,378,376 | 4y | 1/1/2001 | 1/1/2005 |
| Kalamazoo | MI | Kalamazoo/Battle Crk | AZO | N | $4.50 | ** | 1y4m | 1/1/2005 | 5/1/2006 |
| Lansing | MI | Capital City | LAN | N | $3.00 | $15,289,278 | 8y9m | 10/1/1993 | 7/1/2002 |
| Lansing | MI | Capital City | LAN | N | $4.50 | ** | 6y | 7/1/2002 | 7/1/2008 |
| Marquette | MI | Marquette Co | MQT | N | $3.00 | $60,999 | 4y | 12/1/1992 | 12/1/1996 |
| Marquette | MI | Marquette Co/Sawyer Intl | MQT/SAW | N | $3.00 | $1,077,540 | 4y3m | 4/1/1998 | 7/1/2002 |
| Marquette | MI | Marquette Co/Sawyer Intl | MQT/SAW | N | $4.50 | ** | 6m | 7/1/2002 | 1/1/2003 |
| Marquette | MI | Marquette Co/Sawyer Intl | MQT/SAW | N | $4.50 | $773,078 | 3y2m | 1/1/2003 | 3/1/2006 |
| Muskegon | MI | Muskegon Co | MKG | N | $3.00 | $5,013,088 | 10y | 5/1/1994 | 5/1/2004 |
| Muskegon | MI | Muskegon Co | MKG | N | $4.50 | ** | 16y6m | 5/1/2004 | 11/1/2020 |
| Pellston | MI | Pellston Reg | PLN | N | $3.00 | $140,391 | 4y6m | 3/1/1993 | 9/1/1997 |
| Pellston | MI | Pellston Reg | PLN | N | $3.00 | $870,221 | 13y7m | 12/1/1997 | 7/1/2011 |
| Saginaw | MI | MBS Intl | MBS | N | $3.00 | $8,925,189 | 13y2m | 2/1/1997 | 4/1/2010 |
| Traverse City | MI | Cherry Capital | TVC | N | $3.00 | $14,354,594 | 5y | 1/1/1997 | 1/1/2002 |
| Traverse City | MI | Cherry Capital | TVC | N | $4.50 | ** | 15y | 1/1/2002 | 1/1/2017 |
| Traverse City | MI | Cherry Capital | TVC | N | $4.50 | $1,610,804 | 2y3m | 1/1/2017 | 4/1/2019 |
| Bemidji | MN | Bemidji-Beltrami Co | BJI | N | $3.00 | $368,221 | 5y3m | 11/1/1996 | 2/1/2002 |
| Bemidji | MN | Bemidji-Beltrami Co | BJI | N | $4.50 | $416,452 | 3y6m | 2/1/2002 | 8/1/2005 |
| Brainerd | MN | Brainerd-Crow Wing Co Reg | BRD | N | $3.00 | $313,475 | 7y11m | 8/1/1993 | 7/1/2001 |
| Brainerd | MN | Brainerd-Crow Wing Co Reg | BRD | N | $4.50 | $488,231 | 5y | 7/1/2001 | 7/1/2006 |

**FAA Home    Site Map    DOT    Ask FAA    Search**

National Links

Airports Home Page
PFC Reports

## PFC Reports



Readers




### Key Passenger Facility Charge Statistics
### As of August 31, 2003

**Applications Decided:**

• 341 locations approved for collection of PFCs (includes 86 of the top 100 airports)

• 1,171 applications approved or partially approved

• 1 application disapproved (Austin, TX)

• Total approved collections: approximately $42.5 billion

• Locations collecting as of September 1, 2003: 316

• Actual collections from CY92 to CY02: $12.8 billion

```
CY92: $    85,437,686
CY93: $   485,112,053
CY94: $   849,330,244
CY95: $1,046,234,802
CY96: $1,113,999,014
CY97: $1,222,882,438
CY98: $1,448,671,813
CY99: $1,514,695,981
CY00: $1,557,221,630
CY01: $1,585,700,220
CY02: $1,856,714,907
```

• Estimated collections from January 1, 2003, through August 31, 2003: $1.385 billion

• Estimated rate of net collection for September 2003: $177.0 million

• Estimated collections (based on current approvals) for

```
CY03 - $2.092 billion
FY03 - $2.096 billion
CY04 - $2.041 billion
FY04 - $2.069 billion
```

• Airports approved to collect at $4.50 PFC level:

```
165 - small hub, non hub, and commercial service
 33 - large and medium hub
```

Source: FAA, Financial Analysis and Passenger Facility Charge Branch (APP-510)



BACK
TO TOP

---

Questions about this page?          Accessibility          Privacy Policy

**For further information, please contact:**

Federal Aviation Administration
Airports
800 Independence Avenue SW
Washington DC 20591

Page Last Updated: September 02, 2003

## $50M plane ticket to ride; Lawsuit exposes airline windfall; [All Editions]

*J.M. Lawrence*. **Boston Herald**. Boston, Mass.: Nov 28, 2004. pg. 004

**Abstract** (Document Summary)

"I understand the airlines are having their problems," [Evans J. Carter] said after dropping four bankrupt airlines from the lawsuit. "But it just doesn't seem fair or right. They are the least entitled to this money and they're the ones who keep it."

Among the airlines named in the lawsuit are Delta, American, Alaska, ATA, Continental, China Eastern, Lufthansa, SwissAir, British Airways and Alitalia. Lawyers for the airlines have yet to respond to the lawsuit.

The lead plaintiff in Carter's case is Robert J. Harrington of Framingham, a business traveler who forfeited a nonrefundable US Airways ticket in 2002. He couldn't be reached for comment.

**Full Text** (618 words)

*Copyright Boston Herald Library Nov 28, 2004*

Airlines worldwide are ripping off passengers and the government for more than $50 million every year in fees and taxes they pocket after reselling nonrefundable tickets, a passengers' class action lawsuit now pending in Massachusetts claims.

"That seat is paid for twice as far as these fees but they keep it," says Framingham attorney Evans J. Carter, who sued 13 airlines this month in Middlesex Superior Court on behalf of 16 frequent fliers.

Give up your nonrefundable seat today on one of the busiest travel days of the year and the airline is sure to resell the ticket for a windfall.

It's a dirty little secret of the skies that the government so far has been loathe to expose amid the airlines' economic woes since 9/11, according to industry experts.

"It would open the door to a massive accounting nightmare. They would have to adjudicate every ticket and retrieve it from the various buckets," said one industry consultant, who spoke on condition of anonymity.

The consultant called Carter's $50 million estimate for the "unjust enrichments" too low.

"The airlines have made a big business out of these fees," the source said. In fact, an average of 26 percent of your ticket is now fees and taxes, according to the industry's estimates.

"They've passed so much on to consumers that it's difficult to deduce what's a tax and what isn't," the industry consultant said.

The practice has gotten so out of hand that the Department of Transportation issued a notice on Nov. 5 ordering airlines to stop taking out ads with eye-popping low fares and teeny fine print showing the real costs. DOT said it will "no longer allow the separate listing of `government-approved' surcharges" in fare ads.

Carter is specifically taking aim at add-ons known as the Passenger Facility Charge User Fee (about $9), segment fees ($3.10 per trip leg) and foreign landing taxes.

A PFC is a charge approved by the government based on capital improvements at airports - a scheme Carter says keeps every airport perpetually under construction.

"I understand the airlines are having their problems," Carter said after dropping four bankrupt airlines from the lawsuit. "But it just doesn't seem fair or right. They are the least entitled to this money and

they're the ones who keep it."

Among the airlines named in the lawsuit are Delta, American, Alaska, ATA, Continental, China Eastern, Lufthansa, SwissAir, British Airways and Alitalia. Lawyers for the airlines have yet to respond to the lawsuit.

The lead plaintiff in Carter's case is Robert J. Harrington of Framingham, a business traveler who forfeited a nonrefundable US Airways ticket in 2002. He couldn't be reached for comment.

The government also is losing out on federal excise taxes when a seat is re-sold. "Some airlines are giving it back and some aren't," the source said. "There needs to be some clarity, some kind of policy the airlines would adopt en masse."

Airline execs, meanwhile, claim their industry is taxed at a higher rate than alcohol, phone service and trains, while the money goes to support other aviation sectors besides commercial passenger flights.

In a speech to industry leaders in Washington in September, Jim May, president and CEO for ATA, called for an overhaul of security fees and taxes so that dollars go back into commercial airports. He said airlines have paid back the $5 billion in government subsidies given after 9/11.

Runway ripoff

Here are some typical taxes and fees on a $300 ticket:

Base fare: $260.28

- Federal tax: $19.52

- Federal flight segment tax: $6.20

- Federal security surcharge: $5

- Airport Passenger Facility Charge: $9

Total taxes and fees: almost $40 or 13 percent of ticket.

 Source: Air Transport Association

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

People:              Carter, Evans J
Section:             *NEWS*
ISSN/ISBN:     07385854
Text Word Count  618
Document URL:

**Internal Revenue Service**

Index Number: 4261.00-00

Mr. Evans J. Carter
Hargraves, Karb, Wilcox & Galvani, LLP
550 Cochituate Road
P.O. Box 966
Framingham, MA 01701-0966]

Department of the Treasury

Washington, DC 20224

Person to Contact:
Patrick S. Kirwan
Telephone Number:
(202) 622-3130
Refer Reply To:
CC:P&SI:Br.8-GENIN156740-02
Date:

OCT 3 1 2002

Dear Mr. Carter:

I am responding to your facsimile transmission dated October 17, 2002, as supplemented by a second facsimile dated October 21, 2002. Your inquiry relates to the federal air transportation taxes. You ask whether the Internal Revenue Service allows airlines to keep certain fees and taxes collected from the person paying for air transportation when that person does not use the air transportation. Specifically, your inquiry focuses on the Passenger Facilities Charge (PFC), the Zip tax (identified by you as "[a]pproximately $3 as government security for airport used"), and the tax imposed by § 4261 of the Internal Revenue Code.

Regarding the PFC and the Zip tax, the IRS has no regulatory authority over these charges and no authority over airlines concerning their collection or disposition. Thus, we are unable to respond to this portion of your inquiry. Regarding the tax imposed by § 4261, we provide the following information. Section 4261(a) imposes an excise tax of 7.5 percent of the amount paid for the taxable transportation of persons. Generally, taxable transportation is transportation beginning and ending in the United States or in those parts of Canada and Mexico not more than 225 miles from the continental United States. See § 4262. Under § 4261(d), the tax is paid by the person making the payment for the taxable transportation. The person receiving the payment subject to tax collects the tax and remits the tax to the government. See § 4291. Thus, a collector may not retain amounts collected as tax.

As stated above, the § 4261 tax applies to amounts paid for taxable transportation. The fact that a person does not use the air transportation does not retroactively render the payment as being made for something other than taxable transportation. Thus, if a person pays an amount for taxable transportation where the ticket is nonrefundable and then fails to use the transportation, that person has not made an overpayment of tax and is not entitled to a refund of the excise tax paid. Conversely, if the ticket is refundable and the person that fails to use the transportation receives a refund of the

2

amount paid for the transportation, an overpayment of the excise tax has been made and the person that paid the tax is entitled to a refund. In such a circumstance, the collector may refund the tax paid, § 6415(d), but may not be forced to do so. If the collector elects not to refund the tax paid along with the amount paid for the transportation, the person must seek a refund from the IRS. Kaucky v. Southwest Airlines Company, 109 F.3d 349 (7th Cir. 1997). However, amounts collected as tax and remitted to the government may not be refunded to the collector, nor may the collector take those amounts as a credit, without showing that the tax has been refunded to the person from whom it was collected or obtaining the consent of that person. § 6415. Thus, a collector may not retain the § 4261 tax where the person making the payment subject to tax does not use the transportation.

If you have any questions, please contact me at (202) 622-3130.

Sincerely,

Associate Chief Counsel
(Passthroughs and Special Industries)

By:

Richard A. Kocak
Chief, Branch 8